MICHAEL GEARY WILSON
818 Tampico, Walnut Creek, CA 94598
Mobile: 925.270.6017
Fax: 925.848.0178
michaelgearywilson@hotmail.com
SELF-REPRESENTED NON-LAWYER PLAINTIFF

FILED
JUN 23 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CV20 4160

SAN FRANCISCO-OAKLAND DIVISION

WHA

| | |
|---|---|
| MICHAEL GEARY WILSON<br>PLAINTIFF,<br>vs.<br>**_GOVERNMENT ENTITIES_**<br>COUNTY OF CONTRA COSTA (CCC),<br>SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY<br>OF CONTRA COSTA (CCC COURT),<br>CONTRA COSTA COUNTY OFFICE OF EDUCATION<br>(CCCOE),<br>CITY OF CONCORD,<br>CITY OF OAKLAND,<br>CITY OF PLEASANT HILL,<br>CITY OF WALNUT CREEK,<br>CENTRAL MARIN POLICE AUTHORITY (CMPA),<br>MOUNT DIABLO UNIFIED SCHOOL DISTRICT/SPECIAL<br>EDUCATION LOCAL PLAN AREA<br>(DIABLO),<br>COUNTY OF MARIN (MC),<br>SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY<br>OF MARIN (MC COURT),<br>COUNTY OF SANTA CLARA (SCC),<br>SUPERIOR COURT OF CALIFORNIA FOR THE COUNTY<br>OF SANTA CLARA (SCC COURT),<br>**_NON-GOVERNMENT ENTITIES_**<br>ATKINSON, ANDELSON, LOYA, RUUD & ROMO<br>(AALRR),<br>ADMIRAL SECURITY SERVICES, INC. (ASS),<br>CARSON ATTORNEY SERVICES (CAS),<br>FAGEN, FRIEDMAN & FULFROST, LLP (F3),<br>HOGE FENTON JONES & APPEL, INC. (HFJA),<br>JORDAN CONSULTING & INVESTIGATIONS (JC&I; BSIS<br>Licence: 28475),<br>JOHN MUIR HEALTH,<br>LEIGH LAW GROUP, P.C. (LLG),<br>LONG & LEVIT, LLP (LOLE), | Case No.<br>**COMPLAINT FOR<br>INJUNCTIVE RELIEF,<br>SETTING ASIDE ORDERS,<br>DAMAGES, AND OTHER<br>RELIEF**<br>**DEMAND FOR JURY TRIAL** |

06/22/2020                                                                                      **Page 1 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

ORBACH, HUFF, SUAREZ & HENDERSON LLP (OHSH),
RANKIN, SHUEY, RANUCCI, MINTZ, LAMPASONA &
REYNOLDS, A PROFESSIONAL
CORPORATION (RANKIN),
THOMAS DALY LAW, A PROFESSIONAL
CORPORATION (TDL),

***INDIVIDUALS***

ALAN FRENKLACH,
ALICIA D. WILLIAMS,
ALISON PAIGE BUCHANAN (SBN 215710),
ANDREW DAVID LINGUA,
ANDREW EDWARD SWEET (SBN 160870),
ANDREW JAMES OLSON,
ANGELICA NAVARRO,
BARRY BASKIN (SBN 123691),
BENJAMIN SAMUEL CAMPOPIANO,
BETH ANN JOHNSON,
BETH SCHLUTER JORDAN (SBN 121576),
BRADLEY DAVIS,
BRIAN THOMAS LAWRENCE,
BROOKE ROCHELLE POOL,
BRUCE WAYNE JOWER,
CALVIN KNIGHT,
CAROL LYNN CASSIDY,
CAROL WEINSTEIN OVERTON (SBN 116872),
CHARLES BENSON BURCH (SBN 79002),
CHARLES STEPHEN TREAT (SBN 133993),
CHERISE MARIE KHAUND,
CHERYL HANSEN,
CHRISTINA MARIE ENSLEY,
CHRISTINE ANELL HUNTOON (SBN 197339),
CHRISTINE L. WILBURN,
CHRISTOPHER J. SOUZA,
CHRISTOPHER JOSEPH HOLLERAN,
CLIFTON EDWARD HUFFMASTER,
CONTRA COSTA COUNTY SHERIFF'S OFFICE (CCCSO)
COR,
CRAIG MICHAEL BROOKS,
CYNTHIA LYNN KEAST,
DAMIEN BERKES TROUTMAN (SBN 286616),
DANIEL JOHN WEDEMEYER,
DARRYL R. SAFFOLD,
DAVID ELLIOT GOLDSTEIN (SBN 175701),
DAVID F. DOWNS,
DAVID O. LIVINGSTON,
DAVID TODD SHUEY (SBN 162087),
DEBORAH A. COOKSEY (SBN 118197),
DEBORAH ANN RYAN (SBN 77994),
DEBRA ANN MAHER,
DEBRA L. MASON,
DEREK HALL MURDOCK,
DIANA B. BECTON (SBN 124333),
DIANE PATRICIA MORRELL,
DOMINIC EFRAIN MEDINA,
DONNA DONG,

06/22/2020                                    **Page 2 of 554**
**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND
OTHER RELIEF**

DORILYN KAM LAN AHANA (SBN 181569),
DOUGLAS E. WOLFE,
DUSTIN JAMES BROOKSHIRE,
EDWARD GEORGE WEIL (SBN 88302),
ELIZABETH ANN ESTES (SBN 173680),
FAYEDINE L. COULTER (SBN 70505),
FEMALE CPD EMPLOYEE 3172,
FRASER GRANT RITCHIE,
GARETH THOMAS O'BRIEN,
GARY SILVA,
GREGORY A. MAHAN,
GREGORY HARPER (SBN 146119 ORDERED INACTIVE
            PENDING DISBARMENT),
GUY ANTHONY SWANGER,
HEATHER I. ROCK,
HOWARD ALANZO JORDAN,
HOWARD JAY FULFROST (SBN 176498),
JAMES A. DAVIS, JR.,
JAMES HELMS,
JAMES HOAK,
JAMES M. KIM,
JAMES TSAIMING CHOU (SBN 142123),
JANET MINKIEWICZ,
JANIS ERLEEN HOWE,
JAY EDWARD CARSON,
JAY TOIVO JAMBECK (SBN 226018),
JEANNINE MARIE YORE,
JEFFREY COLIN HAGERSTRAND,
JEFFREY MICHAEL KRIEGER,
JENNIFER G. SACHS,
JESSE RAY RUTLAND,
JESSE SAVAGE,
JESSICA LYNNE POZOS,
JIM MILLER,
JOANNE L. DURKEE,
JOHN A. GARCIA,
JOHN BRENDAN SULLIVAN (SBN 238306),
JOHN R. BARRIENTOS,
JOHN WILLIAM RANUCCI (SBN 184801),
JOHNNY Y. ESTRADA,
JONATHAN MICHAEL FEY,
JONATHAN ROBERT RIZZARDI (SBN 244784),
JOSE A. ESPINOZA,
JOSEPH "GERARD" ESTRADA,
JOSEPH PATRICK McMONIGLE (SBN 66811),
JUDY ANN WALKER,
KAREN SHIGEZUMI SAKATA,
KATAN NANTHASIRI,
KATE WYLIE SANDIFORD,
KATHLEEN HANAU GAINES,
KATHRYN ANN BIEKER,
KELLY R. COOPER,
KEVIN ELLSWORTH GILBERT (SBN 209236),
KEVIN RANDALL MINTZ (SBN 172299),
KYLE ANDREW COLVIN,

06/22/2020                                                    **Page 3 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND
OTHER RELIEF**

LAURA CATHERINE RIPARBELLI (SBN 311226),
LAURA MAUREEN JURANEK,
LAURIE SMITH,
LAWRENCE MICHAEL SCHOENKE (SBN 92314),
LEE LAWRENCE,
LESTER A. LAWSON,
LINDA KAYE MAYO,
LINDA MARIE SCHULER,
LISA ANGELL MURPHY-OATES,
LORI ELIZABETH FRUGOLI (SBN 142335),
LORI MARIAN AMENTA,
MANDY GINA LEIGH (SBN 225748),
MARGARET WOOD,
MARGERY DORISE RUSSELL,
MARIA MARGARITE LAMPASONA (SBN 259675),
MARIN COUNTY SHERIFF'S OFFICE (MCSO) COR,
MARIO PEREZ,
MARK ANDREW SOUZA,
MARK D. EVANS,
MARY ANN GRUBB,
MAUREEN ANN FOLAN (SBN 136029),
MELISSA R. MURPHY,
MICAH LEIF MENDEZ (Employee ID 1721),
MICHAEL A. JIMENEZ,
MICHAEL A. NORTON,
MICHAEL GLENN McALISTER,
MICHAEL J. WATSON,
MICHAEL JOSEPH DAVIS (SBN 299196),
MICHAEL PLUMMER,
MICHAEL RENE REYNOLDS (SBN 100126),
MICHAEL THOMAS CZYZ,
MICHAEL W. ROBERTS,
MIKE WESTFIELD,
NANCY DAVIS STARK (SBN 104348),
NATALIE BROWN,
NELLIE EILEEN MEYER,
NOORIA ACHAKZAI,
OAKLAND POLICE DEPARTMENT (OPD) COR,
PAUL MILLER HAAKENSON (SBN 167513),
PAUL RICHARD MULLIGAN,
PERI ANN BUCHHOLZ,
PETER KIRK FAGEN (SBN 143118),
QUASHINA RENEE ROARY,
REBECCA J. FLEMING,
RENEE ROGERS,
RICHARD JACKSON,
RICKEY ALLEN RIVERA,
ROBERT ANTHONY MARTINEZ,
ROGER CLIFFORD BYLUND,
ROSANNE MARIE REID,
ROSEMARY LEE SLOTE (SBN 136350),
ROSENDA FLORES RAMOS,
ROWLAND BERNAL,
ROY ALBERT COMBS (SBN 123507),
RUSSELL A. GARCIA (Employee ID 1762),

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

RYAN MICHAEL HIBBS,
SANDRA KAY BARNHART,
SANDRA LOUISE CREMIN,
SANTA CLARA COUNTY SHERIFF'S OFFICE (SCCSO)
        CUSTODIAN OF RECORDS (COR),
SCOTT BRIAN MOORHOUSE,
SEAN JAMES BIAS,
SEAN MICHAEL CONLEY,
SEAN PATRICK DONNELLY,
SEAN R. ERIKSEN,
SEKOU LUMUMBA,
SETH NATHANIEL ECKSTEIN (SBN 278783),
SHANE MICHAEL BLATZ,
SHANNA GAGE LAI,
SHAWN ALLEN FRANCIS,
SHAY DARRELL HAYNES,
SINEAD SUSAN McCARRON (SBN 325746),
STEPHANIE R.C. KANG (SBN 287935),
STEPHANIE SUNNY QUINTANA,
STEPHEN PAUL FRECCERO (SBN 131093),
STEVEN A. VALKANOFF,
STEVEN CRAIG BOLEN (SBN 141962),
SUMMER MAUREEN GALER,
TAMARA DENISE KAST,
TARA FRANCO ASHOO,
TERRY WILLIAM KOEHNE,
THERESA K. RAMOS,
THOMAS EDWARD CHAPLIN,
THOMAS JOSEPH DALY (SBN 292791),
TODD WAYNE STROUD,
VITA A. JOHANSEN,
WENDI SUSAN AGHILY,
WILLIAM BRYAN CASSIN,
YVONNE LYNETTE BENITEZ,
***UNKNOWNS***
DOES 1-100,

DEFENDANTS.

## BACKGROUND

"We must not allow the United States to become a country where standing up to our government is a dangerous act." (Yovanovitch, *Marie Yovanovitch: These are turbulent times. But we will persist and prevail.* (2/6/2020 3:00 AM) The Washington Post <http://www.washingtonpost.com/opinions/2020/02/06/marie-yovanovitch-ukraine-ambassador-american-institutions-need-us/> (as of 2/20/2020).) At least for me, MICHAEL GEARY WILSON, it already has become so. While I have never had occasion to stand up to anyone as powerful as our criminal President of the United States like Ms. Yovanovitch has, I have stood up to multiple criminals in local and state governments. For the first time approximately 11 years ago in a small Florida town, I

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

stood up to several robed criminals who called themselves judges while abusing their power over me predominantly by unlawfully stigmatizing me and violently depriving me of my constitutional and other substantial rights and interests, the most important of which was and remains my right to the care, custody and companionship of my only biological child. (See, e.g., Case No. 20-cv-01076-JD.) I caused some of those criminals to be removed from my court cases, all of which were civil. Ever since then, they and other government criminals in Florida and California following their lead have waged a campaign of unlawful stigmatization and deprivation against me that has repeatedly put me in physical and other kinds of danger. This case arose because DEFENDANTS joined that campaign as described herein.

I know there are many law-abiding local government employees. But because I have encountered too many criminal local government employees over the last 11 years while conducting lawful business, I regularly record audio and video on electronic devices for self-protection, First Amendment, and law enforcement purposes. I have used those recordings to initiate criminal investigations of government employees and, more recently, in support of private person's[1] arrests of some criminal government employees and agents, including several DEFENDANTS named herein.

I have never been convicted or even credibly accused of a crime. No one has ever lawfully detained or arrested me. No valid restraining order has ever been entered against me. Now that I am pursuing this legal remedy against some criminal government employees, I expect them and their kind to escalate their criminal and, worse, unconstitutional campaign against me, if they have not done so already.

## COMPLAINT

For my **COMPLAINT** against the DEFENDANTS, and each of them, I, PLAINTIFF MICHAEL GEARY WILSON, *demand a jury trial* of all facts, issues, claims, and requests for relief, and allege as follows:

---

[1] I use the term "private person's arrests" herein instead of "citizen's arrests" except when I am quoting others because (a) "private person" is consistent with the language in the statutes (Cal. Pen. Code §§ 834-849) that I have acted under, and (b) at least in California, a private person has a right to arrest others regardless of whether that person is a citizen.

06/22/2020

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

POSSIBLY RELATED CASES (Civil L.R. 3-12)

1. This case appears to be related to Case Nos. 19-cv-03441-MMC, 20-cv-02721-PJH, 20-cv-03045-MMC, and 20-cv-03368-MMC because this **COMPLAINT** concerns many of the same parties, property, transactions and events as my **COMPLAINTS** in those cases. A conspiracy among all parties and overlapping facts in these cases bind them. Moreover, it appears likely that there will be an unduly burdensome duplication of labor and expense and conflicting results if these cases are conducted before different Judges. Accordingly, I am filing herewith **MY ADMINISTRATIVE MOTION TO CONSIDER WHETHER CASES SHOULD BE RELATED**. I have provisionally added the facts, defendants, and claims from **MY 3/19/2020 FAC** in Case No. 19-cv-03441-MMC and 20-cv-03368-MMC to this **COMPLAINT** because:

    a. This Court has not yet decided whether to file that **FAC** of mine; and

    b. Doing so more clearly shows DEFENDANTS' relevant courses of conduct.

## PARTIES

### A. PLAINTIFF

2. I am a California resident with disabilities, now residing in the City of Walnut Creek, California. At all material times relevant to this **COMPLAINT**: (a) my physical and mental impairments have substantially limited many of my major life activities such as seeing, performing some manual tasks, tolerating even slightly warm ambient temperatures, staying hydrated, and, under certain circumstances, balancing, walking, breathing, and thinking; (b) I have been indigent, and therefore have depended on my longtime companion, PARENT-1, for my residence and other needs; and (c) PARENT-1 and PARENT-2 have had two minor children, M.C. and C.C., and have delegated relevant parental rights to me through power-of-attorney documents (hereinafter "dox"). I am the biological father of a minor child (hereinafter referred to as G.W.). DEFENDANTS first learned those facts about me in or around April 2018 and thereafter exploited my disabilities by various means, including but not limited to by violence, by fraud, by sham litigation, and by extortion, described herein. I am a citizen of California.

///

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

## B. DEFENDANTS

3.   All INDIVIDUAL DEFENDANTS, known and unknown, public and private, lawyer and non-lawyer, willfully participated in joint action with each other as described herein, and therefore acted under color of law for purposes of § 1983 actions. (See, e.g.: *Dennis v. Sparks*, 449 US 24, 27-28 (1980) ["[T]o act 'under color of' state law for § 1983 purposes does not require that the defendant be an officer of the State. It is enough that he is a willful participant in joint action with the State or its agents. Private persons, jointly engaged with state officials in the challenged action, are acting 'under color' of law for purposes of § 1983 actions."]; *Kimes v. Stone*, 84 F. 3d 1121 (9th Cir. 1996) [private lawyers representing private clients who conspire with government agents in conjunction with their performance of official acts to sell out their clients' interests are acting under color of state law for the purpose of § 1983, even if government agents are immune from civil liability]; *Gonzalez v. Spencer*, 336 F.3d 832, 834 (9th Cir. 2003) [private lawyer "acted under color of state law" where she was "retained to represent state entities and their employees in litigation" and acted "in the course of that representation … [h]er role was analogous to that of a state prosecutor rather than a public defender, ***because she acted on behalf of the state rather than as its adversary***."]. ***Contrast*** *Filarsky v. Delia*, 132 S. Ct. 1657 (2012) [a case ***inapposite on the law*** because it addresses "whether an individual hired by the government to do its work is prohibited from seeking [either absolute or qualified] immunity, solely because [she or] he works for the government on something other than a permanent or full-time basis," not whether she or he is acting under color of law for purposes of § 1983 actions.]; *Szijarto v. Legeman*, 466 F.2d 864,864 (9th Cir. 1972) [*Szijarto* is a case against a private lawyer hired by a private person who ***did not allege*** that the lawyer he hired conspired with government actors and sold out his interests, which I ***have alleged*** here. *Szijarto* does not stand for any proposition about private lawyers hired by the government.]; *Dyer v. Maryland State Bd. Of Educ.*, 187 F.3 Supp. 3d 599, 615-16 (D. Md. 2016) [That is an out-of-circuit trial-level case in which a private lawyer's alleged actions on behalf of a school district were "***ultra vires*** and ***inconsistent*** with her governmental client's directives" (emphasis added), which tended to disprove conspiracy. The law in this circuit and the facts of this case are much different. See, e.g., *Gonzalez*, *surpra*.]) Unlike the corrupt judge in *Dennis*, the corrupt school district employees, administrators, lawyers, and board members named as DEFENDANTS herein are

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND
~~OTHER RELIEF~~

not entitled to assert absolute immunity as an affirmative defense to the money damages aspects of this suit. (See, e.g.: *Wood v. Strickland*, 420 US 308, 314-322 (1975); *Bilbrey v. Brown*, 738 F.2d 1462, 1467 (9th Cir. 1984).)

**Government Entities**

4.    CCC is a municipal corporation with its principal place of business located at 651 Pine Street, Martinez, CA 94553, is therefore a citizen of California, and is sued under *Monell, respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities. The DISTRICT ATTORNEY'S OFFICE (CCCDAO) and the SHERIFF'S OFFICE (CCCSO) are parts of CCC and their principal places of business are respectively located at 900 Ward Street, Martinez, CA 94553 and 651 Pine Street, Martinez, CA 94553.

5.    CCC COURT is an arm of California with its principal place of business in the WAKEFIELD TAYLOR COURTHOUSE (TAYLOR) located at 725 Court Street, Martinez, California 94553, and is therefore a citizen of California. It is absolutely immune from lawsuits for damages under 42 USC § 1983 *Monell* liability. (*Will v. Michigan Department of State Police*, 491 U.S. 58, 70-71 (1989).) It is not absolutely immune from lawsuits for injunctive relief (see, e.g., *Sammartano v. First Judicial District Court*, 303 F. 3d 959 (9th Cir. 2002), *abrogated on other grounds by Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7 (2008)) or for damages under derivative liability (Cal. Govt. Code § 815.2), and is sued accordingly.

6.    CCCOE is a municipal corporation with its principal place of business located at 77 Santa Barbara Road, Pleasant Hill, California 94523, and is therefore a citizen of California. CCCOE is sued under *Monell, respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities.

7.    CITY OF CONCORD is a municipal corporation with its principal place of business located at 1950 Parkside Drive, Concord, CA 94519, is therefore a citizen of California, and is sued under *Monell, respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities. The POLICE DEPARTMENT (CPD) is part of the CITY OF CONCORD and its headquarters is located at 1350 Galindo Street, Concord, CA 94520.

8.    CITY OF OAKLAND is a municipal corporation with its principal place of business located at 1 Frank H. Ogawa Plaza, Oakland, CA 94612, is therefore a citizen of California, and is sued

06/22/2020                                                                                          **Page 9 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**
**OTHER RELIEF**

under *Monell, respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities. The POLICE DEPARTMENT (OPD) is part of the CITY OF OAKLAND and its headquarters is located at 455 7th Street, Oakland, CA 94607.

9.  CITY OF PLEASANT HILL is a municipal corporation with its principal place of business located at 100 Gregory Lane, Pleasant Hill, CA 94523, is therefore a citizen of California, and is sued under *Monell, respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities. The POLICE DEPARTMENT (PHPD) is part of the CITY OF PLEASANT HILL and its headquarters is located at 330 Civic Drive, Pleasant Hill, CA 94523.

10. CITY OF WALNUT CREEK is a municipal corporation with its principal place of business located at 1666 North Main Street, Walnut Creek, CA 94596, is therefore a citizen of California, and is sued under *Monell, respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities. The POLICE DEPARTMENT (WCPD) is part of the CITY OF WALNUT CREEK and its headquarters is located at the same address.

11. CMPA is a municipal corporation with its principal place of business located at 250 Doherty Drive, Larkspur, CA 94939, is therefore a citizen of California, and is sued under *Monell, respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities.

12. DIABLO is a municipal corporation with its principal place of business located at The James W. Dent Education Center (DENT), 1936 Carlotta Drive, Concord, CA 94519-1358, and is therefore a citizen of California. DIABLO is sued under *Monell , respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities. NORTHGATE HIGH SCHOOL (NHS) is part of DIABLO and its principal place of business located at 425 Castle Rock Road, Walnut Creek, CA 94598. BANCROFT ELEMENTARY SCHOOL (BES) is part of DIABLO and its principal place of business is located at 2200 Parish Drive, Walnut Creek, CA 94598.

13. MC is a municipal corporation with its principal place of business located at 3501 Civic Center Drive, Room 329, San Rafael, CA 94903, is therefore a citizen of California, and is sued under *Monell, respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities. The DISTRICT ATTORNEY'S OFFICE (MCDAO) and the SHERIFF'S OFFICE (MCSO) are parts of MC and their

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

principal places of business are respectively located at 3501 Civic Center Drive, Room 145, San Rafael, CA 94903 and 1600 Los Gamos Drive, #200 San Rafael, CA 94903.

14. MC COURT is an arm of California with its principal place of business at 3501 Civic Center Drive, San Rafael, CA 94903, and is therefore a citizen of California. It is absolutely immune from lawsuits for damages under 42 USC § 1983 *Monell* liability. (*Will, supra*, 491 U.S. at 70-71.) It is not absolutely immune from lawsuits for injunctive relief (see, e.g., *Sammartano, supra*, 303 F. 3d 959) or for damages under derivative liability (Cal. Govt. Code § 815.2), and is sued accordingly.

15. SCC is a municipal corporation with its principal place of business located at 70 West Hedding Street, 10th Floor, San José, CA 95110, is therefore a citizen of California, and is sued under *Monell, respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities. The SHERIFF'S OFFICE (SCCSO) is part of SCC and its principal places of business is located at 55 West Younger Avenue, San José, CA 95110-1721.

16. SCC COURT is an arm of California with its principal place of business at 191 North 1st Street, San José, CA 95113, hereinafter referred to as Downtown Superior Court (DTS), and is therefore a citizen of California. It is absolutely immune from lawsuits for damages under 42 USC § 1983 *Monell* liability. (*Will, supra*, 491 U.S. at 70-71.) It is not absolutely immune from lawsuits for injunctive relief (see, e.g., *Sammartano, supra*, 303 F. 3d 959) or for damages under derivative liability (Cal. Govt. Code § 815.2), and is sued accordingly.

**Non-Government Entities**

17. AALRR is a private law firm that was employed by contract as DIABLO's General Counsel, not merely as its representatives in some disputes, at all material times relevant to this **COMPLAINT**, with its principal places of business located at 5075 Hopyard Road, Suite 210, Pleasanton, California 94588 and 1936 Carlotta Drive, Concord, California 94519-1358, and is therefore a citizen of California. AALRR is sued under individual, *respondeat superior*, and *Monell* liabilities.

18. ASS is a private security corporation with its principal place of business located at 2151 Salvio Street #260, Concord, CA 94520, and is therefore a citizen of California. ASS is sued under individual, *respondeat superior*, and *Monell* liabilities.

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

19. CAS is a private entity that predominantly performs service of process with its principal place of business located at 1630 North Main Street, Walnut Creek, CA 94596, and is therefore a citizen of California. CAS is sued under individual, *respondeat superior*, and *Monell* liabilities.

20. F3 is a private law firm that represented DIABLO at all material times relevant to this **COMPLAINT** with its principal place of business located at 70 Washington Street, Suite 205, Oakland, California 94607, and is therefore a citizen of California. F3 is sued under individual, *respondeat superior*, and *Monell* liabilities.

21. HFJA is a private law firm that has represented AALRR in Case No. 3:19-cv-03441-MMC at all material times relevant to this **COMPLAINT** with its principal place of business located at 60 South Market Street, Suite 1400, San José, CA 95113-2396, and is therefore a citizen of California. HFJA is sued under individual and *respondeat superior* liability.

22. JC&I is a private entity that predominantly performs private investigations with its principal place of business located at 24 Pineview Court, Pleasant Hill, CA 94523, and is therefore a citizen of California. JC&I is sued under individual, *respondeat superior*, and *Monell* liabilities.

23. JOHN MUIR HEALTH is a private health care corporation with its principal place of business located at 1400 Treat Boulevard, Walnut Creek, CA 94597, is therefore a citizen of California, and is sued under *Monell*, *respondeat superior*, and derivative (i.e., Govt. Code § 815.2) liabilities. Concord Medical Center is part of JOHN MUIR HEALTH and is located at 2540 East Street, Concord, CA 94520. Its agent for service is Calvin Knight.

24. LLG is a private law firm with its principal place of business located at 870 Market Street, Suite 1157, San Francisco, CA 94102, and is therefore a citizen of California. LLG is sued under individual, *respondeat superior*, and *Monell* liabilities.

25. LOLE is a private law firm that has represented F3 in Case No. 3:19-cv-03441-MMC at all material times relevant to this **COMPLAINT** with its principal place of business located at 465 California Street, Floor 5, San Francisco, CA 94104, and is therefore a citizen of California. LOLE is sued under individual and *respondeat superior* liability.

26. OHSH is a private law firm that has represented DIABLO in Case No. 19-cv-03441-MMC at all material times relevant to this **COMPLAINT** with its principal place of business located at

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

6210 Stoneridge Mall Road, Suite 210, Pleasanton, CA 94588, and is therefore a citizen of California. OHSH is sued under individual and *respondeat superior* liability.

27. RANKIN is a private law firm that has represented JOHN MUIR HEALTH in Case No. 19-cv-03368-MMC at all material times relevant to this **COMPLAINT** with its principal place of business located at 2030 Franklin Street, 6th Floor, Oakland, CA 94612, and is therefore a citizen of California. RANKIN is sued under individual and *respondeat superior* liability.

28. TDL is a private law firm with its principal place of business located at 2950 Buskirk Avenue, #300, Walnut Creek, CA 94597, and is therefore a citizen of California. TDL is sued under individual, *respondeat superior*, and *Monell* liabilities.

**Individuals**

29. At all material times relevant to this **COMPLAINT**: (a) BECTON, BOLEN, ERIKSEN, J. GARCIA, KANG, McCARRON, MEDINA, MULLIGAN, RITCHIE, RIVERA, WEDEMEYER, BROOKS, CCCSO-COR, LAWSON, LIVINGSTON, MURDOCK, VALKANOFF, and WOLFE were CCC employees, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, City of Martinez, CCCDAO, and/or CCCSO; (b) BECTON, BOLEN, CCCSO-COR, KANG, MEDINA, MULLIGAN, BROOKS, LIVINGSTON, and VALKANOFF had supervisory and policymaking authority at CCC; and (c) BECTON had policymaking authority at CCCDAO and LIVINGSTON had policymaking authority at CCCSO. All of the CCC employees work or worked primarily out of Martinez, CA 94553 at the following street addresses: 900 Ward Street (CCCDAO); 10 Douglas Drive #130 (CCCDAO); and/or 651 Pine Street (CCCSO). They reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as CCC DEFENDANTS. BECTON, BOLEN, ERIKSEN, J. GARCIA, KANG, McCARRON, MEDINA, MULLIGAN, RITCHIE, RIVERA, and WEDEMEYER are hereinafter collectively referred to as CCCDAO DEFENDANTS. BROOKS, CCCSO-COR, LAWSON, LIVINGSTON, MURDOCK, VALKANOFF, and WOLFE are hereinafter collectively referred to as CCCSO DEFENDANTS.

///

06/22/2020

Page 13 of 554

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

30.    At all material times relevant to this **COMPLAINT**: (a) BASKIN, BIEKER, BURCH, FRENKLACH, GOLDSTEIN, POOL, T. RAMOS, STARK, TREAT, WALKER, and WEIL were CCC COURT employees, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, the California Rules of Court, and the CCC COURT; (b) BASKIN, BIEKER, BURCH, GOLDSTEIN, T. RAMOS, STARK, TREAT, WALKER, and WEIL had supervisory authority at the CCC COURT; (c) BASKIN and BIEKER had policymaking authority at the CCC COURT; and (d) BASKIN, BURCH, GOLDSTEIN, STARK, TREAT, and WEIL have been CCC COURT employee-judges who have been disqualified from acting judicially in any case involving me. None of these employees are sued under 42 USC § 1983. (*Will, supra*, 491 U.S. at 71.). They work primarily out of TAYLOR and reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as CCC COURT DEFENDANTS.

31.    At all material times relevant to this **COMPLAINT**: (a) GAINES, KOEHNE, MORRELL, SAKATA, and YORE were CCCOE employees, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, City of Pleasant Hill, and/or CCCOE; (b) GAINES, KOEHNE, and SAKATA had supervisory authority at CCCOE; (c) SAKATA had policymaking authority at CCCOE; and (d) GAINES, KOEHNE, MORRELL, SAKATA, and YORE work or worked primarily out of 77 Santa Barbara Road, Pleasant Hill, California 94523. They reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as CCCOE DEFENDANTS.

32.    At all material times relevant to this **COMPLAINT**: (a) 3172, ACHAKZAI, BERNAL, C. SOUZA, COLVIN, DONNELLY, EVANS, GALER, HOAK, HUFFMASTER, KRIEGER, LAWRENCE, M. SOUZA, MAHAN, NANTHASIRI, NAVARRO, PLUMMER, ROBERTS, RUTLAND, SAVAGE, STROUD, and SWANGER were CITY OF CONCORD employees working in the CPD, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, CITY OF CONCORD, and/or CPD; (b) COLVIN, DONNELLY, GALER, KRIEGER, ROBERTS, STROUD, and SWANGER had supervisory authority

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

at CPD; (c) SWANGER had policymaking authority at CPD; and (d) all of them work or worked primarily out of 1350 Galindo Street, Concord, CA 94520. They reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as CPD DEFENDANTS.

33. At all material times relevant to this **COMPLAINT**: (a) OPD-COR was a CITY OF OAKLAND employee working in the OPD, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, Alameda County, CITY OF OAKLAND, and/or OPD; (b) OPD-COR had supervisory authority at OPD; and (c) works primarily out of 455 7th Street, Oakland, CA 94607. They reside in Northern California, with an intention to reside here indefinitely, and is therefore a citizen of California. They are sued in their official, employee, and individual capacity.

34. At all material times relevant to this **COMPLAINT**: (a) DOWNS and BIAS were CITY OF PLEASANT HILL employees working in the PHPD, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, and/or CITY OF PLEASANT HILL; (b) DOWNS had supervisory authority at PHPD; and (c) both of them work or worked primarily out of 330 Civic Drive, Pleasant Hill, CA 94523. They reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as PHPD DEFENDANTS.

35. At all material times relevant to this **COMPLAINT**: (a) BLATZ, BARRIENTOS, BROOKSHIRE, CHAPLIN, CONLEY, CZYZ, J. DAVIS, ENSLEY, ESTRADA, GRUBB, HIBBS, JOHNSON, JOWER, KAST, LINGUA, MOORHOUSE, MURPHY, O'BRIEN, OLSON, SAFFOLD, SILVA, WATSON, and WILLIAMS were CITY OF WALNUT CREEK employees working in the WCPD, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, and/or CITY OF WALNUT CREEK; (b) CHAPLIN, CONLEY, HIBBS, JOHNSON, JOWER, MOORHOUSE, OLSON, and WATSON had supervisory authority at WCPD; (c) CHAPLIN had policymaking authority at WCPD; and (d) all of them work or

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF

worked primarily out of 1666 North Main Street, Walnut Creek, CA 94596. They reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as WCPD DEFENDANTS.

36. At all material times relevant to this **COMPLAINT**: (a) KEAST and NORTON were CMPA employees, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, MC, and/or CMPA; (b) NORTON had supervisory authority at CMPA; (c) NORTON had policymaking authority at CMPA; and (d) all of them work or worked primarily out of 250 Doherty Drive, Larkspur, CA 94939. They reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as CMPA DEFENDANTS.

37. At all material times relevant to this **COMPLAINT**: (a) AALRR and its employees, AGHILY, AMENTA, ASHOO, BARNHART, BENITEZ, BYLUND, CAMPOPIANO, CASSIDY, CASSIN, COOKSEY, COOPER, CREMIN, DONG, DURKEE, ESPINOZA, ESTRADA, FEY, HAGERSTRAND (REID's husband), HANSEN, HOLLERAN, HOWE, JACKSON, JIMENEZ, JURANEK, KHAUND, LAWRENCE, MAHER, MARTINEZ, MASON, MAYO, McALISTER (a male KAREN[2]), MEYER, MURPHY-OATES, POZOS, QUINTANA, R. RAMOS, REID (HAGERSTRAND's wife), ROGERS, RUSSELL, SACHS, SCHULER, WILBURN, and WOOD were DIABLO employees, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, CITY OF CONCORD, CITY OF WALNUT CREEK, DIABLO, Northgate High School (NHS), and/or Bancroft Elementary School (BES); (b) AALRR and its employees, AGHILY, BYLUND, CAMPOPIANO, CASSIN, COOKSEY, COOPER, DURKEE, ESPINOZA, ESTRADA, HANSEN, HOLLERAN, JACKSON, JIMENEZ, KHAUND,

---

[2] *'Karens' have been going viral. But their behavior is not new — and it's dangerous* NBC News <https://www.nbcnews.com/think/video/-karens-have-been-going-viral-but-their-behavior-is-not-new-and-it-s-dangerous-85240389836> (as of 6/17/2020). I use "Karen" herein to describe people who have used Karen-like behavior against me because I am male, 6'5" tall, white, from the Deep South, and live with some disabilities. In America, such behavior is most often and most harmfully used against Blacks.

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

LAWRENCE, MAHER, MARTINEZ, MASON, MAYO, MEYER, MURPHY-OATES, R. RAMOS, and SACHS had supervisory authority at DENT; (c) CAMPOPIANO, COOPER, FEY, and McALISTER had supervisory authority at NHS; (d) SCHULER had supervisory authority at BES; (e) AALRR and its employees, AGHILY, BYLUND, COOKSEY, DURKEE, HANSEN, KHAUND, LAWRENCE, MARTINEZ, and MEYER had policymaking authority at DENT; (f) McALISTER had policymaking authority at NHS; (g) SCHULER had policymaking authority at BES; (h) AALRR and its employees, AGHILY, AMENTA, ASHOO, BARNHART, BENITEZ, BYLUND, CASSIN, COOKSEY, CREMIN, DONG, DURKEE, ESPINOZA, ESTRADA, HANSEN, HOLLERAN, HOWE, JACKSON, JIMENEZ, JURANEK, KHAUND, LAWRENCE, MAHER, MARTINEZ, MASON, MAYO, MEYER, MURPHY-OATES, POZOS, QUINTANA, R. RAMOS, ROGERS, RUSSELL, SACHS, and WILBURN work or worked primarily out of DENT; (i) CAMPOPIANO, CASSIDY, COOPER, FEY, HAGERSTRAND, McALISTER, REID, and WOOD work or worked primarily out of NHS; (j) SCHULER worked primarily out of BES. (For DENT, NHS, and BES work addresses, see ¶ 12 above.) All of them except HOLLERAN reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. All of them are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as DIABLO DEFENDANTS.

38.   At all material times relevant to this **COMPLAINT**: (a) AHANA, BUCHHOLZ, FRUGOLI, R. GARCIA, HAYNES, MCSO-COR, MENDEZ, ROCK, SANDIFORD, and SLOTE were MC employees, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, MC, City of San Rafael, MCDAO, and/or MCSO; (b) AHANA, MCSO-COR, FRUGOLI, ROCK, and SLOTE had supervisory authority at MC; (c) FRUGOLI had policymaking authority at MCDAO; (d) All of them work or worked primarily at 3501 Civic Center Drive, San Rafael, CA 94903. They reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as MC DEFENDANTS. AHANA, FRUGOLI, and SLOTE are hereinafter collectively referred to as MCDAO DEFENDANTS. BUCHHOLZ, MCSO-COR, R. GARCIA, HAYNES, MENDEZ, ROCK, and SANDIFORD are

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

hereinafter collectively referred to as MCSO DEFENDANTS. For more specific and alternate MCDAO and MCSO work addresses, see ¶ 13 above.

39. At all material times relevant to this **COMPLAINT**: (a) B. JORDAN, CHOU, FRECCERO, HAAKENSON, JOHANSEN, KIM, MINKIEWICZ, ROARY, and SWEET were MC COURT employees, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, the California Rules of Court, and the MC COURT; (b) B. JORDAN, CHOU, FRECCERO, HAAKENSON, JOHANSEN, KIM, MINKIEWICZ, and SWEET had supervisory authority at the MC COURT; (c) HAAKENSON, KIM, and SWEET had policymaking authority at the MC COURT; and (d) B. JORDAN, CHOU, FRECCERO, HAAKENSON, and SWEET have been MC COURT employee-judges who have been disqualified from acting judicially in any case involving me. None of these employees are sued under 42 USC § 1983. (*Will, supra,* 491 U.S. at 71.) They work primarily out of 3501 Civic Center Drive, San Rafael, CA 94903 and reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as MC COURT DEFENDANTS.

40. At all material times relevant to this **COMPLAINT**: (a) B. DAVIS, FRANCIS, HELMS, PEREZ, SCCSO-COR, and SMITH were MC employees, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, SCC, City of San José, and/or SCCSO; (b) FRANCIS, HELMS, PEREZ, SCCSO-COR, and SMITH had supervisory authority at SCC; (c) SMITH had policymaking authority at MCSO; (d) All of them work or worked primarily out of 55 West Younger Avenue, San José, CA 95110-1721. They reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as SCCSO DEFENDANTS.

41. At all material times relevant to this **COMPLAINT**: (a) FLEMING, FOLAN, OVERTON, and RYAN were SCC COURT employees, acting under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, the California Rules of Court, and the SCC COURT; (b) FLEMING, FOLAN, OVERTON, and RYAN had supervisory

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

authority at the SCC COURT; (c) FLEMING and RYAN had policymaking authority at the SCC COURT; and (d) FOLAN, OVERTON, and RYAN have been SCC COURT employee-judges who have been disqualified from acting judicially in any case involving me. None of these employees are sued under 42 USC § 1983. (*Will, supra,* 491 U.S. at 71.) They work primarily out of DTS and reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their official, employee, and individual capacities and are hereinafter collectively referred to as SCC COURT DEFENDANTS.

42. At all material times relevant to this **COMPLAINT**: ESTES, HUNTOON, M. DAVIS, and SCHOENKE have been lawyers and DIABLO/AALRR employees (i.e., of counsel, two associates, and a partner, respectively), acting on behalf of DIABLO under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, CITY OF CONCORD, CITY OF WALNUT CREEK, and/or DIABLO. They work out of 1050 Northgate Drive, Suite 520, San Rafael, CA 94903 and 5075 Hopyard Road, Suite 210, Pleasanton, California 94588 and reside in Northern California, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their employee, professional, and individual capacities and are hereinafter collectively referred to as AALRR DEFENDANTS.

43. At all material times relevant to this **COMPLAINT**: (a) MILLER and WESTFIELD have been security guards and ASS employees working at DENT, conspiring with and/or acting on behalf of and/or jointly with the DIABLO DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, and/or DIABLO; (b) MILLER had supervisory authority at ASS. They work or worked primarily out of ASS. They reside in Northern California with an intention to reside here indefinitely and are therefore citizens of California. They are sued in their employee, professional, and individual capacities and are hereinafter collectively referred to as ASS DEFENDANTS.

44. At all material times relevant to this **COMPLAINT**: (a) CARSON has been a process server and a CAS owner and employee working as an agent of LLG, conspiring with and/or acting on behalf of and/or jointly with the LLG and DIABLO DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, and/or

06/22/2020

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

DIABLO; (b) CARSON had supervisory authority at CAS. He works or worked primarily out of CAS. He resides in Northern California with an intention to reside here indefinitely and is therefore a citizen of California. He is sued in his owner, employee and individual capacities.

45.    At all material times relevant to this **COMPLAINT**: (a) COMBS, ECKSTEIN, FAGEN, and FULFROST have been lawyers and F3 employees (i.e., a partner, an associate, and two founding partners, respectively), conspiring with and/or acting on behalf of and/or jointly with the DIABLO DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, and/or DIABLO; (b) FAGEN, FULFROST, and COMBS had supervisory authority at F3; and (c) FAGEN and FULFROST had policymaking authority at F3. FAGEN works out of 1525 Faraday Avenue, Suite 300, Carlsbad, CA 92008-7372 and resides at 1845 Magnolia Court, Oceanside, CA 92054, with an intention to reside here indefinitely, and is therefore a citizen of California. FULFROST works out of 6300 Wilshire Boulevard, Suite 1700, Los Angeles, CA 90048-5219 and resides at 515 Alandele Avenue, Los Angeles, CA 90036, with an intention to reside here indefinitely, and is therefore a citizen of California. COMBS and ECKSTEIN work out of 70 Washington Street, Suite 205, Oakland, CA 94607 and reside at 4505 Lariat Lane, Oakley, CA 94561 and 15 Juniper Drive, Lafayette, CA 94549, respectively, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their shareholder, employee, professional, and individual capacities and are hereinafter collectively referred to as F3 DEFENDANTS.

46.    At all material times relevant to this **COMPLAINT**: (a) HARPER and LUMUMBA have been HARPER LEGAL GROUP (HLG) employees, conspiring with and/or acting on behalf of and/or jointly with the CCC, CCC COURT, DIABLO, & F3 DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, City of Martinez, City of Point Richmond, and/or the CCC COURT; (b) HARPER had supervisory authority at HLG, which is a sole proprietorship. They work or worked primarily out of 3060 El Cerrito Plaza, #100, El Cerrito, CA 94530-4011. They reside in Northern California with an intention to reside here indefinitely and are therefore citizens of California. They are sued in their employee, professional, representative, and individual capacities and are hereinafter collectively referred to as HLG DEFENDANTS.

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

47. At all material times relevant to this **COMPLAINT**: (a) BUCHANAN and RIPARBELLI have been HFJA employees, conspiring with and/or acting on behalf of and/or jointly with DIABLO DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, and/or the CCC COURT; (b) BUCHANAN had supervisory authority at HFJA. They work or worked primarily out of 60 South Market Street, Suite 1400, San José, CA 95113-2396. They reside in Northern California with an intention to reside here indefinitely and are therefore citizens of California. They are sued in their employee, professional, and individual capacities and are hereinafter collectively referred to as HFJA DEFENDANTS.

48. At all material times relevant to this **COMPLAINT**: (a) KNIGHT has been a JOHN MUIR HEALTH shareholder and employee, conspiring with and/or acting on behalf of and/or jointly with CPD, DIABLO, & RANKIN DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, CITY OF CONCORD, and/or CITY OF WALNUT CREEK; (b) KNIGHT, as Chief Executive Officer, had supervisory and policymaking authority at JOHN MUIR HEALTH. He works or worked primarily out of 1400 Treat Boulevard, Walnut Creek, CA 94597. He resides in Northern California with an intention to reside here indefinitely and is therefore a citizen of California. He is sued in his shareholder, employee, and individual capacities. He, the unidentified JOHN MUIR HEALTH DOEs and JOHN MUIR HEALTH are hereinafter collectively referred to as the JOHN MUIR HEALTH DEFENDANTS.

49. At all material times relevant to this **COMPLAINT**, H. JORDAN has been a private investigator and a JC&I owner and employee working as an agent of DIABLO, conspiring with and/or acting on behalf of and/or jointly with the DIABLO AALRR, & CITY OF CONCORD DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, CITY OF CONCORD, and/or DIABLO. He works or worked primarily out of JC&I. He resides in Northern California with an intention to reside here indefinitely and is therefore a citizen of California. He is sued in his owner, employee, professional, and individual capacities.

///

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

50. At all material times relevant to this **COMPLAINT**: BROWN (legal assistant), LEIGH (top purveyor of THE KAREN VORTEX™[3] at LLG, birth year 1971), JAMBECK (senior purveyor of THE KAREN VORTEX™, birth year 1970), and TROUTMAN (apprentice purveyor of THE KAREN VORTEX™, birth year 1984) have been LLG employees, and between 8/21/2018 and 12/13/2018 provided limited-scope legal representation for PARENT-1, M.C., and C.C., who are students with disabilities in DIABLO schools, and me in a civil dispute involving DIABLO over special education services and civil rights. Beginning on 8/16/2018 and thereafter, I explicitly prohibited LLG from representing or advising me in any other matter, including but not limited to the sham proceedings regarding fraudulent requests for restraining orders brought by DIABLO DEFENDANTS. JAMBECK and LEIGH have supervisory authority at LLG. At all material times relevant to this **COMPLAINT**, they have conspired and/or acted jointly with at least one of the INDIVIDUAL GOVERNMENT DEFENDANTS. They work out of 870 Market Street, Suite 1157, San Francisco, California 94102. BROWN resides in Southern California, JAMBECK and LEIGH reside at 138 Hawthorne Avenue, Larkspur, CA 94939, and TROUTMAN resides at 6521 San Pablo Avenue, Apartment 301, Emeryville, CA 94608, with an intention to reside here indefinitely, and are therefore citizens of California. They are sued in their shareholder, employee, professional, representative, and individual capacities and are hereinafter collectively referred to as LLG DEFENDANTS.

THE KAREN VORTEX™

*Pretending to be a Victim for Profit*

REPEAT — Create Conflict with Target by Any Means Necessary — Blame Target for Creating that Conflict — Demand what KAREN wants from Target — Get what KAREN wants from Target

---

[3] THE KAREN VORTEX™ is a term I use herein to describe LEIGH's policy and procedure of pretending to be a victim for profit.

06/22/2020

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

51. At all material times relevant to this **COMPLAINT**: (a) McMONIGLE, RIZZARDI, and SULLIVAN have been LOLE employees, conspiring with and/or acting on behalf of and/or jointly with DIABLO, AALRR, F3, HFJA, LLG, & OHSH DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, and/or the CCC COURT; (b) McMONIGLE and SULLIVAN had supervisory authority at LOLE. They work or worked primarily out of 60 South Market Street, Suite 1400, San José, CA 95113-2396. They reside in Northern California with an intention to reside here indefinitely and are therefore citizens of California. They are sued in their employee, professional, and individual capacities and are hereinafter collectively referred to as HFJA DEFENDANTS.

52. At all material times relevant to this **COMPLAINT**, GILBERT has been an OHSH employee representing all DIABLO DEFENDANTS except the AALRR DEFENDANTS in Case No. 19-cv-03441-MMC, conspiring with and/or acting on behalf of and/or jointly with DIABLO, AALRR, F3, LLG, & LOLE DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, City and County of San Francisco, and/or this Court. He works primarily out of 6210 Stoneridge Mall Road, Suite 210, Pleasanton, CA 94588. He resides in Northern California with an intention to reside here indefinitely and is therefore a citizen of California. He is sued in his professional, employee, and individual capacities.

53. At all material times relevant to this **COMPLAINT**: (a) LAMPASONA, MINTZ, RANUCCI, REYNOLDS, and SHUEY have been RANKIN shareholders and employees, conspiring with and/or acting on behalf of and/or jointly with the JOHN MUIR HEALTH, CPD, & DIABLO DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, Alameda County, CITY OF CONCORD, CITY OF OAKLAND, and/or CITY OF WALNUT CREEK; (b) LAMPASONA, MINTZ, RANUCCI, REYNOLDS, and SHUEY had supervisory authority at RANKIN. They work or worked primarily out of 2030 Franklin Street, 6th Floor, Oakland, CA 94612. They reside in Northern California with an intention to reside here indefinitely and are therefore citizens of California. They are sued in their shareholder, employee, professional, and individual capacities and are hereinafter collectively referred to as RANKIN DEFENDANTS.

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

54.    At all material times relevant to this **COMPLAINT**, DALY has been a TDL shareholder and employee, conspiring with and/or acting on behalf of and/or jointly with the CCC, CCC COURT, DIABLO, & F3 DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, City of Martinez, CITY OF WALNUT CREEK, and/or the CCC COURT. He works primarily out of 2950 Buskirk Avenue, #300, Walnut Creek, CA 94597. He resides in Northern California with an intention to reside here indefinitely and is therefore a citizen of California. He is sued in his shareholder, professional, employee and individual capacities.

55.    At all material times relevant to this **COMPLAINT**, COULTER has represented HARPER, conspiring with and/or acting on behalf of and/or jointly with the CCC, CCC COURT, DIABLO, & F3 DEFENDANTS under color of law, color of statutes, ordinances, regulations, policies, customs, and usages of the State of California, CCC, City of Martinez, and/or the CCC COURT. She works primarily out of and resides at 1381 Curtis Street, Berkeley, CA 94702 with an intention to reside here indefinitely and is therefore a citizen of California. She is sued in her professional and individual capacities.

56.    At all material times relevant to this **COMPLAINT**, LAI acted jointly with McALISTER. She resides at 1965 Desert Circle, Apartment 2, Walnut Creek, CA 94598, with an intention to reside here indefinitely, and is therefore a citizen of California. She is sued in her individual capacity.

**Unknowns**

57.    The true names and capacities of the DEFENDANTS sued as DOES 1-100, inclusive, whether individual, private company, public entity, corporate, associate, agent, or otherwise, are unknown to me as the real names are not ascertainable or known to me because discovery has not yet commenced. These UNKNOWN/DOE DEFENDANTS are sued under fictitious names pursuant to *Anderson v. Allstate Ins. Co.* (9th Cir. 1980) 630 F.2d 677. I am informed and believe that each of them was responsible in some way for the occurrences and injuries alleged in this **COMPLAINT**, acted as an agent or employee of the other DEFENDANTS and/or ratified the conduct of other DEFENDANTS. ALL UNKNOWN/DOE INDIVIDUAL DEFENDANTS are sued in their individual and, if appropriate, official or employee capacities. ALL UNKNOWN/DOE ENTITY DEFENDANTS are

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

sued under individual, *Monell*, statutory, and/or *respondeat superior* liability as appropriate. I need to conduct limited discovery in order to positively identify these UNKNOWN/DOE DEFENDANTS.

## SUBJECT MATTER JURISDICTION

58.    This Court has original subject matter jurisdiction over this civil action because: it arose under the Constitution and laws of the United States (28 USC § 1331); I commenced it to recover damages for injuries to my person and property from the deprivation of my rights and privileges as a citizen of the United States by acts done in furtherance of conspiracy mentioned in 42 USC § 1985 (28 USC § 1343(a)(1)); I commenced it to recover damages from persons who failed to prevent or to aid in preventing any wrongs mentioned in 42 USC § 1985 which they had knowledge were about to occur and power to prevent (28 USC § 1343(a)(2)); I commenced it to redress deprivations under color of State law, statute, ordinance, regulation, custom or usage, of my rights, privileges and/or immunities secured by the Constitution of the United States or by an Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States (28 USC § 1343(a)(3)), I commenced it to recover damages and to secure equitable and other relief under multiple Acts of Congress providing for the protection of civil rights (28 USC § 1343(a)(4)).

59.    This Court has supplemental subject matter jurisdiction over this civil action because it has original jurisdiction over many of my claims as described herein and all of my other claims are so related to those claims that they form part of the same case or controversy under Article III of the United States Constitution. (28 USC § 1367(a).)

60.    This Court may sustain jurisdiction when an examination of this entire **COMPLAINT** reveals a proper basis for assuming jurisdiction other than one that has been asserted herein. (See, e.g., *Williams v. United States*, 405 F.2d 951, 954 (9th Cir.1969).)

## VENUE

61.    Venue is proper in this District because I bring this civil action against entities and individuals who reside, are found, have agents, and/or transact their affairs here (18 USC § 1965(a)), and because all of the known events giving rise to it occurred here (28 USC § 1391(b)(2)).

///

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

## INTRADISTRICT ASSIGNMENT

62. This civil action should be been assigned to the San Francisco/Oakland Division because a substantial part of the events or omissions which give rise to the claims stated herein occurred in CCC and the City and County of San Francisco. (Civil L.R. 3-2(c) and (d), 3-5(b).)

## SPECIFIC PERSONAL JURISDICTION

63. California law, which partly governs personal jurisdiction in this case, "permits the exercise of personal jurisdiction to the full extent permitted by due process." *Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000).

64. All KNOWN DEFENDANTS and at least some UNKNOWN DEFENDANTS are citizens of California either whose principal places of business are located or who reside in this District.

65. The exercise of specific personal jurisdiction over all KNOWN DEFENDANTS and at least some UNKNOWN DEFENDANTS specified herein is proper because they perpetrated and/or directed all of their known wrongful acts against me while all KNOWN DEFENDANTS, at least some UNKNOWN DEFENDANTS, and I were in this District.

66. My complaint originates from DEFENDANTS' wrongdoing against me in this District. As such, this Court has specific personal jurisdiction over DEFENDANTS.

## CONDITIONS PRECEDENT

67. For my California state law claims against the public employees and employers who are or will be named in this **COMPLAINT**, I have either first filed timely government claims pursuant to the California Tort Claims Act (CTCA) or was fraudulently prevented from doing so by one or more of the DEFENDANTS. (See California Government Code § 911.2.)

## FACTS COMMON TO ALL CLAIMS

68. In order to fraudulently protect themselves from legal liability caused by their wrongful acts, the GOVERNMENT ENTITY DEFENDANTS have trained and enabled their employees, including the GOVERNMENT INDIVIDUAL DEFENDANTS, to prey in packs upon those who complain about their wrongful acts. Across government agencies, they have created a culture of predation. For some examples, they are trained and enabled to fraudulently allege:

///

06/22/2020

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF

a. Child abuse and/or endangerment crimes, to make fraudulent Suspected Child Abuse Reports (SCARs) to CCC Children & Family Services (CFS), and to threaten to make those fraudulent allegations and SCARs. Such acts are very effective at thwarting lawsuits by frightening parents and other caregivers with "the embarrassment and social stigmatization attached to child abuse investigations." (*Greene v. Camreta*, 588 F. 3d 1011, 1016 (9th Cir. 2009) (*Greene*).) Government employees who are mandated reporters feel free to use those fraudulent acts predominantly because they enjoy absolute immunity from state claims arising from SCARs and some acts that precede those SCARs even when they are made and done maliciously. It is no wonder that "[a]lmost two-thirds of abuse and neglect reported is not substantiated." (*Arce v. Children's Hospital Los Angeles*, 211 Cal. App. 4th 1455, 1488 (2nd Dist. 2012) (*Arce*).) Where the reporter is a government employee in California threatened with a lawsuit, it stands to reason that the ratio of unsubstantiated SCARs is much higher. In my case, at least nine DEFENDANTS fraudulently threatened, investigated, alleged, and/or made fraudulent child abuse and/or endangerment charges and/or SCARs. ***ALL OF THOSE REPORTED WERE NOT SUBSTANTIATED***. At all material times relevant to this **COMPLAINT**, the NON-GOVERNMENT INDIVIDUAL DEFENDANTS have been acutely aware of those wrongful tactics and have adopted them for the same purposes.

b. Unlawful violence, mental illness, threats of unlawful violence, misogyny, racism, and to threaten to make those fraudulent allegations. In my case, countless DEFENDANTS fraudulently threatened, investigated, alleged, and/or made such allegations. ***ALL OF THOSE ALLEGATIONS ARE FALSE***. At all material times relevant to this **COMPLAINT**, the NON-GOVERNMENT INDIVIDUAL DEFENDANTS have been acutely aware of those wrongful tactics and have adopted them for the same purposes.

69.    Any disturbances involving DEFENDANTS and me that took place during the time period addressed by this complaint were sparked by my assertions of my rights in the face of unconstitutional, tortious, and criminal statements and acts by DEFENDANTS. There were no disturbances that demonstrate any disruptiveness inherent in those assertions of mine. Yet

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

DEFENDANTS repeatedly followed the same pattern: They used conflicts that they created with their unconstitutional, tortious, and criminal statements and acts in retaliation for my lawful assertions of my rights as evidence of circumstances giving rise to the need for their further unconstitutional, tortious, and criminal statements and acts. (Adapted from *Sammartano*, *supra*, 303 F. 3d at 968, hereinafter referred to as THE *SAMMARTANO* VORTEX™.)

70.     On or around 11/25/2019, the Honorable Mary Ann O'Malley entered an order granting a demurrer of mine, thereby ending sham criminal proceedings that some of the DEFENDANTS began approximately 15 months beforehand on 8/24/2018 (see CCC COURT Docket No. 01-186928-8), which were based on fraudulently alleged violations of two fraudulently obtained and facially void **TEMPORARY RESTRAINING ORDERS (TROs)** that had been entered without notice to me or any opportunity for me to be heard approximately 18 months beforehand on 5/23/2018 (see CCC COURT Case No. MSN18-1101) and 5/30/2018 (see CCC COURT Case No. MSN18-1176). The known complaining witnesses in those sham proceedings were McALISTER, REID, COOPER, WOOD, CAMPOPIANO, CASSIDY, MEYER, COOKSEY, MAHER, and ESTRADA. In support of their sham proceedings for **THOSE FACIALLY VOID TROs** and/or their sham proceedings for subsequently denied Restraining Orders After Hearings (ROAHs), each of those DEFENDANTS provided perjured testimony and/or concealed and/or destroyed hard evidence, including but not limited to video recorded by DIABLO's cameras on DIABLO's computers. COMBS, ECKSTEIN, and other F3 employees conspired with the DIABLO DEFENDANTS, TREAT, WEIL, and others to initiate and maintain those sham proceedings and suborned that wrongdoing by them throughout much of the time period addressed by my **COMPLAINT**. The DIABLO & F3 DEFENDANTS conspired to undertake and undertook those proceedings without the legitimate expectation that those proceedings would in fact induce lawful government action. Importantly, Judge O'Malley had just been assigned to those sham criminal proceedings that day, was ruling on **FACIALLY VOID TROs** that had been entered by TREAT and WEIL, who sat on the CCC COURT bench just like she did, and took less than an hour or so to confirm some of the facts that I had maintained all along by finding **THOSE FACIALLY VOID TROs** "absolutely" and "grotesquely" overbroad.

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

71. Judge O'Malley's unequivocal condemnation of **THOSE FACIALLY, ABSOLUTELY, & GROTESQUELY OVERBROAD & VOID TROs** tended to show another fact that I had stated all along: TREAT and WEIL, by initially entering them without notice or opportunity for me to be heard, and WEIL, by repeatedly extending them and, falsely claiming lack of jurisdiction, repeatedly refusing to even consider **MY REPEATED REQUESTS TO VACATE THE THEM** for approximately 14 months, corruptly conspired with the other DEFENDANTS to create an illusion of legality while stigmatizing me and, for that period and beyond, depriving me of many rights and interests. The other DEFENDANTS could not have done so without them.

72. The DIABLO & F3 DEFENDANTS did not give me notice or an opportunity to be heard on their requests for **THOSE FACIALLY, ABSOLUTELY, & GROTESQUELY OVERBROAD & VOID TROs** before they obtained them from TREAT and WEIL, which completely prevented me from presenting my case against them because I was unaware of the sham proceedings on those fraudulent requests. Every material allegation about my course of conduct that the DIABLO & F3 DEFENDANTS made or suborned under penalty of perjury in their declarations that could have even possibly established the cause necessary to support **THOSE FACIALLY, ABSOLUTELY, & GROTESQUELY OVERBROAD & VOID TROs** was irrefutably contradicted by audio and video that I, DIABLO and some of its employees, and some law enforcement employees recorded. The DIABLO & F3 DEFENDANTS did not present any of DIABLO's own audio and video of the events they perjuriously testified about in support of their fraudulent requests for **THOSE FACIALLY, ABSOLUTELY, & GROTESQUELY OVERBROAD & VOID TROs**. *All of the above-referenced recordings irrefutably show that all of the below extremely damaging statements are false*:

    a. Referring to my approximately three-minute interaction with McALISTER at NHS that he initiated on the morning of 5/15/2018:

        i. "In a sharp, angry voice, [WILSON] demanded, 'Do not do that!'" (McALISTER 5/22/2018 Decl. ¶ 30.)

        ii. "As [WILSON] approached the parking lot, he spotted me from a distance, pointed at me violently and yelled, 'You're toast!' and threatened that I would be fired." (*Id.* ¶ 31.)

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

b. Referring to my seconds-long interaction with MAHER at DENT that I initiated on the afternoon of 5/15/2018:

    i. "[WILSON] banged on my door." (MAHER 5/29/2018 Decl. ¶ 4.)

    ii. "I opened the door and witnessed [WILSON] trying to enter [my office]." (*Id.*)

c. Referring to the events at NHS on the morning of 5/17/2018:

    i. "As [WILSON] began [to read a document aloud], his hands shook in agitation." (McALISTER 5/22/2018 Decl. ¶ 47.)

    ii. "[WILSON] would not let any person inspect or approach the contents of his bag." (*Id.* ¶ 51.)

    iii. "I took [WILSON's] comments to mean that he was threatening to kill and mutilate me and/or other [DIABLO] staff and students." (*Id.* ¶ 55.)

    iv. "[WILSON] was loud and aggressive from the moment he arrived." (CAMPOPIANO 5/20/2018 Decl. ¶ 8.)

    v. "[WILSON's] body was shaking, and he appeared oddly dissociated." (*Id.*)

    vi. "Eventually, [WILSON] reached into his bag and produced a document which he threw at [McALISTER's] feet. (*Id.* ¶ 12.)

    vii. "[WILSON] did not make sense throughout this encounter." (*Id.* ¶ 14.)

    viii. "[WILSON]… tossed a copy [of a document] towards [McALISTER]." (CASSIDY 5/20/2018 Decl. ¶ 4.)

    ix. "[McALISTER] approached [WILSON] and inquired, 'May I ask why you are here?' [WILSON] retorted, 'No, you may not.'" (WOOD 5/20/2018 Decl. ¶¶ 5-6.)

    x. "[WILSON] produced three [dox] and… threw [copies] towards [McALISTER] and [COOPER]." (*Id.* ¶ 11.)

d. On 5/22/2018, "[WILSON] sent… a… largely incoherent email. (MAHER 5/29/2018 Decl. ¶ 9.)

e. Referring to events on 5/25/2018:

    i. "[WILSON] was growing more agitated and hostile." (*Id.* ¶ 16.)

    ii. "[WILSON] raised his voice… towards [ESTRADA]." (*Id.*)

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

iii. "[WILSON]… taunted [ESTRADA]… about his real name." (*Id.*)

iv. "[Two assistants] were both shaking visibly and looked afraid." (*Id.* ¶ 18.)

v. "[WILSON] became very upset when I closed the door…" (*Id.* ¶ 20.)

vi. "[WILSON] began shouting at me repeatedly…" (*Id.*)

vii. "[WILSON] yelled [at] me many times." (*Id.*)

viii. "[WILSON] became visibly upset…" (*Id.* ¶ 21.)

ix. "[WILSON] has repeatedly… harassed staff by… yelling at them… and treating them abusively." (*Id.* ¶ 23.)

x. "[A] very tall man, [WILSON], was disrupting the office and menacing staff." (ESTRADA 5/29/2018 Decl. ¶ 3.)

xi. "[WILSON's] tone of voice was menacing and harassing." (*Id.* ¶ 6.)

xii. "[WILSON] repeatedly demanded that [an assistant] give him an appointment to meet with [another DIABLO employee]." (*Id.*)

xiii. "[An assistant] was on the verge of tears, and insisted, 'I don't know what else I can do for you.'" (*Id.*)

xiv. "[WILSON]… became upset with [MAHER],… and threatened that everyone 'would pay dearly' if we interrupted his business." (*Id.* ¶ 8.)

xv. [I saw an assistant] in… a distressed state." (*Id.* ¶ 9.)

xvi. "[WILSON] said I would be 'very sorry'… and that I would be 'terrified over the weekend…'" (*Id.* ¶ 11.)

xvii. "[WILSON] was blinking his eyes rapidly." (*Id.* ¶ 15.)

xviii. "I informed [WILSON] that his perception must have been [distorted by] his rapid eye blinking. (*Id.*)

xix. "[WILSON] stared at me intently for several seconds." (*Id.* ¶ 17.)

xx. "[WILSON] was sweating profusely and [I] pointed this out to him." (*Id.*)

xxi. "[MAHER] appeared truly terrified…" (*Id.* ¶ 19.)

xxii. "[WILSON] became enraged." (*Id.*)

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

xxiii. "[WILSON's] demeanor changed when [a law enforcement employee who was taller than him] arrived, and he seemed more uneasy." (*Id.* ¶ 22.)

xxiv. "[WILSON told a law enforcement employee] that he was at the [DIABLO property] to make an appointment." (*Id.* ¶ 23.)

xxv. "[WILSON] became visibly upset and agitated." (*Id.* ¶ 25.)

xxvi. "[WILSON] became combative and uncooperative..." (*Id.*)

xxvii. "[PARENT-1] went on an angry tirade..." (*Id.* ¶ 26.)

xxviii. "[WILSON's] behavior... was frightening to observe." (*Id.* ¶ 28.)

xxix. "[WILSON] was loud and hostile... and was clearly intent upon bullying and harassing..." (*Id.*)

xxx. "[WILSON] repeatedly told us we would be 'very sorry' if we 'got in his way' and personally threatened that I was 'going to have a bad weekend[,]'... [which] I perceived as explicit threats that we would be harmed..." (*Id.*)

xxxi. "[WILSON] exhibited... twitching, profuse sweating and irrational thinking..." (*Id.* ¶ 29.)

xxxii. "[WILSON] appeared to take pleasure in upsetting and hurting others and was oblivious to or ignored the distress he was causing others." (*Id.* ¶ 30.)

xxxiii. "When I arrived..., I observed that the office staff were visibly unnerved..." (*Id.*)

xxxiv. "[WILSON was in an] agitated and manic state." (*Id.* ¶ 31.)

73. In further support of their fraudulent requests for those facially void TROs, the DIABLO & F3 DEFENDANTS also knowingly filed a fraudulently-obtained and defamatory order about me from CCC COURT dated 2/10/2014 that had been judicially determined to be facially void years beforehand.

74. A predominant ulterior goal of DEFENDANTS' sham proceedings and other wrongful acts described herein was to deprive PARENT-1, M.C., C.C., and me of our rights to access, to investigate, and to petition DIABLO about wrongful acts by some of its employees, and of our rights to access and to petition the state and federal courts about wrongful acts by the DIABLO DEFENDANTS for long enough to extort property and other consideration from us, including but not limited to releases

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND
OTHER RELIEF

of our legal claims against the DIABLO DEFENDANTS. (*Ernest W. Hahn, Inc. v. Codding*, 615 F.2d 830 (9th Cir. 1980); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 674 F.2d 1252, 1271 (9th Cir. 1982), republished at 690 F.2d 1240; *Omni Resource Development Corp. v. Conoco, Inc.*, 739 F.2d 1412, 1413 (9th Cir. 1984); *Assigned Container Ship Claims, Inc. v. American President Lines, Ltd.*, 784 F.2d 1420 (9th Cir. 1986); *Boone v. Redevelopment Agency of City of San José*, 841 F.2d 886 (9th Cir. 1988).

75.    DEFENDANTS' initial predominant motivation for that predominant ulterior goal was to protect REID from legal and administrative accountability for her known wrongful acts during the 2017-2018 school year as follows:

    a. Emotionally and psychologically abusing M.C., including but not limited to derisively assigning student "babysitters" for M.C., who was then 15 years old, in front of other students and maliciously depriving M.C. of an assistive recording device that M.C. had a right to use in class due to memory and language processing disabilities caused by a Traumatic Brain Injury (TBI), thereby preventing M.C. from fully participating in the curriculum.

    b. Criminally recording M.C. and other students while depriving M.C. of that assistive recording device.[4]

    c. Cheating to win Teacher of the Year (TOY) at the DIABLO level, partly because REID was in competition for TOY at higher levels.

76.    During the sham proceedings on requests for ROAHs in which I represented myself, I adduced such overwhelming evidence of wrongdoing by the DIABLO & F3 DEFENDANTS that a person ostensibly acting as a judge, WEIL, who was biased against me and for them, was nonetheless compelled to find that they lied over and over about me. For some examples of those findings, WEIL

---

[4] Education Code section 51512 states in pertinent part: "The Legislature finds that the use by any person, including a pupil, of any electronic listening or recording device in any classroom of the elementary and secondary schools without the prior consent of the teacher and the principal of the school given to promote an educational purpose disrupts and impairs the teaching process and discipline in the elementary and secondary schools, and such use is prohibited. Any person, other than a pupil, who willfully violates this section shall be guilty of a misdemeanor."

06/22/2020    **Page 33 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

said: "[McALISTER's] claim that he was in fear of physical violence [from WILSON] … was not credible. I don't believe that [McALISTER] was petrified. I don't believe that a reasonable person under the circumstances would have been petrified. On [5/18/2018, McALISTER] wrote an email that said [in pertinent part ']I don't see [WILSON] as someone to fear…" [WILSON] is not someone to be physically feared. And this was [McALISTER's] view on it." (CCC COURT Case Nos. MSN18-1101 & MSN18-1176, Certified Transcript of Sham Proceedings on 7/26/2019 at pp. 11:21-12:14.) "I've considered not only declarations but live testimony, and I've reviewed a lot of audio and video. The declarations in many instances exaggerate the threat posed by [WILSON]. The videos show everyone involved behaving relatively calmly, at least compared to the version set forth in the declarations and sometimes in the testimony." (*Id.* at p. 13:10-16.) I had delivered some of the exculpatory "audio and video" to COOKSEY, AALRR, MEYER, and MAHER on or around 5/16/2018, which they had shared with ECKSTEIN by 5/18/2018.

77.     At all material times relevant to this **COMPLAINT**, I was free to record without prior consent from anyone because:

    a.   My federally-protected right to record, e.g., both generally to gather information about the activities of my government and specifically to gather evidence in connection with my investigations of tortious misconduct by DEFENDANTS (see, e.g., *Tichinin v. City of Morgan Hill*, 177 Cal. App. 4th 1049, 1074-1081 (2009)), which are matters of public concern, within government buildings or police or nonpolice public employees working inside government buildings, subject to reasonable time, place and manner restrictions that are viewpoint neutral, had been clearly established for decades in the Ninth Circuit (see, e.g., *[WILSON] v. County of Contra Costa*, No. 14-cv-03491-SI (N.D. Cal. May 6, 2015)).

    b.   Public meetings under the California Open Meetings Act, a.k.a. the Brown Act, (Cal. Gov. Code §§ 54950-54963), all of which may be recorded according to that law (*id.* § 54953.5(a)) and the California and United States Constitutions, regularly occurred at all but one of the buildings that DEFENDANTS managed where I recorded.

///

06/22/2020                                                                    **Page 34 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

c. The published rules and regulations pertaining to the conduct of members of the public in all but one of the government buildings that DEFENDANTS managed where I recorded did not even ostensibly restrict electronic recording in any area, public or not.

d. DEFENDANTS first gave verbal directions that ostensibly restricted recording in DENT, which first opened in 1959, on 5/25/2018 and first posted such signs in August 2019. Both of those acts by DEFENDANTS occurred after I had first exposed their criminal and tortious misconduct on 4/27/2018. Those ostensible restrictions targeted me predominantly because DEFENDANTS did not want me to gather more evidence to establish their patterns and practices of criminal and tortious misconduct or hold them legally accountable for those patterns and practices. No DIABLO employee or sign has ever stated any published rule or regulation purporting to restrict electronic recording or to provide means to request permission from DIABLO to electronically record at DENT. Those directions and signs directly conflict with the Brown Act and other state recording protections. Those purported restrictions therefore are not reasonable in light of the legitimate purposes served by DENT and are not viewpoint neutral. (*Cornelius v. NAACP Legal Defense & Ed. Fund, Inc.*, 473 US 788 (1985).)

e. I never recorded in any DIABLO classroom. (Ed. Code § 51512.)

f. None of the buildings that DEFENDANTS managed where I recorded were federal property, which means the aforementioned Brown Act and other state recording protections were not superseded under the Supremacy Clause of the U.S. Constitution (see U.S. Const. art. VI, cl.2) by 41 C.F.R. § 102-74.385 ["Persons in and on property must at all times comply with official signs of a prohibitory, regulatory or directory nature and with the lawful direction of Federal police officers and other authorized individuals."] or any other federal law.

g. Other persons were present and overheard my communications with each person I recorded. (See, e.g., *[WILSON] v. County of Contra Costa*, No. 14-cv-03491-SI (N.D. Cal. May 6, 2015).)

h. My electronic recording devices were always in plain view. (*Id.*)

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

i. I recorded in connection with my investigations of criminal misconduct by DEFENDANTS in support and anticipation of making private person's arrests of and police reports against DEFENDANTS.

j. I never recorded any communication in any context where any of the parties to that communication had an expectation of privacy that society is prepared to recognize as reasonable (see, e.g.: *United States v. Fisch* 474 F. 2d. 1071, 1076-1079 (9th Cir. 1973); *People v. Kaaienapua* 70 Cal.App.3d 283, 288 (1977) (*Kaaienapua*) [citizens "daily assume the risk that their neighbors may listen to their conversations through a common wall."]; *People v. Goodson*, 106 Cal. App. Supp. 3d 5, 8-10 (1980) [observations that can be made in a common hallway open to the public of conversations that are audible through the door of an apartment are in plain view]; *People v. Loyd* 119 Cal.Rptr.2d 360, fn. 13 (2002) [California Supreme Court approvingly cites the foregoing *Kaaienapua* quotation].).

k. I recorded all communications for the purpose of obtaining evidence reasonably believed to relate to the commission by DEFENDANTS of the crimes of extortion, kidnapping, and felonies involving violence against me. (Cal. Pen. Code § 633.5.)

l. I recorded all communications to protect myself from perjurious testimony, both written and live, that I correctly anticipated from DEFENDANTS (*Frio v. Superior Court*, 203 Cal.App.3d 1480, 1488 (1988); *People v. Crow* (1994) 28 Cal.App.4th 440, 452 ["Evidence of [allegedly] confidential conversations obtained by ... recording [allegedly] in violation of section 632 ... can be used to impeach inconsistent testimony by those seeking to exclude the evidence"].) The reason for this exception is simple: Section 632 does not "confer upon a testifying witness the right to commit perjury." (*Frio, supra*, 203 Cal.App.3d at p. 1497.)).

78. In April 2018, PARENT-1 initially determined that a legal service plan she had purchased through her employer did not cover the worsening dispute with DIABLO and she could not afford to hire a lawyer without such coverage, so she asked me to help her resolve it.

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

79.    Some events relevant to this **COMPLAINT** began at the Heather Farm Skate Park in Walnut Creek, California (hereinafter Skate Park) on 4/20/2018. SAFFOLD, SILVA, and MOORHOUSE initiated a conflict with and then perpetrated crimes and other wrongdoing against me there, including but not limited to threatening to falsely charge me with child endangerment after I complained about some of their conduct. By 4/23/2020, I had contacted CHAPLIN, CONLEY, MOORHOUSE, complained to them, requested all available evidence from them, and requested reassurance from them that the WCPD would provide honest services to me going forward and help me informally resolve my complaints against MOORHOUSE, SILVA, and SAFFOLD. (See Case No. 20-cv-2721-PJH.) Those events are relevant because they show:

   a.    The GOVERNMENT ENTITY DEFENDANTS' routine practice of weaponizing fraudulent child endangerment charges against people who complain about their employees' conduct (see, e.g., ¶ 68 above); and

   b.    The WCPD's motive to conspire with the DIABLO DEFENDANTS to perpetrate some of the other wrongdoing described herein.

80.    In an email sent on 4/25/2018 around 3:37 PM from REID to PARENT-1, copying several other DIABLO employees, M.C., PARENT-2, and me, REID admitted that she had willfully recorded at least one class of hers that M.C. had attended. (Ed. Code § 51512.) She did not say in her email or at any other time that McALISTER had given REID his prior consent for her to record that class to promote an educational purpose. Nor did McALISTER ever say so.

81.    Beginning on or about 4/26/2018 and continuing thereafter on or about 5/8/2018, 5/15/2018, 5/17/2018, 6/13/2018, 7/30/2019, 7/31/2019, 8/12/2019 and/or other dates, I informed and/or reminded multiple individuals, many of whom worked with the DIABLO, in writing and verbally, of certain disabilities of mine that, among other impairments (see, e.g., ¶ 2 above), make it very difficult for me to keep my internal temperature safely low, which makes sunlight and external temperatures above 70° Fahrenheit potentially dangerous for me, cause me to need to drink water extremely frequently due to chronic dehydration, which makes lack of water even for short periods potentially dangerous for me, and/or cause me to use the restroom extremely frequently both to urinate and to administer medication with a needle to private areas of my body, which makes lack of quick

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

access to a restroom potentially dangerous for me. Those individuals include, but are not limited to, Katherine Vose, COOPER, REID, Peter Anthony Ceresa, Lauren Anne Lahey, Rita Marie Farabaugh, Ann Louise Tirrell, WOOD, Lindee Moylan Sargent, McALISTER, CAMPOPIANO, COOKSEY, FEY, CASSIDY, MEYER, MAHER, ESTRADA, ECKSTEIN, COMBS, AMENTA, WILBURN, BYLUND, MILLER, WESTFIELD and MURPHY-OATES. Those people had the ability and responsibility to tell other individuals who worked with DIABLO about my disabilities and the dangers associated with them. Each person I asked about who gave instructions affecting me regarding the below events occurring between 7/30/2019 and 8/12/2019 answered that BYLUND did so.

82.    On 4/26/2018 during a meeting at NHS, I started to complain to REID, COOPER, ERICKSON, and other DIABLO employees about REID abusing M.C., criminally recording M.C. during at least one class, and cheating to win the TOY competition at the DIABLO level. Long before I finished stating the first of those three complaints, they walked out of the meeting. NHS students had previously complained about REID's abuse of M.C. to several mandated reporters at NHS, including but not limited to COOPER, but none of them made a SCAR to CCCCFS against her by 4/26/2020.

83.    On 4/27/2018 during a meeting at NHS, PARENT-1 and I, on behalf of M.C., PARENT-2, and ourselves, escalated those complaints about REID to McALISTER and asked him to remove M.C. from her class at least during the investigation. He agreed then and there to initiate an investigation into those complaints, but it turned out to be a sham investigation that he conducted himself. McALISTER did not make a SCAR to CCCCFS against REID on 4/27/2020 for abusing M.C. Within 30 minutes or so from the end of that meeting, McALISTER removed M.C. from REID's class as we had requested, but by the next morning falsely implied that he had done so because REID, he, and other DIABLO DEFENDANTS feared for REID's safety as a result of unspecified wrongful acts by PARENT-1, M.C., and me. His exact words to us were: "[I]n transferring [M.C.] to another class, I have acted to make sure that neither [M.C.], nor you, nor [M.C.'s] mother, [PARENT-1], has any reason to have further contact with [REID]." (Email from McALISTER sent 4/28/2018 9:14:57 AM.) None of us had done anything wrong toward REID so we understood those words from McALISTER as a threat to falsely accuse us of wrongful acts toward REID that caused REID, him, and other DIABLO DEFENDANTS to fear for REID's safety unless we stopped pursuing our complaints against

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

REID. I later established at trial that McALISTER intended those words of his to mean exactly what they had always implied.

84.    In an email sent on 4/29/2018 around 5:08 PM from me to McALISTER, copying several other DIABLO employees, PARENT-1, and PARENT-2, I requested further information about McALISTER's sham investigation and attached a notarized **POWER OF ATTORNEY (POA)** signed by PARENT-1 and PARENT-2 on 4/29/2018 delegating to me all material parental rights regarding M.C. and C.C. that are relevant to this **COMPLAINT**.

85.    On 5/8/2018 around noon, I entered NHS and delivered an original of the **4/29/2018 POA**. Standing near McALISTER, who was paying attention to me, I clearly explained the nature of the **4/29/2018 POA** to several DIABLO employees and permitted them to make copies of it, which they did. Then McALISTER, who had "transferr[ed] [M.C.] to another class" so PARENT-1, M.C., and I would not have "any reason to have further contact with [REID]" impliedly because REID, he, and other DIABLO DEFENDANTS feared for REID's safety as a result of unspecified wrongful acts by us (see ¶ 83 above), stated that M.C. was to further contact REID and that she would contact M.C. While I was at NHS, I also requested a copy of M.C.'s complete education file. The registrar on duty told me that I could get it faster from DENT because it was stored there. I had already intended to go there anyway to escalate our complaints against REID and to complain about McALISTER so I retracted my request in order to make it at DENT, thereby saving everyone, including myself, some work and time.

86.    On the afternoon of 5/8/2018 at DENT after I had requested a copy of M.C.'s complete education file, I met with and complained to HOLLERAN about McALISTER's sham investigation of our complaints about REID. In response to my complaints and subsequent email with further information about those complaints, HOLLERAN agreed to initiate investigations of them, but those investigations turned out to be shams that he conducted himself. Less than 10 days later, I received a letter from HOLLERAN in which he summarily exonerated REID of criminally recording M.C. during class—an act she had essentially admitted to—and did not even address the other aspects of those complaints. No one interviewed M.C., PARENT-1, PARENT-2 or me in connection with the investigations we had requested.

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

87. One of my top priorities after removing M.C. from REID's class was to learn whether any DIABLO employee had reported REID's emotional and psychological abuse of M.C. to CCCCFS, or any other authority. I understood those sham investigations partly as attempts by the DIABLO DEFENDANTS to hide the fact that no one had reported REID's abuse of M.C.

88. On the morning of 5/15/2018, I was at NHS attempting, among other things, to retrieve M.C. to give him a dose of prescription medication that he had forgotten to take before he went to his first classroom of the school day. McALISTER approached me, stood uncomfortably close to me, and interrupted a conversation I was having with WOOD about briefly retrieving M.C. This is a verbatim transcript of a recording of my entire interaction with McALISTER that morning:

McALISTER: [WILSON], what's your order of business today?

ME: Hi. Already taking care of it. Just—it was a situation with Lauren Lahey, and—

McALISTER: I want you to make an appointment with her next time, okay?

ME: Attempted to. Please be fair with me. Don't give me a hard time. Don't give me a hard time, Principal McAlister. I appreciate it.

McALISTER: I'm not giving you a hard time. I don't want you to gi—

ME: You are.

McALISTER: —No, I don't want you to gi—

ME: You're standing in my face.

McALISTER: I'm in your face.

ME: Yes. You're far too close to me.

McALISTER: (He got out of my face, walked toward his office, and stopped at his door.) Why don't you come on into my office?

ME: I'd rather not.

McALISTER; Okay. Then I'd rather you get off the site right now.

ME: I'd rather not. I've got to talk to [M.C.].

McALISTER: You have a choice. You have a choice. What I can do is either call the police and have you escorted, or you can leave your own volition. Are we clear?

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

ME: I believe—

McALISTER: I don't like you harassing my staff.

ME: I'm not harassing anyone. I'm not harassing anyone. You can ask her.

McALISTER: No.

ME: I just spoke—I had a friendly conversation with Laruen Lahey. I'm about to have a conversation with [M.C.]. And I'm about to leave the campus.

McALISTER: Good.

ME: If you'll let me finish my business, I would appreciate it.

McALISTER: Good. Thank you.

ME: Are you gonna let me do that?

McALISTER: I'm going to encourage it.

ME: Okay. Thank you.

McALISTER: By the way, it's "DOCTOR McAlister!"

ME: Well, congratulations, Doctor McAlister. "Doctor Principal McAllister?" Or just "Principal Doctor McAlister?" Or just "Doctor McAlister?"

McALISTER: You're making it difficult for her to do her business right now.

ME: You are.

McALISTER: Excuse me?

ME: You are.

McALISTER: I'm gonna call the police now.

ME: Please don't. (I exited the NHS building and saw McALISTER's assistant entering.) Hi Lindee (last name: Sargent, NHS's Office Manager and McALISTER's Assistant who was walking up the ramp to NHS as I was walking down).

SARGENT: How are you?

ME: Good. How are you?

SARGENT: Good.

ME: Mister McAllister—Doctor McAlister, you're standing above—Doctor McAlister, you're standing above me [on a ramp to/from the NHS Administrative

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

Office area that I had just left], above the address that says 425. Thank you. I'm headed to the [DIABLO] right now, Doctor McAlister. I'm headed to the [DIABLO] now, Doctor McAlister, to talk to your boss, Chris Holleran. Thank you. On my schedule, not yours, Doctor McAlister. Right in front of multiple NHS students, parents of and other caregivers for NHS students, other DIABLO employees, some of whom are DEFENDANTS, and other members of the public, McALISTER falsely accused me of harassing DIABLO employees that morning, twice threatened to call the police on me, called the police on me once, and falsely reported to the police that I had disrupted school. He knew those public statements and acts of his about me were false and fraudulent when he made them and caused me to be viewed by those people as a criminal. I knew those statements and acts of his were wrong, but left NHS predominantly because I was unsure of my rights at that time. Then I went to DENT and attempted to regain access to NHS to retrieve M.C. for medical attention. HOLLERAN and MEYER were reportedly not immediately available and MAHER, one of MEYER's assistants, did not immediately help me regain that access so I went to the WCPD building and asked for the same help. Then and there, JOWER and CONLEY refused to provide a civil standby for me so I could return to NHS to retrieve M.C. for medical attention, and told me that BLATZ had stated that he had "verbally trespassed me," which statement was false. I told them that I believed I had a right to attend to go there for that reason regardless of any trespass allegation and asked to speak with CONLEY's supervisor. CONLEY refused to let me speak with his supervisor and ordered me out of the WCPD building. I complied with his order and then called the non-emergency line of the WCPD from outside the WCPD building. During multiple conversations with WCPD dispatchers, I repeatedly asked to speak with one of CONLEY's supervisors. Some of them said they were trying to reach one of his supervisors, but I was unable to speak to any of them within a reasonable amount of time so I left the WCPD property. I later learned that CONLEY, KAST, and ENSLEY had falsely caused me to be flagged as a threat to officer safety in a WCPD database on 5/15/2018. Within an hour of leaving the WCPD building, I was back at DENT. HOLLERAN refused to help me regain access to NHS to retrieve M.C. for medical attention and told me that COOKSEY was going to send me a letter. HOLLERAN and MAHER blocked me from escalating to MEYER, who was available at that time,

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

asking her to help me regain that access, and complaining about HOLLERAN's foregoing wrongful acts. HOLLERAN ordered me to leave DENT, which I did. I called the non-emergency CPD line and requested a civil standby so I could return to DENT, gain access to MEYER, and return to DENT to make the aforementioned request and complaint. By the time CPD provided the civil standby, however, DEFENDANTS had thwarted my attempts to regain access to NHS to retrieve M.C. for medical attention for the whole school day so, with the civil standby from CPD, I:

    a.   re-entered DENT;

    b.   attempted to gain access to MEYER to escalate my complaints about REID and McALISTER and complain about HOLLERAN, which MAHER blocked; and

    c.   gained access to COOKSEY and requested the letter HOLLERAN that had mentioned, which COOKSEY had not yet completed.

Therefore, I made an appointment with COOKSEY for the next day at 2:00 PM. The DEFENDANTS identified in this paragraph and possibly others withheld M.C. from me without a hint of probable cause to suspect that I had abused or was a danger to M.C.

89.    In an email sent on 5/16/2018 around 6:56 AM from me to COOKSEY, MAHER, and MEYER, copying PARENT-1 and PARENT-2, I confirmed my 2:00 PM appointment with COOKSEY and attached a declaration of mine in support of our complaints against REID that included statements about my disabilities and the foregoing events on 5/15/2018. I also attached a recording of those events that had occurred at NHS between 7:27 AM AND 7:56 AM. When COOKSEY and I met later that same day around 2:00 PM in Room 18 of DENT, COOKSEY told me that she had rejected my declaration and recording without even familiarizing herself with their contents first. Then COOKSEY handed me a letter from her dated 5/16/2018 that contained fraudulent, false and defamatory statements by McALISTER and HOLLERAN about me and ordered me blocked from all DIABLO property. I did not read that letter during our meeting, but, based on COOKSEY's description of it at that time, I knew her alleged order was facially void. COOKSEY indicated to me that it was her job was to "believe" McALISTER and HOLLERAN because she was the personal legal representative for each of them, which was false. I indicated to COOKSEY that, by signing and distributing **HER 5/16/2018 LETTER** after rejecting my declaration, which conclusively exculpated me from any wrongdoing and

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

conclusively inculpated McALISTER, HOLLERAN, and others to significant wrongdoing against M.C. and me, COOKSEY had violated my federal due process and many other federal rights and defamed me for the predominant purpose of accomplishing DEFENDANTS' foregoing ulterior goal. In response to my stated concerns about the probability that some DIABLO DEFENDANTS would try to stop me from entering NHS or BES to retrieve M.C. or C.C. for medical attention, COOKSEY indicated that the law prohibited them from doing so. After our 2:00 PM meeting ended, I walked past COOKSEY and MAHER in the main public hallway of DENT on my way to the public restroom. COOKSEY instructed me to stop and falsely stated in front of MAHER and anyone who was around that **HER 5/16/2018 LETTER** included a directive for me to stay away from all DIABLO property starting 5/16/2018. COOKSEY knew at that time that her alleged directive was facially void, which meant it had never existed in any legal sense, and no government employee had ever been protected from legal liability for publishing, relying on, or enforcing it. Even if that directive had been valid, **COOKSEY'S 5/16/2018 LETTER** stated that that directive would have been effective on 5/17/2018, not 5/16/2018, so I was free to continue conducting lawful business (i.e., any act that did not violate a statute), including but not limited to exercising my federally protected right to use the public restroom, at DENT on 5/16/2018, which I did. COOKSEY had no authority to interfere with those federally protected activities of mine. When I returned to Room 18 of DENT shortly thereafter to complain to COOKSEY about her foregoing misconduct, I easily heard COOKSEY and HOLLERAN talking behind her closed office door. In other words, COOKSEY's office was not even slightly soundproof, which she knew. During that conversation, COOKSEY repeated to HOLLERAN, me, and others some of the false and defamatory information from **HER 5/16/2018 LETTER** to me. The false and defamatory information in that letter, which I still had not read, was:

    a. "As described in detail below, you were a serious and major disruption to the peaceful conduct and good order of activities at [NHS]."

    b. Referring to my approximately three-minute interaction with McALISTER that he initiated on the morning of 5/15/2018 (see, e.g., ¶ 88 above):

        i. "You became visibly upset and began raising your voice."

        ii. "You... continued to raise your voice..."

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF**

   iii. "You replied, 'Do not do that!' or words to that effect."

   iv. "As you departed, you continued yelling while you walked passed [*sic*: past] students and staff who were arriving at school."

   v. "Students and staff were visibly alarmed by your behavior."

  c. Referring to my brief interaction with HOLLERAN that I initiated on the afternoon of 5/15/2018 (see, e.g., ¶ 88 above):

   i. "You were loud and appeared agitated."

Then I heard COOKSEY falsely say to HOLLERAN that she had told me, "Get out of this building, sir." COOKSEY did not say that to me in the main DENT hallway or anywhere else. At some point, HOLLERAN indicated that REID had admitted to him that she had criminally recorded M.C. and many other students. As soon as COOKSEY exited her office, I offered her an opportunity to correct her foregoing false and defamatory statements about me. COOKSEY rejected my offer. Later that same day, I informed COOKSEY, HOLLERAN, and McALISTER by email that, as a consequence of their foregoing misconduct, I intended to pursue my legal remedies directly against them.

90.　On 5/17/2018 around 9:22 AM, I entered a public area of NHS and attempted to retrieve M.C. for medical attention. In response, McALISTER, COOPER, CAMPOPIANO, FEY, WOOD, CASSIDY, and other DIABLO employees conspired with each other and possibly others to stop me from exercising that right of mine. McALISTER refused to release M.C. to me, physically blocked me, repeatedly interrupted me, harassed me, intimidated me, ridiculed me, laughed at me, attempted to provoke and me with offensive words, and otherwise attempted to deter me while COOPER, CAMPOPIANO, FEY, WOOD, CASSIDY, and other DIABLO employees and students watched and encouraged him. For some examples of those offensive words and acts, some of which were offensive to me because they were defamatory, McALISTER said to me and about me to others in front of me:

  a. "I will have you arrested." (Multiple times.) *I had not broken any law.*

  b. "You're breaking the law right now." (Multiple times.) *I was not.*

  c. "[Y]ou will be arrested…" *I had not broken any law.*

  d. "I'm worried about your stability at this point." *He was not.*

  e. "I think you're a danger to the students and the staff." *He did not.*

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

f. "I'm worried about [M.C.'s] safety." (Multiple times.) *He was not.*

g. "I'm worried about the safety of the students. *He was not.*

h. "Right now, you're agitated and aggressive, which means that you are a danger to this site." *I was not.*

i. "You just told me that your emotional state isn't stable." *I had not.*

j. "You just told me that your cognitive—your cognitive abilities are impaired." *I had not.*

k. He did not get in my face in the same public area of NHS on 5/15/2018. *He did.*

l. "You're not seeing reality clearly." *I was.*

m. "The school right now is under threat from an intimidating person who, on some level, seems unhinged." *I had not threatened the safety of NHS and was not behaving in an intimidating or unhinged manner.*

n. "Were you a former—were you a former police officer?" *I was not a former police officer.*

o. "Were you asked to leave the ser—service?" *I was not asked to leave service as police officer.*

p. Referring to a fraudulently obtained, defamatory, and facially void restraining order against me from a Florida court dated 11/3/2009 (**11/3/2009 FRAUDULENTLY OBTAINED, DEFAMATORY, ABSOLUTELY & GROTESQUELY OVERBROAD, & FACIALLY VOID FLORIDA RESTRAINING ORDER**) that the DIABLO DEFENDANTS had been circulating among themselves and others since April 2018, "Have you been involved in lawsuits in other states?"

q. Referring to my request that he stop asking me offensive questions, "Do not ask you questions that are germane to this bit of agitation I'm seeing? You can't even hold that to your lips without it shaking." *I was not shaking.*

r. "For you to—for you to assume—for you to assume that I would be release anybody into your custody is folly." *He had no legal or factual basis to refuse to release M.C. to me.*

s. "Clearly you don't have the way of assessing reality for what reality is at this point." *I did.*

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

t. "Are you armed?" *I was not.*

u. "Do you have a gun?" *I did not.*

v. "Do you have a weapon?" *I did not.*

w. "Do you have intent to harm or hurt anyone on this campus?" *I did not.*

x. Referring to a meeting that he hoped had gone very badly for me, "How did that meeting go yesterday?" (Multiple times.)

y. Referring to me, "Are [the emergency responders] aware that were lookin' at—that were lookin' at somethin' that's not stable?" *I was stable.*

z. "I think basically we have somebody who's mentally unstable trying to pull a kid out of the campus." *I was mentally stable.*

aa. Sarcastically referring to my allegation that he and CAMPOPIANO were trying to get their false stories straight for when the WCPD arrived, "Ha ha ha. Well, we'll see how that goes for you."

bb. Sarcastically: "You're the one who's got the [lawyer's] bill. So keep going. I'm really interested, Mister Wilson, with your assessment. Ha ha ha."

cc. "Do you have, like, a job, actually, or do you do this during the day?"

dd. Sarcastically: "Do you still wanna hug me?"

ee. Sarcastically referring to a statement I had quoted about my expertise at examining human behavior, "Your vivisection, I'm sure, is quite skillful."

McALISTER had no legal or factual basis for any of the above statements or questions that I have denied, and he knew that when he made them. He also knew when he used the above words in public that they would offend me. Nonetheless, I persisted. I threatened to sue them for withholding M.C. under false pretenses. Perhaps as late as February 2019, I received BWC recordings of the 5/17/2018 events from the WCPD, one of which shows FEY agreeing to comply with a request from J. DAVIS to sign a form for a baseless "citizen's arrest" ("CA form") of me on behalf of the DIABLO DEFENDANTS, which they conspired to do in order to stop me from attempting to retrieve M.C. for medical attention. That same BWC recording shows J. DAVIS enthusiastically stating, "Yeah, they'll—they'll sign a CA form so I'll just hook [i.e., put handcuffs on] [WILSON] and call it a day cuz

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

I don't have time to play with these people today, Sarge." He said that before he even walked in the front door to NHS where I was. A BWC recording from OLSON shows McALISTER stating, "I have no fucking idea." when OLSON asks him, "What is this?" The document was entitled: **"[M.C.'S] COMPLAINT AGAINST ROSANNE (ROSIE) REID: NOTICE OF PRESENCE OF [MICHAEL GEARY WILSON] AT NORTHGATE HIGH SCHOOL (NHS) TO RETRIEVE M.C. FOR MEDICAL ATTENTION, ETC."** I had handed two copies of that document to McALISTER and had just finished reading it aloud in front of McALISTER. This is a verbatim transcript of OLSON's BWC recording of his initial interaction with McALISTER on 5/17/2018 that lasted approximately one minute and 38 seconds:

> McALISTER: ...before yesterday by Shane [BLATZ]. He made a scene at [DENT] yesterday. They're doing a stay away order there. He—he—his stability is in question. He wanted to take his son out. He's been—

> OLSON: Does he have, like, the rights to take his son?

> McALISTER: He has ed[ucation] rights, but my concern is the level of—the kid's not safe is my concern. He—we've got witnesses who saw the whole thing here, Drew [OLSON]. Shane obviously handled it. He was banging on the superintendent's door yesterday. They're afraid of him.

> OLSON: Okay. What is this?

> McALISTER: I have no fucking idea.

> OLSON: Who is Rosanne Reid?

> McALISTER: _**That's a teacher—a teacher of the year. And he's accusing her of being a criminal. It's not—it's not stable.**_ [Emphasis added.] It's not—so he was asked to stay off this site.

> OLSON: Where's the mom?

> McALISTER: At home, I guess.

> OLSON: Is she the—

> McALISTER: She's the girlfriend.

> OLSON: Is he the—is he the dad or the—

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

McALISTER: Boyfriend.

OLSON: He's the boyfriend.

McALISTER: Yeah.

OLSON: So does he—

McALISTER: She signed over ed[udcation] rights to him so that he can see records and so forth.

OLSON: Right. So—alright—give me f—

At that point, OLSON walked away from McALISTER, exited the NHS building, passed me, and stopped recording on his BWC at least temporarily. COOPER alleged in her live testimony that she had interrogated M.C. on 5/17/2018. McALISTER alleged in **HIS 5/22/2018 DECLARATION** and thereafter that he had interrogated M.C. on 5/17/2018. The WCPD did not provide any of OLSON's BWC recordings that may have been made thereafter other than OLSON's interrogation of M.C. so I do not yet know what else occurred in his presence that may be relevant to this **COMPLAINT**. Several DEFENDANTS withheld M.C., and COOPER, McALISTER, and OLSON interrogated M.C. without a hint of probable cause to suspect that I had abused or was a danger to M.C., and DEFENDANTS excluded PARENT-1, PARENT-2, and me from those interrogations without informed consent from any of us. At some point on 5/17/2018, McALISTER and possibly others made a fraudulent SCAR against me to CCCCFS regarding M.C. They had absolutely no basis to make that report, which he told at least REID, COOPER, HOLLERAN, COOKSEY, ECKSTEIN, and COMBS that he had made, and encouraged them to do the same. He maliciously intended by that fraudulent report to initiate a sham investigation and other sham proceedings and further violate my right to the care, custody and companionship of M.C., my right to access NHS, my right to investigate his activities and those of his coconspirators, NHS and DIABLO, my right to petition NHS, DIABLO, the courts, and other governmental authorities for redress of my grievances, and my other rights. And those actions of his did violate those rights of mine.

91. On the afternoon of 5/17/2018, on the evening of 5/18/2018, and again on the morning of 5/21/2018, following statutory procedures I complained by phone and email to MEYER, MAHER,

///

06/22/2020                                                      **Page 49 of 554**

MASON, HANSEN, DURKEE, LAWRENCE, and MAYO about many of the foregoing deprivations of my rights, but they did not provide any due process whatsoever regarding those complaints of mine.

92.    In an email sent on 5/18/2018 around 8:06 AM from McALISTER to and copying several DIABLO employees, including but not limited to four of his teachers, his special education coordinator, three DEFENDANTS (i.e., FEY, CAMPOPIANO, and COOPER), and possibly blind-copying other DEFENDANTS, he wrote in most pertinent part: "I don't see [WILSON] as someone to fear..." McALISTER, ECKSTEIN, COMBS, COOPER, CAMPOPIANO, and possibly others who knew about that conclusively exculpatory written statement did not submit the email containing it in their fraudulent request for the facially void TROs, did not produce the email containing it in response multiple subpoenas and court orders for such dox, and did not refer to it or the email containing it in any of their declarations or live testimony. All of them had completely and intentionally concealed it from me. I only discovered that conclusively exculpatory written statement by McALISTER on 1/29/2019 when, after more than eight months of sham proceedings, one of M.C.'s former teachers, Peter Anthony Ceresa, produced the email containing it in response to one of my subpoenas. That email also contained the following statements by McALISTER that defamed me directly, by implication, and/or by painting me in a false light:

a. "Based on the behavior of... [WILSON] I am seeking a Restraining Order against him."

b. "[WILSON's] erratic behavior and history of belligerence is starting to tax NHS inappropriately."

McALISTER also instructed the recipients of that email to further deprive me of several rights:

c. "Under no circumstances... should any of you agree to meet with [WILSON] or speak directly to him over the phone."

DEFENDANTS had strong motivation to conspire to conceal and to conceal that email and its existence because the foregoing statements tend to further inculpate DEFENDANTS, especially McALISTER, in wrongful acts.

93.    By 5/21/2018, ECKSTEIN and COMBS had conspired with COOKSEY, AALRR, SCHOENKE, MEYER, McALISTER, COOPER, WOOD, CAMPOPIANO, and CASSIDY and drafted some of the aforementioned "exaggerate[d]" declarations.

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF

94.   Throughout the entire business day of 5/21/2018 at DENT while it was open to the public, PARENT-1 (in person) and I (through multiple electronic devices) attempted to get assurances from DIABLO that M.C. and C.C. would be safe and that we would be able to retrieve them if we returned them to NHS and BES, to gather information about the activities of DIABLO and some of its employees, to complain about the foregoing wrongful acts by criminal DIABLO employees that we knew of, and to exercise other of our federally protected rights and interests. COOKSEY, MEYER, and MAHER believed I was recording in the public areas of DENT during the entire encounter, which was true. COOKSEY repeatedly attempted to confirm that I was recording. I never denied doing so. In response: MEYER and MAHER ran and hid, and then conspired with COOKSEY, DONG, an unidentified DIABLO employee, and possibly others to block me from exercising those rights; DONG refused to respond and/or delayed responding to my repeated requests to speak with certain DIABLO employees or their assistants, helped them run and hide, and otherwise helped them fabricate pretexts (e.g., "in a meeting," "not in [DENT]," "not available," etc.) to avoid speaking with me; COOKSEY repeatedly pretended that I did not have a right to record in the public areas of DENT; and COOKSEY unlawfully ejected me from DENT. That night at DENT during the public comment portion of a public DIABLO Board Meeting, MASON, HANSEN, DURKEE, LAWRENCE, and MAYO unlawfully deprived me of my right to speak for at least three minutes. During the closed session of that public meeting and perhaps at other times that same day, MASON, HANSEN, DURKEE, LAWRENCE, and MAYO met with MEYER, COOKSEY, AALRR, SCHOENKE, ESTES, HUNTOON, F3, COMBS, and/or ECKSTEIN and, after being informed that a forthcoming request for restraining orders was supported by those "exaggerate[d]" declarations that were irrefutably contradicted by the "audio and video," nonetheless approved the filing of that request.

95.   Throughout much of the business days of 5/22/2018 and 5/24/2018 at DENT while it was open to the public, PARENT-1 and I again attempted to do the same things as on 5/21/2018, and we received exactly the same treatment from many of the same DIABLO DEFENDANTS and others.

96.   Throughout much of the business day of 5/25/2018 at DENT while it was open to the public, PARENT-1 and I (both in person) again attempted to do the same things as on 5/21/2018, 5/22/2018, and 5/24/2018. In response, MEYER and MAHER briefly came out of hiding, and then

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF

conspired with COOKSEY, ESTRADA, MURPHY-OATS and possibly others to stop me from exercising those rights of mine. ESTRADA physically blocked, repeatedly interrupted, harassed, intimidated, ridiculed, laughed at, attempted to provoke PARENT-1, M.C., C.C., and me with offensive words, and otherwise attempted to deter me while MEYER, MAHER, MURPHY-OATS, JURANEK, BARNHART, and possibly other DIABLO employees watched and encouraged him. For some examples of those offensive words and acts, some of which were offensive to us because they were defamatory, ESTRADA said to me:

    a. "It doesn't look like you read anyway." *I read.*

    b. That I was sweating profusely. *I was not.*

    c. That I was shaking. *I was not.*

    d. That I was acting unlawfully. *I was not.*

ESTRADA had no legal or factual basis for any of the above statements or questions that I have denied, and he knew that when he made them. He also knew when he used the above words in public that they would offend PARENT-1, M.C., C.C., and me. Nonetheless, I persisted. MEYER and MAHER refused to respond and/or delayed responding to my repeated requests to speak with certain DIABLO employees or their assistants, helped them run and hide, and otherwise helped them fabricate pretexts (e.g., "in a meeting," "not in [DENT]," "not available," etc.) to avoid speaking with me again and again, MAHER falsely stated that I did not have a right to record in the public areas of DENT. I requested a civil standby from CPD, which it kindly provided. From the time that CPD arrived, I knew my right to record in DENT's public areas, which was already clearly established for First Amendment and law enforcement purposes, became even more clearly established because of CPD's presence, Nonetheless, MEYER, MAHER, COOKSEY, and possibly others: attempted to get CPD to force me to stop audio and/or video recording in the public areas of DENT, which CPD refused to do and stated that the reason for its refusal was that we had a federal right to record in the public areas of DENT; attempted to unlawfully eject me from DENT, which CPD refused to do; closed to the public every office that I attempted to enter in DENT; and finally closed DENT to the public in the middle of the business day in order to block me from exercising my right to record in the public areas of DENT. A DIABLO employee said MEYER would reopen DENT to the public if and only if I agreed to re-enter

06/22/2020                              **Page 52 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

without any electronic devices in my possession. That alleged rule, which was facially void, did not apply to the general public.

97.    By 5/30/2018, ECKSTEIN and perhaps COMBS had conspired with COOKSEY, AALRR, SCHOENKE, MEYER, MAHER, and ESTRADA and drafted the rest of the aforementioned "exaggerate[d]" declarations. That same day, MEYER and possibly MASON, HANSEN, DURKEE, LAWRENCE, and/or MAYO, after being informed that a forthcoming request for restraining orders was supported by those "exaggerate[d]" declarations that were irrefutably contradicted by my and their own "audio and video," nonetheless approved the filing of that request.

98.    On 5/31/2018, SCHULER, then-principal of Bancroft Elementary School (BES), fraudulently reported to the WCPD that C.C. had been chronically absent without a known reason, which is a crime. (Cal. Pen. Code § 270.1(a).) In fact, SCHULER knew at the time she called that:

   a.  PARENT-1, PARENT-2, and I had removed C.C. from BES for medical treatment because SCHULER and other DIABLO employees and associates had failed to protect C.C. from bullying and had perpetrated other wrongdoing against C.C.

   b.  We had not failed to reasonably supervise C.C.'s school attendance.

   c.  C.C. was not a chronic truant.

SCHULER made that fraudulent report of a crime in order to initiate a sham investigation and in furtherance of the conspiracy to stigmatize and deprive me of my rights described herein.

99.    That same day, I took M.C. and C.C. to the Skate Park. A group of several young adults inside that Skate Park, DOES 1-10, were smoking marijuana, drinking alcohol, riding bikes, loudly speaking profanities. I did not recognize any of them as part of the group that had caused the previous incident on 4/20/2018. Nonetheless, those acts of theirs were infractions and misdemeanors under the circumstances, and they were making it too dangerous for C.C. to use a scooter inside that Skate Park, so I did not let C.C. enter. Instead, I promptly called the non-emergency WCPD line and requested assistance to get the members of that group to either comply with the law or leave the Skate Park. Some members of that group overheard me talking to a WCPD dispatcher and, in retaliation, yelled profanities at me, raced toward me and banged their skateboards and other objects on a fence that separated us, thereby making more loud noises, attempted to climb over that fence, and repeatedly used

06/22/2020                                                                      **Page 53 of 554**

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

extremely offensive words to me about my body and other characteristics in the presence of M.C. and C.C. One of them, DOE-1, threw a skateboard at me, but a wheel caught the top of the fence and stopped it. M.C. and C.C. were always a safe distance from that group. I was scared for my safety. The WCPD dispatcher agreed to send uniformed WCPD employees there, but it took a very long time and several more calls from C.C. and me before they arrived. OLSON and HIBBS arrived, and I attempted to report the foregoing events to them. They did not ask whether I intended to sign a private person's arrest form, but instead let the remaining members of that group escape. At some point, without any evidence whatsoever and in retaliation for my complaints against those group members in the Skate Park, HIBBS threatened to initiate a sham investigation for child endangerment against me, which made me feel very intimidated. I had asked OLSON and HIBBS to gather the names of as many suspects as possible so I could pursue my legal remedies against them. I do not know whether they did so or whether they filed any reports of that investigation.

100. On 6/6/2018, PARENT-1, M.C., and C.C. entered NHS while I was connected to some of their electronic devices through FaceTime and a cellular telephone service. McALISTER, who knew that I was there, falsely alleged that PARENT-1 had a restraining order against her and ordered us to leave, which we temporarily did. Promptly thereafter, we contacted WCPD dispatch and requested a civil standby from WILLIAMS. JOWER, GRUBB, and at least one other WCPD employee arrived, but did not provide a civil standby. Instead, without any cause whatsoever to suspect us of committing any crime, they blocked us from re-entering NHS and threatened to detain PARENT-1 if she did not leave the NHS campus immediately.

101. On 6/9/2018 around 2:42 PM, I sent an email to M. DAVIS, copying, as pertinent here, CHAPLIN, MOORHOUSE, ECKSTEIN, FAGEN, FULFROST, ESTES, HUNTOON, and SCHOENKE, that stated in pertinent part (emphasis in original):

> This is an excerpt from **MY DECLARATION IN SUPPORT OF MY VERIFIED CHALLENGE FOR CAUSE OF DISQUALIFIED JUDICIAL OFFICERS WHO HAVE BEEN OR MAY BE ASSIGNED TO DEFENDANT CONTRA COSTA COUNTY SUPERIOR COURT CASE NO. MSN18-1101, AND MOTION TO TRANSFER VENUE (Code of Civil Procedure[2] §§ 170.1, 170.3(c)(1), 394, 397(b) and (d))**, which I expect to complete tomorrow: ¶ Since about 6/12/2016, I have supported the campaign led by _**STANFORD LAW SCHOOL PROFESSOR AND ALL-AROUND HONEY**_

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

***BADGER MICHELE DAUBER*** to recall rape-culture poster-cobra aaron michael persky (sbn 148470), a former Stanford student-athlete in Santa Clara County who dared to call himself a judicial officer until 6/6/2018, but who gave sexual predator and fellow former Stanford student-athlete brock turner an extremely lenient sentence after three felony convictions for sexually assaulting and unconscious woman in the dirt behind a dumpster on Stanford's campus. True and correct copies of some slightly redacted emails to some of my loved ones showing my longstanding support for ***MS. DAUBER*** and my opposition to persky are attached hereto as Exhibit 4. My support for the #Recallpersky campaign, which easily made mincemeat of the well-heeled opposition campaign, has always been partly based on my personal experiences that such obviously biased acts in the name of "independence" by pedantic/robed criminals who sit on benches and dare to call themselves judicial officers demonstrate a dangerous lack of integrity, which must be forcefully rejected, and for which those criminals must be held accountable to the fullest extent of the law. As shown below, certain pedantic/robed criminals have demonstrated such lack of integrity in cases that have harmed [my biological daughter] and me. I have always been and remain ready, willing, and able to ask all relevant authorities to hold those criminals accountable to the fullest extent of the law. But my staunch support for the #Recallpersky campaign and related movements (e.g., Black Lives Matter, #MeToo, #TimesUp, etc.) has always been mostly based on deeper and vastly more savage personal experiences. For example, I was raised in a pit of King Cobras, but I never have been and never will be one. That is a metaphor, of course—an apt one. Someone very close to me was vaginally raped again and again beginning, at the latest, when she was about seven years old. One day when I was about seven or eight years old, she and I rode our bikes together around a neighborhood. When we finished, I saw blood from her vagina all over the seat of her bike and the crotch of her shorts. It was one of the most vivid and horrifying memories of my youth, but I did not know then that she was bleeding there because a near-adult King Cobra had vaginally raped her earlier that day. She did not tell me so until almost two decades later. She did tell others, including at least one female King Cobra, while she was enduring those countless vaginal rapes for years. ***No one with the requisite power and knowledge—and there were plenty— protected her from those vaginal rapes or gave her the other help she needed.*** Instead, her RAPIST and his complicit little brother got away with what they did to her, had successful careers in law enforcement, and had several daughters of their own. Who knows what awful crimes Troy and Brian Pagels have committed against their own and each other's daughters? I know a thing or two about the awful crimes Leslie Pagels has committed in her life. I have lived with the foregoing and other disgusting knowledge about the Pagels Cobras for a very long time, but have never once threatened to, planned to, or actually harmed any of them. That is because I have always been and remain a gentleman. Most importantly for our present purposes only, it is because I have always done my best to be a law-abiding citizen. CRIMINALS need ME like Cobras need Honey Badgers. That is an analogy, of course—an apt one. The government must taste it. ¶ Perhaps you will be able to use the foregoing information to investigate our complaint more thoroughly before you and I meet next Friday. ¶ Some of the people I have copied on this email may be able and willing to help you prepare for

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

our meeting. You seem like a talented and nice guy so it's okay with me if you bring one or more of the other apparently very competent and accomplished [lawyers] from your firm with you to Caffe La Scala or elsewhere, if we change our meeting location.

My subtext, of course, was that I had nothing to hide from them or anyone else who intended to harm my family, some of whom live with disabilities, and me, who lives with disabilities. Many DEFENDANTS, including but not limited to LEIGH, JAMBECK (see, e.g., ¶ 297.c.iii below), and MURPHY-OATES, read those words of mine after I published them.

102.    On the afternoon of 6/13/2018, following McALISTER's lead, COOPER fraudulently reported to CCCCFS that I was a danger to M.C. and C.C. while PARENT-1 and I were with them in Room 301 of TAYLOR to appear for the DIABLO & F3 DEFENDANTS' sham proceedings for ROAHs. She had absolutely no basis for that report, which she made in the presence of at least McALISTER, REID, COOPER, COOKSEY, SCHULER, ECKSTEIN, and COMBS and/or told them and possibly others that she had made it and encouraged them to do the same. She maliciously intended by that fraudulent report to initiate a sham investigation and other sham proceedings and further violate my right to the care, custody and companionship of M.C. and C.C., my right to investigate her activities and those of her coconspirators, NHS, and DIABLO, my right to petition NHS, DIABLO, the courts, and other governmental authorities for redress of my grievances, and my other rights. And those actions of hers did violate those rights of mine.

103.    On 6/15/2018 at Caffe La Scala in downtown Walnut Creek, California, M. DAVIS and an AALRR intern pretended to interview me regarding some complaints PARENT-1, M.C., C.C., and I had filed against some DIABLO DEFENDANTS. In fact, they were conspiring with two heretofore unidentified CCCCFS investigators who were sitting at a nearby table typing on their laptop computers and conspicuously looking straight at me for possibly that entire pretend interview. None of my actions warranted investigation by CCCCFS. Their actions were clearly intended to intimidate and provoke negative reactions from me. I did not oblige them.

104.    On 6/25/2018, COOKSEY, AALRR, SCHOENKE, MEYER, MASON, HANSEN, DURKEE, LAWRENCE, and/or MAYO met and discussed the foregoing fraudulent requests for restraining orders. Despite already knowing that those requests for restraining orders were supported by

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

"exaggerate[d]" declarations that were irrefutably contradicted by my and their own "audio and video," they did not approve the dismissal of those sham proceedings, and instead approved their continuation.

105. On 7/3/2018, McALISTER gave perjurious live testimony in the sham proceedings on DEFENDANTS' fraudulent requests for ROAHs. For some examples:

Q. And you prepared a declaration as part of this restraining order petition?

A. I did.

Q. All right. Have you reviewed the declaration?

A. Yes.

Q. And is everything in the declaration true to the best of your knowledge?

A. To the best of my knowledge, it's true.

(CERTIFIED TRANSCRIPT OF 7/3/2018 SHAM PROCEEDINGS at p. 6:11-18.)

A. ...I was scared to death [of WILSON].

(*Id.* at p. 17:16-17.) Referring to some events on 5/15/2018 that DEFENDANTS had reviewed audio and video of, McALISTER perjuriously testified:

A. ...[WILSON] was visibly agitated with me and/or the situation.... ¶ He said, loudly, that he was not going to do that.... [McALISTER intentionally omitted that upon my request he agreed to let me finish my lawful business at NHS before leaving NHS] ¶ He then very loudly said, Do not do that.... ¶ [H]e started telling me that, you know, *my days were numbered*, that I was toast... It was definitely aggressive, kind of coming at me... I said, You're – you're welcome to do so.

(Id. at pp. 19:1-20:3.) Referring to some events on 5/15/2018 and 5/17/2018 that DEFENDANTS had reviewed audio and video of, McALISTER perjuriously testified:

A. [WILSON] had been... creating a disturbance.

(*Id.* at p. 20:19-20.)

A. [WILSON] was carrying and clutching a... very long bag, across his back. ¶ I immediately thought this might be my last day on the planet.... I did know him to be aggressive, intimidating, and -- and he was, at this point, coming at me... ¶ And my immediate concern was for the safety of not only all the kids and my staff, but also

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND OTHER RELIEF

[M.C.]. ¶ And... he just kind of went off... ¶ Where it got particularly frightening for me is as I started to see him shake. ¶ I did not want [my staff]... anywhere near me and, potentially, the conflict that might ensue. ¶ I interpreted [a quote of a news article that WILSON made to state his expertise at closely examining and understanding human behavior] as coming at me. He mentioned that I was pushing him into a place where his instability, his mental instability was -- was ratcheting up. ¶ And here again, that, coupled with... his tone -- he was shaking... with live animal dissection, and I'm just trying to stall so the police can get here. I was -- I was petrified.

(*Id.* at pp. 21:1-22:6.)

A. [WILSON], himself, said that -- in the course of this conversation, he -- he admitted that he was -- his stability was in question.

Q. And how did you feel in that moment?

A. Like I said, petrified.

(*Id.* at p. 22:17-22.) I had actually reminded McALISTER and the other DEFENDANTS on that scene of my foregoing disabilities, none of which could reasonably be construed as causing mental instability in the sense McALISTER alleged. With help from other DEFENDANTS (e.g., ECKSTEIN, COMBS, etc.), McALISTER again deliberately twisted my disclosure of my weaknesses to create a false impression that I was a danger to others, which further demonstrates their hatred of individuals with disabilities, especially me, and their malice against me.

A. [Because WILSON had quoted a news article to state his expertise at closely examining and understanding human behavior] I had imagery -- I still have imagery of either me or my family getting cut up.

(*Id.* at p. 23:2-3.)

A. [WILSON] let me know very clearly that... I would pay. I would pay for [making a false police report].

(*Id.* at p. 23:18-21.) McALISTER again deliberately omitted and twisted my actual words, which DEFENDANTS had reviewed audio and video of, in order to create the false impression that I had threatened violence against him. I had actually said words to the effect that McALISTER would be

06/22/2020                                                                                    **Page 58 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**
**OTHER RELIEF**

guilty of the crime of making a false police report because I had done nothing wrong, which the DIABLO & F3 DEFENDANTS knew long before McALISTER said that.

A. On [5/17/2018], [WILSON] started to discuss live animal dissection.

(*Id.* at p. 29:19-20.) McALISTER again deliberately twisted my actual words, which DEFENDANTS had reviewed audio and video of, in order to create the false impression that I had threatened violence against him. I had actually quoted a news article to state my expertise at closely examining and understanding human behavior, which the DIABLO & F3 DEFENDANTS knew long before McALISTER said that.

106.    McALISTER's foregoing statements on 7/3/2018 were untrue. Many further examples of McALISTER's perjurious live testimony on 7/3/2018 that reaffirm the DIABLO & F3 DEFENDANTS' malice and discriminatory animus against me continue through 86 pages of that transcript.

107.    On 7/5/2018, RYAN, FLEMING, FOLAN, the SCC COURT, BASKIN, BIEKER, TREAT, the CCC COURT, HAAKENSON, KIM, SWEET, FRECCERO, CHOU, B. JORDAN, the MC COURT, and possibly others were reminded that at all material times relevant to this case they had been responsible for fully ensuring the right of parties with fee waivers to "an official court reporter, or other valid means to create an official verbatim record for purposes of appeal, [which] must generally be made available to [us] upon request." (*Jameson v. Desta* 5 Cal.5th 594, 599 (Cal. S. Ct. 2018).) That right was clearly established in 1917. Instead of fully ensuring that right, those people have shamefully built and/or maintained several barriers between us and that clearly established right in their Local Rules, policies, and procedures.

108.    On 7/11/2018 and 7/12/2018, REID gave perjurious live testimony in the sham proceedings on DEFENDANTS' fraudulent requests for ROAHs. For some examples:

A. [At a meeting involving WILSON that occurred on 4/26/2018,] without being asked to come in, he came in, and we weren't ready yet, but he came in and said, "Let's get started.... [H]e shook everybody in the room's hand and told them all to call him Mike, but he didn't shake my hand, and he didn't tell me to call him Mike."

(CERTIFIED TRANSCRIPT OF 7/11/2018 and 7/12/2018 SHAM PROCEEDINGS at pp. 13:25-14:4.)

06/22/2020                                                                     **Page 59 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

A. [WILSON] said he had no intention of recording, and I think it was Ms. Vose who said, "Well, we only record if you record." And he said, "Well, I'm not going to record it."

(*Id.* at p. 19:1-4.)

A. [WILSON] was very loud and looking at me very intensely.

(*Id.* at p. 20:5-6.)

A. This was incredibly scary, and it was also -- I felt like [WILSON] was crazy...

(*Id.* at p. 21:9-10.)

A. [WILSON] looked at [COOPER] and told her that, you know -- something along the lines of, "If you interrupt me again, you'll be sorry."

(*Id.* at p. 21:9-10.) By 7/11/2018, REID had conspired with McALISTER, ECSTEIN, COMBS, COOPER, and others to accomplish the DIABLO & F3 DEFENDANTS foregoing ulterior goal. She knew to twist my foregoing disabilities, none of which could reasonably be construed as causing mental instability in the sense REID alleged, to create a false impression that I was a danger to others, which further demonstrates the DIABLO & F3 DEFENDANTS' hatred of individuals with disabilities, especially me, and their malice against me.

109. REID's foregoing statements on 7/11/2018 and 7/12/2018 were false. Many further examples of her perjurious live testimony on those days that reaffirm the DIABLO & F3 DEFENDANTS' malice and discriminatory animus against me continue through 201 pages of that transcript.

110. Between 7/11/2018 and 7/17/2018, I delivered to McALISTER, MAHER, AALRR, ECKSTEIN, COMBS, several others at F3, including but not limited to FAGAN and FULLFROST, and several others the rest of the aforementioned "audio and video," including audio of the 4/26/2018 meeting, that irrefutably contradicted the aforementioned "exaggerate[d] … declarations and live testimony." Yet they continued to maintain the foregoing sham investigations and proceedings.

111. On 7/24/2018 at approximately 8:00 AM, M.C., C.C., and I were at the CCCOE auditorium located on the second floor at 77 Santa Barbara Rd. in Pleasant Hill, California attempting to attend, record, and speak at a public meeting regarding one of the aforementioned TOY

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

competitions, which was well within our rights under the Brown Act as well as the state and federal Constitutions, and to conduct other lawful business within the CCCOE building afterward. REID was also at that public meeting. When I saw her and did not see a security guard who could act as a civil standby, M.C. and C.C. took seats at my request and I exited the auditorium, contacted PHPD, and requested a civil standby for M.C., C.C., and me. At some point thereafter, REID and COOPER met and conspired with MORRELL, YORE, KOEHNE, GAINES, SAKATA, and/or other CCCOE employees to violate my below-stated rights. While I waited for PHPD to arrive, MORRELL and YORE removed M.C. and C.C. from the auditorium and refused to let any of us return. I asked GAINES and KOEHNE to let us return, and they refused. They locked the door leading from the lobby to the auditorium. In order to initiate another sham investigation, false imprisonment, false arrest and other sham proceedings, REID alleged, without evidence, that I had knives and guns and had given M.C. and C.C. knives or guns to use while we were in that CCCOE building. Again following McALISTER's lead and at REID's insistence, COOPER, DOWNS, and BIAS fraudulently reported to CCCCFS that I was a danger to M.C. and C.C. while I was at the CCCOE building. She had absolutely no basis for that report, which she told REID, BIAS, DOWNS, and possibly others she intended to make and had made. BIAS and DOWNS arrived, did not provide the civil standby I had requested, refused to accept the fact that the alleged TROs were facially void and did not apply to the CCCOE anyway even after I had repeatedly told them so, physically blocked M.C., C.C., and me from going where we wanted to go, including the auditorium, invaded my personal space, refused to back away from me upon my repeated requests, threatened to arrest me when they had no probable cause to suspect me of a crime, physically blocked M.C., C.C., and me from that CCCOE building, and, after meeting and conspiring with REID and COOPER, threatened to falsely charge me with child endangerment when they had no evidence that I was a danger to M.C. or C.C. At various points, several of them also repeatedly threatened to falsely charge me with disturbing a public meeting. (Cal. Pen. Code § 403.) After REID, COOPER, DOWNS, and BIAS left the CCCOE building, GAINES, SAKATA and possibly other CCCOE employees continued to refuse to let M.C., C.C., and me re-enter the CCCOE building to conduct further business even after I informed them that the heat outside was becoming intolerable for me due to some of my disabilities, which caused me to suffer acute

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

hyperthermia and seek emergency medical attention. They neither stated nor had any legal basis for refusing to let us re-enter. When we were waiting outside of the CCCOE building, GAINES grabbed C.C. as he was standing still near her, thereby causing him to fear for his safety. REID, COOPER, MORRELL, YORE, KOEHNE, GAINES, SAKATA, BIAS, DOWNS, and possibly others maliciously intended by their actions that day to initiate several more sham investigations and other sham proceedings and further violate my right to the care, custody and companionship of M.C. and C.C., my right to access that public CCCOE building, my right to attend that public meeting, my right to record that public meeting, my right to speak during that public meeting, my right to investigate their activities and those of their coconspirators, NHS, DIABLO, and CCCOE, my right to petition NHS, DIABLO, CCCOE, the courts, and other governmental authorities for redress of my grievances, and my other rights. And those actions of theirs did violate those rights of mine. MEYER, ECKSTEIN, and COMBS learned about those actions of theirs either contemporaneously or soon afterward and ratified them.

112.    By 8/5/2018, I had delivered to McALISTER, MAHER, AALRR, ECKSTEIN, COMBS, several others at F3, including but not limited to FAGAN and FULLFROST, and several others additional "audio and video" of the events that had occurred on 7/24/2018.

113.    On the morning of 8/6/2018, REID gave further perjurious live testimony in the sham proceedings on DEFENDANTS' fraudulent requests for ROAHs. For example:

Q. Please describe your understanding of the spectrum of mental stability.

A. I thought you were a little off... Now I know that you're much more crazy than I originally thought. Now I would make a CFS report, now that I know how crazy you are. ¶ But at the time, it just seemed like this mild level of crazy that's not worthy of making me scared or of being concerned for the student.

(CERTIFIED TRANSCRIPT OF 8/6/2018 SHAM PROCEEDINGS at p. 33:1-15.) REID ignored my question and twisted my foregoing disabilities, none of which could reasonably be construed as causing craziness in the sense REID alleged, to create a false impression that I was a danger to others, which further demonstrates the DIABLO & F3 DEFENDANTS' hatred of individuals with disabilities, especially me, and their malice against me.

///

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND
OTHER RELIEF

114. None of REID's foregoing statements on 8/6/2018 was true. Many further examples of her perjurious live testimony on 8/6/2018 that reaffirm the DIABLO & F3 DEFENDANTS' malice and discriminatory animus against me continue through 151 pages of that transcript.

115. On 8/6/2018 around noon during a lunch break in the sham proceedings on the DIABLO DEFENDANTS' fraudulent requests for ROAHs, I was walking on a public sidewalk next to Ward Street in downtown Martinez, California across from CCCDAO located at 900 Ward Street. REID and HAGERSTRAND, who were walking on the public sidewalk in front of the CCCDAO, while knowing that they had conspired with each other and the other DIABLO & F3 DEFENDANTS to fraudulently obtain the facially void TROs, called loudly to several other people who were nearby, pointed at me, said my name, and falsely stated to everyone around that they had a valid restraining order against me, that I was committing a crime by walking near them, and that someone should stop me. One of the nearby people who heard REID and HAGERSTRAND spew those lies about me was a retired lawyer who, like me during that time period, spent a significant amount of time in downtown Martinez so I feared that he was going to spread those lies around to other people in that area, which he did. That retired lawyer told those lies to COMBS and an unknown number of others. Another of those people who heard REID and HAGERSTRAND publicly spew those lies about me was a security guard who worked around there. I feared that he would also spread them to others in the area.

116. On 8/6/2018, while knowing that they had fraudulently obtained the facially void TROs, the DIABLO & F3 DEFENDANTS initiated sham contempt proceedings against me within the ongoing sham proceedings on their fraudulent requests for ROAHs for non-existent violations of those facially void TROs on 7/24/2018 and during the lunch break on 8/6/2018. They maintained those sham contempt proceedings well past 12/12/2018, which is the end of the time period addressed by this **FAC**.

117. On 8/7/2018 and 8/8/2018, McALISTER gave further perjurious live testimony in the sham proceedings on DEFENDANTS' fraudulent requests for ROAHs. For some examples:

A. ...I first started feeling a little bit frightened [on 5/15/2018 and]... I thought I was going to die [on 5/17/2018].

(CERTIFIED TRANSCRIPT OF 8/7/2018 SHAM PROCEEDINGS at p. 29:25-27.)

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

Q. [As of 4/27/2018]... did [REID] fear for her physical safety from [M.C.] or [PARENT-1]?

A. To be fair, I think all of us, at some point, as we started seeing the connection that [M.C.] and [PARENT-1] seemed to have with you, the connection that they shared with you and how you seemed to be able to act as, if you will, a puppet master, I think we were all afraid of how extensive this net of dysfunction might extend within our classrooms.

(*Id.* at p. 44:2-11.)

118. None of McALISTER's foregoing statements on 8/7/2018 was true. Many further examples of his perjurious live testimony on 8/7/2018 and 8/8/2018 that reaffirm the DIABLO & F3 DEFENDANTS' malice and discriminatory animus against me continue through 230 pages of those transcripts.

119. By early August 2018, I had been preoccupied with the foregoing sham proceedings for more than two months so PARENT-1 and I were desperate for help to get M.C. and C.C. into schools where they felt safe and supported as soon as possible. PARENT-1 further investigated whether her legal services plan would cover the dispute, and she obtained coverage on an exception basis of up to $3,000.

120. On 8/13/2018, PARENT-1, with my assistance, made a set of notes in preparation for interviews that we intended to conduct with lawyers regarding the dispute with DIABLO.

121. On 8/13/2018, MASON, HANSEN, DURKEE, LAWRENCE, and MAYO met and conspired with MEYER, COOKSEY, AALRR, SCHOENKE, ESTES, HUNTOON, F3, COMBS, and/or ECKSTEIN and, while knowing that the foregoing sham proceedings were irrefutably contradicted by my "audio and video" and other hard evidence, agreed to maintain those sham proceedings.

122. Between 8/15/2018 and 8/16/2018, PARENT-1, again with WILSON's assistance, turned that set of notes into a script for a telephonic interview of LEIGH. The note set and script include references to the DIABLO & F3 DEFENDANTS' fraudulent requests for restraining orders against me. PARENT-1 and I intended to provide information to the LLG DEFENDANTS about those fraudulent

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

requests in order to get from them an estimate of its impact on our civil rights claims against the DIABLO & F3 DEFENDANTS.

123.   On 8/16/2018 during a telephone interview of LEIGH by PARENT-1 and me, PARENT-1 began by explaining to LEIGH that she was seeking a lawyer because I was preoccupied with sham proceedings on two fraudulent requests for restraining orders that the DIABLO & F3 DEFENDANTS were pursuing against him. ***Then PARENT-1 said she and I had made many recordings that incontrovertibly proved that those requests were fraudulent.*** LEIGH initially responded that it was a relatively standard practice for school districts to seek fraudulent restraining orders against people who complain, that she had experience dealing with school districts who had done even worse things to self-represented parents and students who had complained about wrongful acts by their employees, that DIABLO was an "evil" school district, and that she thought LLG DEFENDANTS could help us. LEIGH said that, if hired, they would timely file CTCA forms with the appropriate authorities to preserve our civil rights and other causes of action under California law. PARENT-1's notes of that interview include several references to LEIGH's requests for further information about the DIABLO & F3 DEFENDANTS fraudulent requests for restraining orders and sham contempt proceedings against me. PARENT-1 expressed to LEIGH our shared an interest in keeping the special education issues separate from the civil rights issues (e.g., DIABLO's fraudulent efforts to retaliate against us for complaining about DIABLO employees, especially REID, fraudulent allegations that M.C. and C.C. carried guns and knives, fraudulent allegations that PARENT-1 had a restraining order against her, sham restraining order proceedings, sham civil contempt proceedings, sham criminal contempt prosecutions, sham Suspected Child Abuse Reports (SCARs) and sham investigations, etc.) until M.C. and C.C. were placed in safe and appropriate school environments because we understood that combining those issues would almost certainly delay such placement. That teleconference ended around 12:27 PM. Both during and after that teleconference, LEIGH consulted with JAMBECK about the issues that were raised. Later that same day, we offered LLG DEFENDANTS employment primarily because of their collective civil rights experience, which no other local special education law firm or lawyer had as far as we could tell from our research and interviews.

///

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

124. On 8/20/2018, COOPER gave perjurious live testimony in the sham proceedings on DEFENDANTS' fraudulent requests for ROAHs.

125. By the morning of 8/21/2018 around 9:23:20 AM, I had uploaded to a Shared Folder on a Google Drive (Shared Folder) all of the requested dox, including but not limited to those related to the DIABLO & F3 DEFENDANTS' fraudulent petitions for restraining orders and sham proceedings against me (e.g., pleadings, orders, etc.). Search results of the contents as of 8/21/2018 of that Shared Folder before LLG DEFENDANTS fully executed **THEIR 8/21/2018 FACIALLY VOID RETAINER AGREEMENT** further show that we disclosed all potentially relevant information about all known aspects of our dispute with DIABLO, including but not limited to that which relates to the DIABLO & F3 DEFENDANTS' fraudulent restraining order petitions and sham proceedings against me. PARENT-1's draft declaration (24,551 words) is the main document in that Shared Folder, and can be read for comprehension by an average reader (i.e., about 300 words per minute) in less than an hour-and-a-half. It references 73 Exhibits, all of which are contained in that same Shared Folder. Those dox represent most of the contents of that Shared Folder. On top of our other pre-agreement communications with LLG DEFENDANTS, that Shared Folder strongly shows that we hid nothing from them. And LLG DEFENDANTS' initial bills show that they reviewed the dox in the Shared Folder for almost an hour-and-a-half about a week after fully executing **THEIR 8/21/2018 FACIALLY VOID RETAINER AGREEMENT**. LLG DEFENDANTS had the option to search and review those dox right from the Shared Folder before agreeing to provide legal services to us. Soon after I uploaded those dox, PARENT-1 sent an email to LEIGH and at least one other LLG employee with a link to that Shared Folder and an attachment that included **LLG DEFENDANTS' 8/21/2018 FACIALLY VOID RETAINER AGREEMENT** signed by us. The last line of that email reads: "Please let me know if you need anything else (e.g., ***any of the recordings that we discussed***)." (emphasis added.) PARENT-1 was referring to the recordings she had first disclosed on 8/16/2018 that incontrovertibly proved that the DIABLO & F3 DEFENDANTS' requests for restraining orders against me were fraudulent and the contempt proceedings against me were shams.

126. By 8/21/2018 around 10:57:16 AM, PARENT-1 and I had hired the LLG DEFENDANTS for limited-scope representation. I explicitly forbade the LLG DEFENDANTS from

06/22/2020                                                          **Page 66 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

representing me in any of the foregoing sham proceedings, and we explicitly asked the LLG DEFENDANTS to assume that I would prevail in those sham proceedings, to provide a detailed written evaluation of our legal claims against the non-LLG DEFENDANTS based partly on that assumption, and to file CTCA claims based on that evaluation to preserve our state claims against the non-LLG DEFENDANTS.

127.    Throughout the period that the LLG DEFENDANTS were pretending to represent PARENT-1 and me, we were unaware that **THEIR 8/21/2018 FACIALLY VOID RETAINER AGREEMENT** violates The State Bar of California Rules of Professional Conduct as follows: Limited Scope of Services (**LLG DEFENDANTS' 8/21/2018 FACIALLY VOID RETAINER AGREEMENT**, ¶ 1); Petitioners' Hourly Rate and Costs (*Id.*, ¶ 4); Respondents' Non-Billable Time (*Id.*, ¶ 5); Bill Review (*Id.*, ¶ 5); Petitioners' Penalty for Discharging Respondents (*Id.*, ¶ 6); Recovery and Recovery Rate (*Id.*, ¶ 12); Respondents' Billing to Scope (*Id.*, ¶ 13); Petitioners' Penalty for Respondents' Withdrawal: (*Id.*, ¶ 14); Petitioners' Truth/Disclosure (*Id.*, ¶ 16); Lien (*Id.*, ¶ 18); Severability (*Id.*, ¶ 22); Conflict Waiver (*Id.*, ¶ 27).

128.    Around the time PARENT-1 and I hired the LLG DEFENDANTS and continuing for months thereafter, LEIGH repeatedly stated that she had a long-term relationship with ESTES. LEIGH said that she and ESTES had been friendly for a long time, lived "just down the street" from each other, had worked on many cases together, etc. According to public records, LEIGH and ESTES lived about two miles away from each other in Marin County, California. LEIGH indicated that her relationship with ESTES gave her valuable advantages in our negotiations with the DIABLO DEFENDANTS because ESTES was inclined to favor her.

129.    Between 8/21/2018 and 9/1/2018, the LLG DEFENDANTS performed some initial tasks and discussed some of the uploaded dox, which indicates they accessed many dox on the Shared Folder, including but not limited to those related to the DIABLO & F3 DEFENDANTS' fraudulent requests for restraining orders and sham proceedings against me.

130.    As of 8/24/2018, for almost two years a lawsuit of mine had been pending and unresolved against many SUPERIOR COURT judicial officers, including BECTON, who had become the DA by

///
06/22/2020                                                                    **Page 67 of 554**
COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

then. (See, e.g., SUPERIOR COURT Case No. C16-02064 and San Francisco Superior Court Case No. CGC-17-558127.)

131. On 8/24/2018:

a. Early in the morning I went to the SUPERIOR COURT CLERK'S OFFICE and requested the contents of the file for the sham criminal proceedings that had been initiated against me, SUPERIOR COURT Docket No. 01-186928-8. A Deputy Clerk checked the file upon my request, but it was devoid of the complaint and discovery. That clerk searched for the file, was unable to locate those dox, and directed me to go the CCCDAO in order to the obtain them.

b. I promptly walked to the CCCDAO located less than a block away at 900 Ward Street to request copies of those dox, gather information about the activities of the CCCDAO, including but not limited to those related to those sham criminal proceedings, and make some other requests. Initially, I made those requests to RIVERA, an employee of the CCCDAO who I had briefly worked with years beforehand regarding a parental kidnapping of my daughter. (See Case No. 20-cv-01076-JD.) RIVERA said he would try to help me get a copy of those dox. His progress was slow so I told him, among other things, that I would go eat lunch and return later in order to give him more time to fulfill my requests. We agreed that I would send him an email with my requests, and that he would promptly confirm receipt. That email includes, among other information, the following request: "Please provide a copy of the complete discovery file as soon as possible today." RIVERA did not confirm receipt.

c. When I returned to the CCCDAO that afternoon, I emailed RIVERA to let him know that I was back, to repeat my request to confirm receipt of my previous email, and to request an update on his progress fulfilling my previous requests. He did not reply. Soon thereafter, two DA employees, a receptionist and MEDINA, blocked my access to the public restroom there, which I needed to use predominantly in order to administer a shot of medication in my buttocks related to one of my disabilities. Also, they thwarted my my requests, including to make appointments with BECTON and MULLIGAN.

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

d. After I briefly exited the office around 2:28 PM that afternoon, I observed and electronically recorded of the following people outside talking about me: WEDEMEYER, a DA employee and former SUPERIOR COURT security guard supervisor employed by the CONTRA COSTA COUNTY SHERIFF'S OFFICE, who while he worked there had personally abused and caused others to abuse me, which abuses figured prominently in several court cases, including the California Supreme Court (S229852) and California First District Court of Appeal (A146974) cases where I prevailed unanimously; MEDINA; RIVERA; and J. GARCIA. WEDEMEYER falsely told MEDINA, RIVERA and J. GARCIA then and there that I had a "history of surreptitious conversations—like he will put it in his recorder." He also told them that they should not try to reason with me, but should use force instead. They agreed to do so. Soon thereafter, MEDINA, RIVERA and J. GARCIA physically blocked my attempts to re-enter the CCCDAO to conduct lawful business. Without warning, they physically attacked me, violently gang-tackled me onto the concrete walkway outside the CCCDAO, pressed their heavy bodies against mine, smashed my face into the concrete, thereby chipping some of my teeth, turned off one of my electronic devices, which had been recording, and squeezed and twisted hand cuffs around me so tight that they caused abrasions to my wrists and severe numbness to my hands. One of those thugs may have even put his knee on the back of my neck like that murderer did to George Floyd in Minneapolis on 5/25/2020. Videos will show. Their actions injured me and caused me severe pain.

e. At one point, J. GARCIA bent my wrists and lifted my arms. They did not buckle a safety belt around me when they put me in and drove me around in a car, which caused me to slide around and bang my knees into several hard surfaces, which was painful. When they got me behind a closed garage door at the CONTRA COSTA COUNTY SHERIFF'S OFFICE Martinez Detention Facility (MDF), RIVERA bent my wrists and lifted my arms as I exited the car, which was very painful. At some point, RIVERA turned off another one of my electronic devices, which had been recording. Because of their

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

foregoing actions, including, but not limited to their repeated refusals to provide access to their public restrooms so I could administer medical attention to myself, I began to experience a medical emergency. When I repeatedly requested emergency medical attention, RIVERA and J. GARCIA caused a bunch of CONTRA COSTA COUNTY SHERIFF'S OFFICE employees to crowd around me. All of their foregoing actions were unreasonable and caused me pain, some of which was severe.

f.  Thereafter, the CONTRA COSTA COUNTY SHERIFF'S OFFICE employees hurt me even worse. Among other things, they lifted me off the ground by my arms, which were still cuffed at my hands, and pulled my arms apart. The pain was so excruciating that I repeatedly screamed and began to hyperventilate. With growing pain in my chest, I felt like I was going to pass out. Like MEDINA, RIVERA, and J. GARCIA, those abusive CONTRA COSTA COUNTY SHERIFF'S OFFICE employees ignored my repeated requests for emergency medical attention. They also repeatedly mocked me. Somehow, an ambulance finally came for me and drove me to safety.

g.  Sometime that same day, the CCCDAO initiated sham criminal proceedings against me based on fraudulent allegations by some of the DEFENDANTS that I violated the aforementioned facially void TROs. I represented myself in those sham criminal proceedings for all of the first four months much of the approximately 15 total months that they dragged on before they were finally dismissed by Judge O'Malley as "absolutely" and "grotesquely" baseless. (SUPERIOR COURT Docket No. 01-186928-8, Certified Transcript of Sham Criminal Proceedings on 11/25/2019 at p. 7:10-27.)

h.  That same evening, I emailed BECTON and MULLIGAN about many of the foregoing details and a link to the relevant parts of the recordings I had made. Neither BECTON nor MULLIGAN replied or otherwise responded to me as far as I could tell. Instead, they ratified foregoing violent misconduct, which had left me bruised, scraped, with chipped teeth, with strained shoulders and wrists, in pain, and in fear of what else they and other criminal government employees would do to harm me. BECTON, MULLIGAN, MEDINA, WEDEMEYER, J. GARCIA, RIVERA, and possibly others had thereby

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

blocked and otherwise deterred me from accessing that public CCCDAO and restroom, from electronically recording their and other criminal government employees' activities, from investigating the local government in anticipation of litigation against it, from petitioning the local government regarding crimes, including perjury and other felonies, against me by other government agencies and criminal employees, and from engaging in other constitutionally protected activities. And they maintained those sham criminal proceedings for approximately 15 months thereafter.

132. On 8/27/2018, MASON, HANSEN, DURKEE, LAWRENCE, and MAYO met and conspired with MEYER, COOKSEY, AALRR, SCHOENKE, ESTES, HUNTOON, F3, COMBS, and/or ECKSTEIN and, while knowing that the foregoing sham restraining order and criminal proceedings were irrefutably contradicted by recordings and other hard evidence, agreed to maintain those sham proceedings.

133. On 8/28/2018 around 2:00 PM while making my way to Taco Bell at Encina Grande Plaza on Ygnacio Valley Road in Walnut Creek, California with M.C. and C.C., who were in my care, M.C. directed my attention to someone he saw sitting in the outdoor area of Toyo Sushi. M.C. did not say who it was, so I backtracked and saw McALISTER sitting there with LAI. They saw me look at them briefly. I laughed audibly at our unexpected and unwanted encounter with McALISTER. M.C. said McALISTER saw all three of us before I saw him and LAI. After that, we continued walking toward Taco Bell, which was less than 30 yards from McALISTER and LAI. While we did so, McALISTER asked LAI to help him further prolong the foregoing sham proceedings against me, and to fraudulently initiate new sham proceedings against me. LAI agreed. First, they tried to provoke a confrontation with me. They watched us enter the Taco Bell. McALISTER, the person who had recently alleged under penalty of perjury that I had threatened "to kill and mutilate [him] and/or other [DIABLO] staff and students" (see ¶ 72.c.iii above), told LAI to enter Taco Bell and watch us while he pranced around in front of us. He did not call 911. Instead, he put LAI right next to me all by herself right after I had seen them together—and she let him put her next to me without hesitation. I recorded McALISTER walking to a vehicle, into and out of Whole Foods Market, and then back to that same vehicle. At each of those times, McALISTER was between 65 and 80 yards away from us. Then we

06/22/2020
Page 71 of 554

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

watched him go out of his way to drive past Taco Bell in that same vehicle, which put him less than 12 yards away from us at his closest. He looked right at me as he passed slowly. McALISTER and LAI communicated with each other by text message to coordinate their actions during those events. After they failed to provoke a confrontation with me, LAI left Taco Bell. Around 7:03:32 PM that same day, I sent an email to COMBS, ECKSTEIN, CHAPLIN, and others informing them of the foregoing events as well as M.C.'s, C.C.'s, and my "well[-]informed and very low" shared opinion of McALISTER. I also delivered some hard evidence, including some audio and video, of those events. Second, that same day and/or the next, COMBS, ECKSTEIN, McALISTER, LAI, CHAPLIN, MURPHY, and possibly others conspired to further prolong and initiate sham proceedings against me. Together, they fabricated a report with an intentionally false version of the foregoing events, including but not limited to the omission of their attempt to provoke a confrontation and the falsehood that I had violated those fraudulently obtained and facially void TROs. Without contacting me about or otherwise investigating that report, the WCPD forwarded it to the CCCDAO, which further prolonged the sham criminal proceedings. The DIABLO & F3 DEFENDANTS also used that intentionally false report to further prolong the sham proceedings on their fraudulent requests for ROAH's and to threaten me as described herein.

134.   On 9/3/2018 around 4:01:24 PM, PARENT-1 emailed the LLG DEFENDANTS an updated list of our objectives similar to that which she had stated to LEIGH on 8/16/2018 in order to further enable them to perform their work within the limited scope that we had defined for them: (1) getting M.C. and C.C. into schools where "they feel safe and supported... as soon as reasonably possible...*[w]ithout sacrificing any legal remedies against [DIABLO]*"; (2) ensuring that DIABLO provides "compensatory services for both [M.C. and C.C.], especially [M.C.], who is in his Junior year [of high school]"; (3) "[c]lean[ing] up [both M.C.'s and C.C.'s] transcripts"; (4) holding all DIABLO employees, including but not limited to REID and McALISTER, legally responsible for their wrongdoing, including but not limited to their "false and defamatory statements" about PARENT-1, M.C., C.C., and me; and (5) financial compensation for civil rights violations against PARENT-1, M.C., C.C., PARENT-2, and me.

///

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

135.   On 9/5/2018 starting around 2:34 PM, TROUTMAN, PARENT-1, and I spoke by telephone for about 57 minutes to determine the tasks the LLG DEFENDANTS needed to complete that would enable us to meet our foregoing objectives. Referencing those objectives, TROUTMAN said he intended to use our other claims predominantly as "leverage" for our special education claims. We told TROUTMAN that we needed the LLG DEFENDANTS to provide a written report of the strength and estimated monetary value of each of our state and federal claims (hereinafter "case evaluation") so we knew how much money to demand from DIABLO either in prelitigation settlement negotiations or litigation. Like LEIGH had said in her interview on 8/16/2018, TROUTMAN said that it was standard practice for the LLG DEFENDANTS to file CTCA claims with school districts in situations like ours so the LLG DEFENDANTS would need to assess the strength and estimated monetary value of our state claims anyway. He said that adding our federal claims to that analysis would be a straightforward exercise and agreed to complete both of the foregoing tasks on those bases. TROUTMAN provided a detailed description of LLG DEFENDANTS' action plan in order to preserve our state causes of action for a possible civil rights lawsuit, among other objectives. He said that LLG DEFENDANTS intended to promptly present a "Notice of Government Tort Claim" to DIABLO, which presentation Petitioners expressly approved and specifically instructed LLG DEFENDANTS to make as soon as possible.

136.   On 9/11/2018, COOPER gave further perjurious live testimony in the sham proceedings on DEFENDANTS' fraudulent requests for ROAHs. For some examples:

> Q. Okay. Who did you perceive my actions as a threat of violence toward on [5/15/2018]?
>
> A. The entire school. You were a threat to the entire school for being on campus when being asked to leave. So the safety to my students, the safety to staff, the safety to us.

(CERTIFIED TRANSCRIPT OF 9/11/2018 SHAM PROCEEDINGS, VOL. 1 at p. 69:13-17.) That was a transparently fraudulent inference to allege between my peaceful presence and a threat of violence (see, e.g., *Pierson v. Ray*, 386 US 547 (1967)), and it was based on her false allegation that I had been "asked to leave" NHS. COOPER had witnessed McALISTER retract his facially void order for me to leave NHS, and COOPER had reviewed audio of that retraction before testifying.

///

06/22/2020

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

Q. ...[D]uring the time that you were there, did I do anything physical that caused you to fear for your safety or the safety of anyone else?

A. Sure. No, you didn't do anything physical that created a perceived threat outside of directing [M.C. and C.C.] to record various conversations, separate from you, once you were instructed to get off the property.

(CERTIFIED TRANSCRIPT OF 9/11/2018 SHAM PROCEEDINGS, VOL. 2 at p. 123:3-25.) That was a transparently fraudulent inference to allege between my directions and a physical threat to safety (see, e.g., *Pierson v. Ray*, *supra*). COOPER knew that the alleged instruction to "get off the property" was facially void partly because it was based on fraudulently obtained and facially void TROs that she had helped fraudulently obtain, and that recording government employees in public areas as I asked [M.C. and C.C.] to do is constitutionally protected activity.

Q. [M]y instructions to [M.C. and C.C.] about recording, under those circumstances, caused you to fear for someone's safety. Was it your safety?

A. I was next to a police officer so, no, it wasn't that I was fearing for my physical safety in that moment.

Q. And did you fear for anyone else's physical safety in that moment?

A. Only in the manner that I didn't know what your intent was from being on the property.

(*Id.* at p. 125:4-14.) Here COOPER essentially admitted that her foregoing statements about the events on 7/24/2018 were perjurious.

137. None of COOPER's foregoing statements on 9/11/2018 was true. Many further examples of her perjurious live testimony on 9/11/2018 that reaffirm the DIABLO & F3 DEFENDANTS' malice and discriminatory animus against me continue through 221 pages of those transcripts.

138. On 9/11/2018 between 2:32 PM and 2:36 PM in Room 301 of TAYLOR during a break in the DIABLO & F3 DEFENDANTS' sham proceedings for ROAHs, COMBS threatened to present child endangerment charges against me to unspecified authorities. He made that threat loudly and many people heard it. He had absolutely no basis for or intent to present such charges. Instead, he intended by

///

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

that threat to gain an unfair advantage over me in those sham proceedings and set me up for the extortionate demands for my property and other consideration that he intended to make.

139. By 9/12/2018, the cumulative impact of the DIABLO & F3 DEFENDANTS' foregoing sham proceedings, threats, and intimidation had preoccupied, overwhelmed and scared me so much that I had been unable to continue presenting a case to this Court that I had filed on 7/2/2018, which thereby caused its dismissal with prejudice. (See Case No. 18-cv-03973-JD.)

140. On 9/12/2018 and 9/24/2018, MASON, HANSEN, DURKEE, LAWRENCE, and MAYO met and conspired with MEYER, COOKSEY, AALRR, SCHOENKE, ESTES, HUNTOON, F3, COMBS, and/or ECKSTEIN and, while knowing that the foregoing sham proceedings were irrefutably contradicted by my "audio and video" and other hard evidence, ratified the foregoing further wrongful acts and agreed to maintain those sham proceedings.

141. On 9/17/2018, PARENT-1 and LEIGH had a telephone conversation in which they recapped the 9/5/2018 teleconference (see, ¶ 135 above), and discussed additional aspects of our state and federal civil rights claims against DIABLO DEFENDANTS.

142. On the morning of 9/26/2018, COOPER gave further perjurious live testimony in the sham proceedings on DEFENDANTS' fraudulent requests for ROAHs. For example:

Q. By "aggressive," do you mean physically aggressive?

A. Aggressive in the manner where you will get closer, where you'll stand close enough to somebody and then make the demands that they back up.

(CERTIFIED TRANSCRIPT OF 9/26/2018 SHAM PROCEEDINGS at p. 21:14-17.) That has never happened, and COOPER has never witnessed it happen.

143. COOPER's foregoing statement on 9/26/2018 was knowingly false. Further examples of her perjurious live testimony on 9/26/2018 that reaffirm the DIABLO & F3 DEFENDANTS' malice and discriminatory animus against me continue through 23 pages of that transcript.

144. By 9/26/2018, I had confirmed that since late April 2018 the DIABLO DEFENDANTS had circulated the **11/3/2009 FRAUDULENTLY OBTAINED, DEFAMATORY, ABSOLUTELY & GROTESQUELY OVERBROAD, & FACIALLY VOID FLORIDA RESTRAINING ORDER** among themselves and others. (See, e.g., ¶ 90.p above.)

06/22/2020                                                                                    **Page 75 of 554**

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

145. On the morning of 9/26/2018 after COOPER finished her perjurious live testimony, 9/27/2018, and 10/4/2018, MAHER gave further perjurious live testimony in the sham proceedings on DEFENDANTS' fraudulent requests for ROAHs. For some examples:

A. Later that same afternoon there was a knock at our closed door. It was quite a loud knock.

(CERTIFIED TRANSCRIPT OF 9/26/2018 SHAM PROCEEDINGS at p. 27:21-22.)

A. ...There were several poundings, for lack of a better term, on the door.

(*Id.* at p. 28:11-12.)

Q. When you opened the door, did it appear as if [WILSON] was attempting to come into the area that you were in?

A. It did appear that he was attempting to come in.

(*Id.* at p. 29:14-17.)

Q. ...[D]id it appear that [WILSON] was standing inside what we sometimes call a personal space [of HOLLERAN's]?

A. Yes.

(*Id.* at 30:8-10.) My recordings irrefutably contradict each of MAHER's foregoing allegations. The DIABLO & F3 DEFENDANTS concealed or destroyed their own video, which showed that I did not attempt to enter that area, that HOLLERAN approached me, and that I did not stand in his personal space. The DIABLO & F3 DEFENDANTS also refused to call HOLLERAN as a witness.

146. MAHER knew her foregoing statements on 9/26/2018 were false when she made them. Many further examples of her perjurious live testimony on 9/26/2018, 9/27/2018, and 10/4/2018 that reaffirm the DIABLO & F3 DEFENDANTS' malice and discriminatory animus against me continue through 257 pages of the transcripts of those sham proceedings.

147. On the morning of 10/4/2018 after MAHER finished her perjurious live testimony and 10/15/2018, ESTRADA gave further perjurious live testimony in the sham proceedings on DEFENDANTS' fraudulent requests for ROAHs. For some examples:

///

///

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

A. ...I did notice, as the conversation got more intense, that his leg was shaking.... I noticed that he was [shaking], and I noticed that he was sweating rather profusely, which, kind of, led me to believe something is not right here and I need to be extra cautious.

(CERTIFIED TRANSCRIPT OF 10/4/2018 SHAM PROCEEDINGS at pp. 83:26-84:4.) My video clearly shows that I was not sweating or shaking at all.

A. I suggested, again, you know, "If you have anxiety, you could go to the public area and no one will be there."

(*Id.* at p. 85:6-7.) My recordings show that ESTRADA did not say that to me. They also show that he repeatedly pretended that I was exhibiting symptoms of anxiety (e.g., shaking and sweating) and mocked me for it.

Q. Who told you I was disrupting the office and menacing the staff?

A. I observed you. No one told me that you were disrupting the office. I observed that. And Ms. Maher called me to ask me to assist her, that there was some issues or an incident in Wing C. I believe those were my words.

Q. No. Your words were, and I'll read them directly: "I was called to the C wing of the Dent Center to intervene in a situation with a very tall man who was disrupting the office and menacing the staff."

(*Id.* at pp. 90:26-91:12.) ESTRADA did not observe me doing either of those things at any time. Nor did anyone else. His live testimony directly contradicted his foregoing statement that I quoted from **HIS 5/29/2018 DECLARATION.**

Q. Did you intend that statement "It doesn't look like you read anyway" as a provocation to me?

A. I wouldn't call it a provocation.

Q. What would you call it?

A. From what I observed from your shaking and your sweating, I didn't think that you could actually sit down and read or focus on anything that involved any amount of time. That's just what I saw.

Q. And in seeing that, what compelled you to make that comment?

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

A. I didn't see where your purpose there was -- reading anything, waiting for an appointment. I don't understand why you were there beyond when you were told Mr. Espinoza is not here.

Q. If you, as you have testified here today, thought that I was unpredictable, you didn't know what I would do next, why would you say something like that to someone who was unpredictable?

A. So saying something like that, in your opinion, would cause someone to do something. Is that what you're asking me?

Q. I am -- I would like the court reporter to please read back the question.

(Record read.)

A. I didn't think something like that would evoke anything. Gosh.

Q. Did you consider that statement "It doesn't look like you read anyway" to be an insult?

A. No. It's what I observed.

Q. Did you consider it to be a positive comment about me?

A. It – it's a comment about concern.

Q. Your concern was that I wasn't able to read?

A. My concern –

Q. About my ability to read?

A. My concern was that you leave.

(*Id.* at p. 104:15-105:25.)

148.    ESTRADA knew his foregoing statements on 10/4/2018 were false when he made them. Many further examples of his perjurious live testimony on 10/4/2018 and 10/15/2018 that reaffirm the DIABLO & F3 DEFENDANTS' malice and discriminatory animus against me continue through 189 pages of the transcripts of those sham proceedings.

149.    On 10/8/2018, MASON, HANSEN, DURKEE, LAWRENCE, and MAYO met and conspired with MEYER, COOKSEY, AALRR, SCHOENKE, ESTES, HUNTOON, F3, COMBS, and/or ECKSTEIN and, while knowing that the foregoing sham proceedings were irrefutably

06/22/2020

**Page 78 of 554**

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

contradicted by my "audio and video" and other hard evidence, agreed to maintain those sham proceedings.

150.   By early October 2018 at the latest, the LLG DEFENDANTS had decided to sell-out my interests. PARENT-1 and I had allowed Respondents to communicate with ESTES to schedule IEP meetings for M.C. and C.C., subject to the following conditions: the IEP meetings needed to occur as soon as possible; the IEP meetings were not to be held on DIABLO property; and all DIABLO employees who had caused or worsened the dispute were to be excluded from those IEP meetings. Several weeks before October 2018, LEIGH had falsely asserted that I was not a client of LLG, which alarmed PARENT-1 and me. In a series of email exchanges, the LLG DEFENDANTS, led by LEIGH, repeatedly refused to even ask DIABLO to hold the IEP meetings off DIABLO property or to exclude all DIABLO employees who had caused or worsened the dispute, which impaired our IEP meeting rights. It first came to my attention that the LLG DEFENDANTS had sold-out my interests on 10/9/2018 when they made very derogatory statements about me because they began to perceive me as an individual with disabilities[5] and because I stated my intent to exercise my right to attend, record, and speak at meetings with DIABLO regarding M.C. and C.C. During communications that ensued, LEIGH threatened to expose to PARENT-1 and others extremely negative defamatory information about me that she incorrectly assumed I had kept from PARENT-1. In a 10/9/2018 9:27:01 PM email LEIGH sent to me and TROUTMAN only, she referred to the **11/3/2009 FRAUDULENTLY OBTAINED, DEFAMATORY, ABSOLUTELY & GROTESQUELY OVERBROAD, & FACIALLY VOID FLORIDA RESTRAINING ORDER** and asked me, "Is this your case?" That question had nothing whatsoever to do with the professional services the LLG DEFENDANTS were supposed to provide us. DEFENDANTS, through LEIGH, were just exposing their knowledge of that unrelated defamatory information to me and implying that it would be exposed more broadly to threaten and intimidate me into meeting their demands for our property and other consideration,

---

[5] In a recorded conversation with a law enforcement employee on 8/21/2019, LEIGH stated that she and the other LLG DEFENDANTS began to perceive me as such and therefore regretted having established a lawyer-client relationship with me.

06/22/2020

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

including but not limited to waiving my right to attend, record, and speak at upcoming meetings with DIABLO regarding M.C. and C.C.

151. By late evening on 10/9/2018, PARENT-1 and I knew the LLG DEFENDANTS had done wrong by refusing to follow our instructions, which were perfectly legal, so we reviewed **THEIR 8/21/2018 FACIALLY VOID RETAINER AGREEMENT** to refresh our recollections about the terms related to discharging them. It stated that we would have to pay a penalty if we discharged them—even for cause. We did not yet know that **THEIR 8/21/2018 FACIALLY VOID RETAINER AGREEMENT** violates The State Bar Rules of Professional Conduct. We were unable to pay such penalty. Predominantly for that reason, we did not discharge them at that time even though such discharge seemed necessary.

152. On 10/10/2018, PARENT-1 and I learned that LEIGH had been working with ESTES behind our backs since 10/9/2019 around 4:33 PM at the latest to cancel those IEP meetings without obtaining our informed consent beforehand. The LLG DEFENDANTS' foregoing threat against me made me so scared of further exposure that I waived my right to attend, record, and speak at meetings with DIABLO regarding M.C., and later, other property and consideration.

153. Because the LLG DEFENDANTS had financially trapped PARENT-1 and me and wrongfully threatened me on top of that, we did not challenge, disagree, follow-up on outstanding work, address scope violations, raise billing concerns or otherwise assert our rights with respect to them between 10/10/2018 and 11/27/2018 regardless of what they did wrong. I did not even directly communicate with them between 10/10/2018 and 11/2/2018.

154. Between 10/15/2018 at the latest and 10/30/2018, the LLG DEFENDANTS conspired with the DIABLO & F3 DEFENDANTS, mostly through LEIGH and ESTES, to threaten PARENT-1 and me with the continuation by the DIABLO & F3 DEFENDANTS of the foregoing sham investigations and other sham proceedings against me and the initiation by the DIABLO & F3 DEFENDANTS of new sham investigations and proceedings against me unless we accepted less than the full value of some of our legal claims against the DIABLO DEFENDANTS and released all of our other legal claims against the DIABLO DEFENDANTS.

///

06/22/2020

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

155. On 10/17/2018 around 6:41:31 PM, LEIGH sent an email to PARENT-1 only, not me, in which she asserted that DIABLO would request a "full waiver" and stated that she did not yet know the "merits" of our non-special education claims, which included civil rights claims directly involving me. About two-and-a-half hours later, TROUTMAN sent an email to PARENT-1 only, not me, that briefly addressed the risks of litigating some of our state and federal non-special education claims, which included civil rights claims directly involving me. That was not the case evaluation that we had previously and repeatedly requested. The next morning, PARENT-1 replied to them and copied me about those emails. Because neither LEIGH nor TROUTMAN had sent those emails to me, PARENT-1 addressed LEIGH's notion of a "full waiver" of claims with respect to her, M.C., and C.C. only, and questioned whether such "global waiver" was appropriate under the circumstances. They failed to timely answer those questions from PARENT-1.

156. By 10/22/2018, the LLG DEFENDANTS still had not completed the case evaluation for our claims, so we authorized a settlement demand that was limited to the special education claims and made no reference whatsoever to any of the foregoing sham investigations or other sham proceedings.

157. On 10/22/2018, MASON, HANSEN, DURKEE, LAWRENCE, and MAYO met and conspired with MEYER, COOKSEY, AALRR, SCHOENKE, ESTES, HUNTOON, F3, COMBS, and/or ECKSTEIN and, while knowing that the foregoing sham proceedings were irrefutably contradicted by my "audio and video" and other hard evidence, agreed to maintain those sham proceedings and approved the communications of the threats and demands by the DIABLO & F3 DEFENDANTS described herein that would begin on 10/31/2018 around 2:12 PM.

158. As of 10/30/2018, the LLG DEFENDANTS still had not provided the detailed written evaluation of our legal claims against the non-LLG DEFENDANTS or filed CTCA claims based on that evaluation to preserve our state claims against the non-LLG DEFENDANTS.

159. By and through 10/31/2018 2:12 PM and 2:14 PM emails with attachments, the DIABLO, F3 & LLG DEFENDANTS caused two "draft agreements" to be transmitted to PARENT-1 and me. At the core of those "draft agreements" were threats to maintain the foregoing sham investigations and other sham proceedings against me unless the DIABLO DEFENDANTS obtained from PARENT-1 and me much of our valuable property and other consideration, including but not

06/22/2020    **Page 81 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

limited to releases of our known and unknown claims against the DIABLO DEFENDANTS that spanned almost two pages. The threats read in pertinent part: "[DIABLO] will withdraw all pending [sham] contempt proceedings against [me] and will also inform the [DA]'s office the [sham] matter has resolved with [DIABLO]." (DRAFT COMPROMISE AND RELEASE AGREEMENT, M.C. v. DIABLO, § 3.E; DRAFT COMPROMISE AND RELEASE AGREEMENT, C.C. v. DIABLO, § 3.F.) The foregoing sham proceedings against me referred to in those "draft agreements" were unrelated to our special education claims that PARENT-1 and I had asked the LLG DEFENDANTS to help us settle as quickly as possible.

160.   "When litigation processes are not tightly controlled — and often they are not — they can be and are used as mechanisms of extortion. Ultimate vindication on the merits does not repair the damage." (*Nixon v. Fitzgerald*, 457 US 731, 763 (1982) (Burger, J., concurring).) In many published legal cases I have studied about extortionate threats and demands involving lawyers that are similar to those described herein, the lawyers for the victims helped them understand the illegality of those threats and demands, reported those threats and demands to law enforcement, and otherwise assisted in bringing the offending lawyers to justice. (See, e.g., *Mendoza v. Hamzeh*, 215 Cal. App. 4th 799, 806-807 (2013); *Stenehjem v. Sareen*, 226 Cal. App. 4th 1405, 1420-1427 (2014); *People v. Bollaert*, 248 Cal. App. 4th 699, 725-726 (2016); *People v. Toledano*, 36 Cal.App.5th 715 (2019).) But legal history is also replete with cases where a "[lawyer] fraudulently or without authority assumes to represent a party and connives at his defeat; or where the [lawyer] regularly employed corruptly sells out his client's interest to the other side." (*United States v. Throckmorton* , 98 U.S. 61, 65-66 (1878).) That is exactly what the LLG DEFENDANTS did here. They had no authority to negotiate regarding any of the foregoing sham investigations or other sham proceedings, all of which were unrelated to our special education claims, but they did so anyway — against PARENT-1's, M.C.'s, C.C.'s and my interests. They did not ever advise PARENT-1 or me that DIABLO's aforementioned threats and demands are illegal. They did not tell the DIABLO & F3 DEFENDANTS that they would not discuss those illegal threats and demands with us despite the fact that the sham investigations and other sham proceedings were unrelated to our special education claims and beyond their scope of services. Instead, they repeatedly discussed those illegal threats and demands with the DIABLO & F3 DEFENDANTS and

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

repeatedly pressured PARENT-1 and me to submit to those illegal threats and demands, as described herein.

161.   On 11/2/2018 during a teleconference among LEIGH, TROUTMAN, PARENT-1, and me that lasted approximately 94 minutes, LEIGH and TROUTMAN repeatedly confirmed that the DIABLO DEFENDANTS were threatening to maintain the foregoing sham investigations and other sham proceedings and to initiate new sham investigations and other sham proceedings if we did not meet their terms, which included payments from DIABLO to LLG of at least $8,000. LEIGH repeatedly said to us on 11/2/2018 that the DIABLO DEFENDANTS had made those and similar threats and demands in her conversations with them that had occurred in the preceding weeks. The LLG DEFENDANTS repeatedly refused to remove the unrelated issues of the foregoing sham proceedings from the "draft agreements" and settlement negotiations so PARENT-1 and I again demanded that the DIABLO & F3 DEFENDANTS' actions related to those issues completely exonerate me. LLG DEFENDANTS demanded that we "leave in [the] DA language" about DIABLO's sham misdemeanor prosecution against me or else the IDEA prong that directly affected M.C. and C.C. would not settle.

162.   On 11/5/2018, MASON, HANSEN, DURKEE, LAWRENCE, and MAYO met and conspired with MEYER, COOKSEY, AALRR, SCHOENKE, ESTES, HUNTOON, F3, COMBS, and/or ECKSTEIN and, while knowing that the foregoing sham proceedings were irrefutably contradicted by my "audio and video" and other hard evidence, agreed to maintain those sham proceedings and the communications of the threats and demands by the DIABLO & F3 DEFENDANTS described herein that began on 10/31/2018 around 2:12 PM.

163.   On 11/12/2018 during a teleconference among LEIGH, TROUTMAN, PARENT-1, and me that lasted approximately 37 minutes, LEIGH and TROUTMAN again repeatedly confirmed that the DIABLO DEFENDANTS were threatening to maintain the foregoing sham investigations and other sham proceedings and to initiate new sham investigations and other sham proceedings if we did not meet their terms, which included payments from DIABLO to LLG of at least $14,000. LEIGH again repeatedly said to us on 11/12/2018 that the DIABLO DEFENDANTS had made those and similar threats and demands in her conversations with them that had occurred in the preceding week or so. The LEIGH DEFENDANTS again repeatedly refused to remove the unrelated issues of the foregoing sham

06/22/2020                                                          Page 83 of 554

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

proceedings from the "draft agreements" and settlement negotiations so PARENT-1 and I again demanded that the DIABLO & F3 DEFENDANTS' actions related to those issues completely exonerate me.

164. In late November 2018, which was around three months after the criminals employed by the CCCDAO had beaten me up and deprived me of many of my federal rights, I built up the courage to re-enter that office, repeat my request for a complete copy of the discovery file and attempt to conduct other lawful business there. MEDINA and some other criminal employees there again refused to fulfill that request and again blocked me from using the public restroom there. But rather than beating me up again, they called the Martinez Police Department (MPD). After arriving, the MPD officers did not make me leave the office or physically harm me. Instead, they facilitated my attempts to conduct other lawful business there and agreed to accept a report from me about the foregoing incident that had occurred on 8/24/2018. MEDINA and the other criminal employees there were visibly upset about that.

165. During a 11/28/2018 teleconference among LEIGH, TROUTMAN and COMBS, the DIABLO & F3 DEFENDANTS again threatened that they would only "encourage the dropping of charges against [me]" by the "D.A." and "expungement" of the records of the foregoing sham investigations and other sham proceedings against me if they obtained property and other consideration from us (e.g.: releases of our claims against the DIABLO DEFENDANTS; an agreement to "stay away" from DIABLO buildings, which would have deprived me of many of my claims against them, my right to investigate DIABLO's and its employees' activities, my right to record DIABLO's and its employees' activities that occur in public areas, my right to petition DIABLO, my rights to attend, record and speak at DIABLO's public meetings, my right to arrest certain DIABLO employees for their criminal activities and petition other governmental authorities about those activities, my other rights; etc.) The DIABLO & F3 DEFENDANTS were "unwilling to consider" anything less than those terms, especially the "stay away" term, in exchange for undoing all of their sham proceedings.

166. In a 11/28/2018 2:09:14 PM email from me to TROUTMAN, LEIGH and others, I again asked the DIABLO & F3 DEFENDANTS "to limit the settlement to the special education claims."

///

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

167. In a 11/28/2018 3:49:08 PM email from me to TROUTMAN, LEIGH and others, I again asked the DIABLO, F3 & LLG DEFENDANTS "to exclude me" from any settlement.

168. On 11/28/2018 between 3:52:16 PM and 4:08:59 PM in a series of emails from LEIGH to me, PARENT-1, and others, she indicated that the DIABLO & F3 DEFENDANTS would only settle our special education claims and stop unlawfully harming me by pressing the foregoing unrelated sham investigations and other sham proceedings and undo the damage caused by those shams if, in addition to our release of all claims against them and other consideration, I agreed "stay away" from DIABLO buildings, which, as stated above, would have deprived me of many of other claims against them as well as many of my rights.

169. On 11/28/2018 between 6:39:04 PM and 7:20:59 PM in a series of emails from LEIGH to me, PARENT-1, and others, she again tried to scare PARENT-1 and I into settling our special education claims by saying that I would not be able to overcome the foregoing unrelated sham investigations and other sham proceedings, including those involving the "DA," at least partly because CCC COURT was "bias[ed]" toward the DIABLO DEFENDANTS.

170. In a 11/30/2018 12:18:07 PM email from PARENT-1 to TROUTMAN, LEIGH, me and others, she again asked the DIABLO, F3 & LLG DEFENDANTS to exclude me from any settlement.

171. In a 11/30/2018 2:48 PM email from COMBS on behalf of the DIABLO DEFENDANTS to TROUTMAN and others which TROUTMAN forwarded to PARENT-1 and me in a 11/30/2018 2:49:18 PM email, COMBS again warned that, unless PARENT-1 and I settled on terms that included, among other terms favorable to the DIABLO DEFENDANTS, an agreement to "stay away" from DIABLO property, they would "ask the DA to pursue charges against [me]." Considering that email in its full context, which the law requires, PARENT-1 and I understood that the DIABLO, F3 & LLG DEFENDANTS meant to threaten not only that they would continue to maintain the foregoing sham investigations and proceedings that they had already initiated with the DA, which I previously alleged (**MY 6/17/2019 COMPLAINT** ¶ 23), but also that they would initiate the foregoing sham investigations and proceedings that they had not yet initiated with the DA.

172. On 11/30/2018 during an approximately six-minute telephone conversation between PARENT-1 and LEIGH regarding settlement that began around 4:07 PM, LEIGH repeatedly asked

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

PARENT-1 whether PARENT-1 knew what the DIABLO DEFENDANTS had on me regarding the foregoing sham proceedings (i.e., "Do you know what they have on him?"). Also, LEIGH repeatedly said something almost exactly like, "Once [more allegations from the DIABLO & F3 DEFENDANTS about me] get to the DA, they can do whatever they want." Referring to the **11/3/2009 FRAUDULENTLY OBTAINED, DEFAMATORY, ABSOLUTELY & GROTESQUELY OVERBROAD, & FACIALLY VOID FLORIDA RESTRAINING ORDER**, LEIGH asked PARENT-1 something almost exactly like, "Have you seen what's on the internet about him?" That question had nothing whatsoever to do with the professional services the LLG DEFENDANTS were supposed to provide us. DEFENDANTS, through LEIGH, were just exposing that unrelated defamatory information to PARENT-1 and implying that it would be exposed more broadly to further threaten and intimidate us into meeting their demands for our property and other consideration. Asserting that, because I financially depended on PARENT-1, PARENT-1 ultimately controlled my decisions regarding the foregoing sham proceedings against me, LEIGH demanded that PARENT-1 tell me to agree to "stay away" from DIABLO and to other terms that would have deprived me of my constitutional and statutory rights and interests vis-à-vis DIABLO, including but not limited to those related to my property (i.e., my claims against the DIABLO DEFENDANTS) and the DIABLO & F3 DEFENDANTS' sham proceedings against me. According to LEIGH, the DIABLO & F3 DEFENDANTS would not enter into any agreement that did not include the foregoing concessions from me. All of the sham proceedings against me that LEIGH referred to in that telephone conversation with PARENT-1 were unrelated to our special education claims that PARENT-1 and I had asked the LLG DEFENDANTS to help us settle as quickly as possible. DEFENDANTS just kept throwing them into our faces to further threaten and intimidate us into meeting their demands for our property and other consideration, including $14,000 that LLG wanted for their involvement in the conspiracy.

173. On 12/3/2018 during the first sham proceeding in the DIABLO, F3, CCCOE, PHPD & CCCDAO DEFENDANTS' fraudulent misdemeanor case against me, I informed the CCC COURT in writing and live statements that my predominant objectives were to obtain a determination of factual innocence, to cause multiple involved individuals to be referred to the proper authorities for perjury and

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

possibly other crimes, and to gather more evidence in support of my forthcoming lawsuits against multiple involved individuals and entities. I also reminded the CCC COURT that:

  a.  I did not have a lawyer to defend me.

  b.  I lived with disabilities, which limited my ability to defend myself in that case.

  c.  Since October 2016, I had been the Petitioner and/or Plaintiff in two pending lawsuits against the CCC COURT and its judicial officers who worked in the CCC COURT at that time, including BECTON.

  d.  The **DIABLO, F3, CCCOE, PHPD, & CCCDAO DEFENDANTS' 8/24/2018 FRAUDULENT COMPLAINT** did not identify the alleged **TRO** referred to therein or how I allegedly violated it.

  e.  Despite my multiple requests that began on 8/24/2018, the CCCDAO DEFENDANTS' had failed to produce a copy of its discovery file for that case.

  f.  Multiple CCC COURT DEFENDANTS had repeatedly blocked my access to court.

  g.  Multiple CCC COURT & CCCDAO DEFENDANTS had perpetrated violent and other crimes against me.

  h.  The CCC Public Defender's Office had previously failed to provide me with effective assistance of counsel.

  i.  I did not understand the charges and evidence against me, my rights, or the procedures to address the foregoing and other problems so I needed to delay entering a plea in order to seek assistance from a lawyer.

174.  In a 12/9/2018 4:53:26 PM email to LEIGH, copying TROUTMAN and me, PARENT-1 reiterated our request to separate the DIABLO & F3 DEFENDANTS' sham proceedings against me from the settlement of our special education claims.

175.  In 12/9/2018 7:06:18 PM email to PARENT-1, copying TROUTMAN and me, LEIGH replied that our special education claims were "not the strongest." But LEIGH had previously indicated in a 10/17/2018 6:41:31 PM email to PARENT-1 and TROUTMAN that our special education claims were relatively strong. All things considered, we understood LEIGH's conflicting to mean that she was

///

06/22/2020

**Page 87 of 554**

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

just saying whatever she needed to say to coerce us into keeping the DIABLO & F3 DEFENDANTS' sham proceedings against me on the table in the settlement negotiations.

176.   In a 12/9/2018 7:34:01 PM email to LEIGH, copying TROUTMAN and me, PARENT-1 asked LEIGH to confirm that the LLG DEFENDANTS had preserved our state claims against the DIABLO DEFENDANTS by filing the CTCA claims that they had promised to file.

177.   On 12/10/2018 during an approximately 45-minute telephone conversation between LEIGH and PARENT-1 that began around 4:09 PM, LEIGH stated that the LLG DEFENDANTS had not filed those CTCA claims. LEIGH also repeated almost verbatim the statements she had made during her aforementioned telephone conversation with PARENT-1 on 11/30/2018, thereby confirming our understanding LEIGH was just saying whatever she needed to say to coerce us into keeping the DIABLO & F3 DEFENDANTS' sham proceedings against me on the table in the settlement negotiations. After PARENT-1 and I discussed the fact that the LLG DEFENDANTS had not filed the aforementioned CTCA claims, we realized that the DIABLO, F3 & LLG DEFENDANTS had obtained many of our state claims against the DIABLO DEFENDANTS and thousands of dollars from us against our will by the foregoing wrongful means.

178.   In a 12/11/2018 8:59 AM email to LEIGH, copying some of the other DIABLO & LLG DEFENDANTS, COMBS issued an additional threat against me by indicating that the DIABLO & F3 DEFENDANTS would continue to maintain the foregoing sham criminal proceedings that they had already initiated with the DA, which I previously alleged (**MY 6/17/2019 COMPLAINT ¶ 23**), and that they would initiate with the DA at least one of the foregoing sham investigations and proceedings that they had not yet initiated (i.e., for "[o]n two separate occasions … knowingly and intentionally violat[ing]" the facially void TROs that they had fraudulently obtained). At 9:43:11 AM that same day, LEIGH forwarded that email to PARENT-1 and me. Late into that evening, COMBS sent several other emails, the last of which was sent around 10:39 PM and had an additional demand for a "stay away" agreement attached, which was linked to the DIABLO & F3 DEFENDANTS' foregoing threats. LEIGH forwarded that email and attachment to PERSON-1 and me around 10:53:55 PM.

179.   By the following morning, 12/12/2018 around 7:40 AM, I had received and read that "stay away" agreement, which demanded that I admit to a false fact set, incur risks of further sham

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND

criminal proceedings, and stay away from DIABLO property and some of the INDIVIDUAL DIABLO DEFENDANTS. Submitting to those demands would have further deprived me of many of my claims against them, my right to investigate DIABLO's and its employees' activities, my right to record DIABLO's and its employees' activities that occur in public areas, my right to petition DIABLO, my rights to attend, record and speak at DIABLO's public meetings, my right to arrest certain DIABLO employees for their criminal activities and petition other governmental authorities about those activities, and my other rights. In an email sent around 7:41:14 AM from me to LEIGH, I said, "No." For the next 80 minutes or so, PARENT-1 and I repeated our instructions to stop threatening and demanding those things from us, and LEIGH refused to do so. Around 9:00 AM, COMBS and I were in a Martinez, California courtroom together for further sham proceedings on the DIABLO DEFENDANTS' fraudulent requests for ROAHs. COMBS immediately asked me whether I had reviewed the aforementioned "stay away" agreement. I answered that I had done so. The LLG DEFENDANTS did not ever advise PARENT-1 or me that DIABLO's aforementioned threats and demands are illegal. They did not tell the DIABLO & F3 DEFENDANTS that they would not discuss those illegal threats and demands with us despite the fact that the sham investigations and other sham proceedings were unrelated to the special education claims and beyond their scope of services.

180.    On 12/12/2018:

a.    Between 9:00 AM and 12:30 PM while LEIGH knew I was in court with COMBS, LEIGH repeatedly exerted maximum pressure on PARENT-1 and me to submit to those illegal threats and demands. I repeatedly refused. Nonetheless, the DIABLO, F3 & LLG DEFENDANTS had already obtained many of our state claims against the DIABLO DEFENDANTS and thousands of dollars from us against our will by the foregoing wrongful means.

b.    Around 9:14:54 AM, I expressed concerns about the LLG DEFENDANTS fees to LEIGH. Instead of agreeing to review those concerns with me, LEIGH threatened to withdraw "for cause" and impose a "lien" against PARENT-1 and me. Refusing to be intimidated any further by LEIGH's wrongful conduct, I told her to "[s]ettle down," which LEIGH claimed was further cause for withdrawal. After further back-and-forth

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

along those lines, LEIGH claimed to be withdrawing from representing me "for cause" around 10:09:50 AM Less than one hour had passed between my expression of concern about fees and the LLG DEFENDANTS' withdrawal.

 c. Incongruously, LEIGH continued to communicate with me about the DIABLO DEFENDANTS fraudulent requests for restraining orders against me even after she had withdrawn. I had to tell LEIGH, "***DO NOT CONTACT ME AGAIN***." Then LEIGH repeatedly contacted me again anyway—both indirectly and directly. Shortly thereafter at my request, PARENT-1 told LEIGH not to contact me "directly" again. In reply, LEIGH falsely stated that she had told me to stop emailing her altogether *before* I had told her not to contact me again.

 d. Meanwhile, DEFENDANTS, through LEIGH, continued to exert maximum wrongful pressure on PARENT-1 to coerce me to comply with their demands.

181. On 12/13/2018, PARENT-1 again instructed LEIGH to stop wrongfully threatening her so LEIGH withdrew from representing PARENT-1 as well. LEIGH did not allow any time for PARENT-1 and I to seek lawyers to replace the LLG DEFENDANTS. Instead, LEIGH informed the DIABLO & F3 DEFENDANTS of her withdrawal on 12/13/2018 slightly more than an hour after informing PARENT-1 of it. Less than one minute later, LEIGH emailed PARENT-1 about her alleged basis for withdrawing. LEIGH stated many opinions and few facts therein. Almost all of her factual statements were false when she made them, and she knew that then. I do not know whether other of her factual statements were true or false when she made them. LEIGH made at least one factual statement that was true when she made it. Only LEIGH's factual statements that were false when she made them follow:

 a. "[Y]ou and [WILSON] (prior represented by me as well) are not taking my advice." *We took all of LEIGH's legal advice. No statement LEIGH made about any matter beyond the scope of the LLG DEFENDANTS' services was not "advice" in any legal sense.*

 b. "[WILSON]… is impeding my ability to represent you and [M.C. and C.C.]." *PARENT-1 and PARENT-2 determined the best interests of M.C. and C.C. at all material times*

///
06/22/2020   **Page 90 of 554**
**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

*relevant to the LLG DEFENDANTS' ostensible representation, and they approved every relevant act I did before I did it. No conflict existed between us.*

   c.  "[Y]ou have now indicated that [WILSON] will deal with... the settlement [of the special education dispute]." *PARENT-1 did not state or imply that.*

   d.  "[WILSON] authorized you to have final say [about whether and on which terms to settle the DIABLO & F3 DEFENDANTS' fraudulent requests for restraining orders against him]." *We did not state or imply to the LLG DEFENDANTS that I had authorized PARENT-1 to have such final say. We had previously denied that assertion by LEIGH over and over.*

   e.  "[H]aving to have asked [WILSON] to stop sending harassing emails is cause for [withdrawal]." *I did not send any emails to LEIGH that were harassing in any legal sense, **and actually had to demand that LEIGH stop contacting me after she withdrew**. LEIGH did not stop contacting me immediately upon that demand of mine.*

   f.  "[The LLG DEFENDANTS] will notify [the DIABLO & F3 DEFENDANTS of the withdrawal]." *They already had.*

PARENT-1 asked LEIGH to confirm one of her new assertions, which was that our special education claims had low value. Then PARENT-1 and made a record of her disagreement with LEIGH's foregoing statements.

182.  On 12/16/2018 around 7:36:46 PM, I emailed COMBS, ECKSTEIN, ESTES, and HUNTOON a copy of a CTCA claim with my unfiled federal complaint attached thereto. It was predominantly based on the foregoing extortionate acts (see also, e.g., 19-cv-03441-MMC) by DIABLO, F3, AALRR, LLG, COMBS, ESTES, HUNTOON, LEIGH, and TROUTMAN. The next day, I submitted it to DIABLO via U.S. Mail. MEYER, COOKSEY, and possibly others received it.

183.  On 12/17/2018, PARENT-1 asked LEIGH to send us our file, and LEIGH retaliated by fraudulently claiming to the DIABLO & F3 DEFENDANTS that the LLG DEFENDANTS had a fraudulent lien against us, which was for an unspecified amount up to that point.

///

///

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

184.   On 12/18/2018, PARENT-1 informed LEIGH that we disputed the LLG DEFENDANTS' fees and fraudulent lien, and made several more requests for information, which LEIGH quibbled with.

185.   On 12/19/2018, PARENT-1 offered to informally resolve that fee dispute, which offer the LLG DEFENDANTS immediately rejected.

186.   On 12/21/2018, the LLG DEFENDANTS emailed us an untimely notice of withdrawal, fraudulent bills, and links to incomplete versions of our files. That notice contained a fraudulent recalculation of the LLG DEFENDANTS' bills to roughly two-and-a-half times their original amounts in order to create a fraudulent lien of $12,025. We had already paid those bills that the LLG DEFENDANTS had sent to us before 12/21/2018. Several other issues were apparent to PARENT-1 and me by then:

    a.   LLG DEFENDANTS never even attempted to communicate with M.C. or C.C. before withdrawing because they clearly understood all along that M.C. and C.C. did not direct them so they were prohibited from analyzing conflicts of interest between PARENT-1 and me on one hand and M.C. and C.C. on the other, regardless of any alleged disagreements or other alleged conflicts of interests between them. (Cannon, Yael Zakai. *Who's the Boss?: The Need for Thoughtful Identification of the Client(s) in Special Education Cases.* American University Journal of Gender Social Policy and Law 20, no. 1 (2011): 1-79 (*Who's the Boss?*), 46, fn. 210.) In other words, there were no such conflicts, but it would not have mattered if there were.

    b.   LLG DEFENDANTS had recently alleged two pretextual conflicts of interest: (1) "[Our unspecified] conduct"; and (2) "[PARENT-1]'s desire to serve her minor children and WILSON's self-serving interest to protect himself in a separate legal action"] (**RESPONDENTS' 6/4/2019 SUBPOENAS**, at p. 2.) LLG DEFENDANTS' first recently alleged conflict of interest is too vague to address. The circumstances that would have caused the second recently alleged conflict of interest—separate legal actions involving me—existed at the point LLG DEFENDANTS' joint ostensible representation

///
06/22/2020

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

of PARENT-1 and me began, and LLG DEFENDANTS knew or should have known about those circumstances by then.

c. "Under a standard conflicts analysis, the ethical propriety of joint representation of a parent, multiple parents or caregivers, and/or a child should be determined prior to the initiation of the representation by identification of any potentially impermissible conflicts, a determination of whether any such conflicts are waivable, and the procurement of voluntary consent after disclosure for those conflicts that are waivable." (*Who's the Boss?*, *supra*, p. 48.) LLG DEFENDANTS did not determine that the separate legal actions involving me created a non-waivable conflict of interest between PARENT-1 and me, and did not therefore decline joint representation of us. **LLG DEFENDANTS' 8/21/2018 FACIALLY VOID RETAINER AGREEMENT** did not disclose that the separate sham proceedings involving me created a waivable conflict of interest between PARENT-1 and me.

> [A] lawyer should not represent a client if the representation involves a concurrent conflict of interest, which happens if the representation of one client is directly adverse to another client or there is a significant risk that the representation of a client will be materially limited by the lawyer's responsibilities to another client. The lawyer can proceed with the representation of a client, despite a concurrent conflict of interest, if the lawyer reasonably believes that she will be able to provide competent and diligent representation to each affected client, the representation is not prohibited by law, the representation does not involve the assertion of a claim by one client against another represented by the lawyer in the same proceeding before a tribunal, and each affected client gives written informed consent.

(*Id.*) Even dubiously assuming solely for purposes of this issue that LLG DEFENDANTS did not initially know about the separate sham proceedings involving me, the fact remains that they did not immediately declare a concurrent conflict of interest and withdraw when they have recently said they first learned of those sham proceedings or PARENT-1's and my unspecified alleged conduct. Instead, they continued to misrepresent us for several months thereafter. That is because they knew the following facts: our expressed interests

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

were not directly adverse to each other; they were not guardians ad litem (*Id.* p. 39) [a guardian ad litem is charged with advocating for the best interests of the child while other lawyers for a child are charged with advocating for the child's expressed interests]); there was not a significant risk that the limited legal services that they were supposed to provide individually or collectively to us would have been materially limited by their responsibilities to any of us; and even if a concurrent conflict of interest had existed, then they demonstrated for months their collective belief that they were able to continue providing limited legal services to each affected client (regardless of whether they believed they were providing their services competently and diligently), that their limited legal services were not prohibited by law, or that their limited legal services did not involve the assertion of a claim by one of us against another represented by them in the same proceeding before a tribunal. They further demonstrated that no concurrent conflict of interest had arisen because they never sought written informed consent from any of us regarding such concurrent conflict.

d. They did not indicate on or before 8/21/2018 any suspicion that any of the potential implications of *Winkelman* were applicable to our situation. (*Id.* p. 49-50.)

e. "Where the attorney jointly represents the parent and child, the retainer agreement should contain an explanation regarding any potential conflict of interest, including the possibility that they might disagree on the objectives of the representation." (*Id.* p. 50.) **LLG DEFENDANTS' 8/21/2018 FACIALLY VOID RETAINER AGREEMENT** contained no explanation about the possibility that we might disagree with each other on the objectives of the representation.

f. "Due to the difficulty of securing legal representation in special education matters, withdrawal often leaves the family with no representation whatsoever. In determining whether to jointly represent [multiple] parties, the lawyer should keep in mind that the family members may not be able to secure alternate representation if the common representation fails." (*Id.* p. 51.) As shown by the way LLG DEFENDANTS withdrew without notice and then fabricated a large lien, they either intentionally left us with no

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

representation whatsoever or recklessly disregarded the high likelihood that we would suffer that fate.

g. LLG, DIABLO, & F3 DEFENDANTS had found a common enemy in me, exploited their shared interest in harming me as described herein, and then LLG DEFENDANTS fabricated the pretext of conflicts of interest to hide their true motives for their withdrawal.

187. On or around 12/21/2018, I found sample retainer agreements, including clauses and disclosure forms, on The State Bar website that contain minimum required language (e.g., "This sample written fee agreement form is intended to satisfy the basic requirements of Business & Professions Code section 6148..." **STATE BAR FORM NO. 1**, fn. 1). Upon a cursory review of those dox, PARENT-1 and I noticed several glaring and relevant deficiencies in **THE LLG DEFENDANTS' 8/21/2018 FACIALLY VOID RETAINER AGREEMENT**, which follow:

a. **Required Language That Is Absent**: (i) Bills (**LLG DEFENDANTS' 8/21/2018 FACIALLY VOID RETAINER AGREEMENT (LLG)** ¶ 5 vs. **STATE BAR FORM NO. 1 (BAR)** ¶ 7); (ii) Client Approval Necessary for Settlement (**LLG** ¶ 6 vs. **BAR** ¶ 8); (iii) Discharge and Withdrawal (**LLG** none vs. **BAR** ¶ 9); (iv) Client File: (**LLG** ¶ 14 vs. **BAR** ¶ 10); (v) Joint/Multiple Client Disclosure and Consent (**LLG** ¶ 27 vs. **STATE BAR JOINT/MULTIPLE CLIENT DISCLOSURE AND CONSENT FORM**).

b. **Prohibited Language That Is Present**: (i) Discharge and Withdrawal (**LLG** ¶ 14 vs. **Exhibit 24** at **BAR** ¶ 9-10); (ii) Client File (**LLG** ¶ 14 vs. **BAR** ¶ 10).

We began drafting our **REQUEST FOR FEE ARBITRATION** under the Mandatory Fee Arbitration Act (MFAA) on or around that same day and completed it on 12/23/2018. We filed it on 1/2/2019 because the Bar Association of San Francisco (BASF) was closed during the holidays.

188. On 12/13/2018 following that abrupt withdrawal by the LLG DEFENDANTS, PARENT-1 and I resumed negotiating directly with the DIABLO & F3 DEFENDANTS.

189. On 12/19/2018, we demanded that the DIABLO & F3 DEFENDANTS stop wrongfully threatening us. They did not stop wrongfully threatening us. Instead, they started wrongfully threatening us through people other than the LLG DEFENDANTS. Around that same time, we limited

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

the settlement negotiations with them to the special education dispute and limited our proposed release to our special education claims.

190. On 1/7/2019:

    a. The CCC COURT appointed DALY ostensibly to assist me in the DIABLO, F3, CCCOE, PHPD & CCCDAO DEFENDANTS' fraudulent misdemeanor case against me.

    b. I sent an email with some attachments to DALY in which I informed him of my objectives, asked him to confirm that he has no conflicts of interest, asked him to move to have the fraudulent case dismissed ***before my arraignment***, and asked him to meet with me.

    c. For the next approximately 66 days, DALY did nothing to assist me in DIABLO, F3, CCCOE, PHPD & CCCDAO DEFENDANTS' fraudulent misdemeanor case against me. He did not communicate with me at all.

191. On 1/8/2019:

    a. During the sham proceedings in CCC COURT Case Nos. MSN18-1101 and MSN18-1176, DIABLO stipulated and the Court ordered that:

        i. There would be no minimum notice requirement for witnesses employed by DIABLO to attend those sham proceedings.

        ii. I could serve notice for those witnesses upon some of DIABLO's lawyers at their published email addresses.

    b. Later, I served upon some of DIABLO's lawyers at their published email addresses written notice requesting COOKSEY, MEYER, MASON, DURKEE, LAWRENCE, and MAYO to attend those sham proceedings as witnesses in Department 39 of TAYLOR beginning on the mornings of 1/14/2019, 1/15/2019, and 1/18/2019.

192. On or around 1/11/2019:

    a. I was at TAYLOR engaged in negotiations to settle the special education aspects of our dispute with DIABLO that were being led by the Honorable Susanne Michele Fenstermacher, a Judge on the CCC COURT bench, at my request. During a conversation among ESTES, AGHILY, PARENT-1, and me in the public area on the third floor

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

outside Judge Fenstermacher's courtroom, PARENT-1 and I clearly expressed our intent to ensure that no money was paid to the LLG DEFENDANTS as part of any settlement agreement that included us. ESTES and AGHILY agreed to that term. PARENT-1 and I continued to express that intent of ours while ESTES, HUNTOON, AGHILY and other DIABLO DEFENDANTS were drafting various versions of written settlement agreements during the months that followed. None of them ever abrogated that verbal agreement of ours with ESTES and AGHILY.

b. Consistent with Petitioners' repeated and emphatic instructions to LLG DEFENDANTS to get M.C. and C.C. back to school full-time immediately and foremostly while preserving our other causes of action against DIABLO, Judge Fenstermacher repeatedly instructed DIABLO to do the same. These instructions directly addressed the necessary separation of the education and school matters from the sham proceedings, just as Petitioners had said all along. Judge Fenstermacher insisted M.C. and C.C. should be back to school ***before*** negotiations of any other issues took place. PARENT-1 and I had repeatedly instructed LLG DEFENDANTS in almost those exact words. Their wrongdoing, including but not limited to their continuous refusal to prioritize resolution of the special education dispute separate from DIABLO & F3 DEFENDANTS' sham proceedings against me as instructed by us and echoed by Judge Fenstermacher, their continuous refusal to zealously advocate for us, and their vindictive and malicious abandonment of us long before their withdrawal, deprived me of my right to ensure that M.C. and C.C. received free appropriate public education through the entire 2018-2019 academic year.

193. On the mornings of 1/14/2019, 1/15/2019, and 1/18/2019, COOKSEY, MEYER, MASON, DURKEE, LAWRENCE, and MAYO failed to attend those sham proceedings as witnesses in Department 39 of TAYLOR. Because of their repeated failures to appear, I was compelled first to agree to delay trial on 1/14/2019 and 1/15/2019, and then to proceed with trial in an unprepared manner on 1/18/2019. During the sham proceedings that day, DIABLO & F3 included events that occurred then and there as evidence of ongoing conduct by me in support of the relief they sought, thereby making

06/22/2020                                                                    **Page 97 of 554**

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

everyone there, including WEIL, witnesses. As a direct result, those sham proceedings, which began on or around 7/3/2018, needed to be restarted. I estimated that I had spent approximately 2,400 hours working on those fraudulent cases by then. WEIL did not restart them.

194. On 1/23/2019, the LLG DEFENDANTS claimed for the first time that:

a. They "[n]ever agree[d] orally or in writing to [provide a written report of Petitioners' causes of action, including the strength and estimated value of each, or to timely file CTCA forms with the appropriate authorities to preserve Petitioners' state causes of action.]." (**LLG DEFENDANTS' 1/23/2019 MFA BRIEF**, pp. 30:25-31:3.) As shown above, they had so agreed. For further evidence of that fact, on 12/9/2018 when PARENT-1 asked LEIGH whether she had filed those CTCA forms, LEIGH did not reply with anything like: "We never agreed to do that." It evidently took LEIGH about six-and-a-half weeks to concoct the foregoing lie.

b. "At no time prior to the execution of [LLG DEFENDANTS'] Retainer Agreement did [WILSON] ever disclose to Respondents that he was representing himself against two pending civil harassment restraining order actions filed against him by [DIABLO] and some of its employees, or that he had been previously sanctioned by the Eighth Judicial Circuit of Florida [(Florida Court)]for, *inter alia*, 'hostile and disruptive behavior' towards Court staff." (*Id.* p. 4:13-18.) Since 8/7/2010, the "sanction" LLG DEFENDANTS referenced above has been easily found by Googling my full name. It is the first search result. The Florida Court failed to provide me notice or opportunity to be heard regarding the allegations therein, which are fraudulent, before or after it fabricated that document. Several months thereafter, the Florida Court made it searchable as a favor for my former spouse and her lawyer. Like a Superior Court of Contra Costa (SCCC) document that was fabricated under identical circumstances years later, it is facially void. But that fact has never mattered to the Florida Court because the primary purpose for it is to defame me, which purpose it has achieved for more than a decade. LLG DEFENDANTS used it for the same primary purpose in the fee arbitration—trying to make the arbitrator hate me and therefore deny relief to PARENT-1 and me regardless of

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

the true and relevant facts and the law. As shown above, PARENT-1 and/or I disclosed to LLG DEFENDANTS the foregoing information verbally and/or through dox up to five days before LLG DEFENDANTS fully executed their retainer agreement. For further evidence of that fact, LLG DEFENDANTS admitted that they were aware of the fraudulent restraining order proceedings by 9/13/2018, but they did not withdraw around that time, and did not complain at any time before their withdrawal 13 weeks later on 12/13/2018—or before they filed their fee arbitration brief almost 19 weeks later—that we had allegedly failed to disclose that information before LLG DEFENDANTS had executed their retainer agreement. Given that PARENT-1 first disclosed the foregoing information about the CCC COURT to LEIGH on 8/16/2018 and that the foregoing information about the Florida Court was available to LLG DEFENDANTS as soon as LEIGH learned of my existence on 8/15/2018 or 8/16/2018, it evidently took LEIGH about 23 weeks to concoct the foregoing lie.

195. LLG DEFENDANTS' statements regarding their egregious and repeated extortion are misleading. For example, LLG DEFENDANTS said they "never represented [me]… individually…" (*Id.*, p. 32:8-9.) In fact, LLG DEFENDANTS previously claimed to represent me individually, as their retainer agreement shows: "IT IS HEREBY AGREED by and between [LLG], Attorney at law ("Attorney") and [PARENT-1] and [***WILSON***] ("Clients"), that Clients do employ and engage Attorney to represent Clients ***in connection with document review, review of potential civil claims and representation in special education matter***, on behalf of Clients' minor children, [M.C.] and [C.C.], and involving [DIABLO]." (**LLG DEFENDANTS' 8/21/2018 FACIALLY VOID RETAINER AGREEMENT, ¶ 1**, emphasis and appropriate adaptations added.) LLG DEFENDANTS withdrew from ostensibly representing me individually because they always understood that they ostensibly represented me individually. LLG DEFENDANTS and DIABLO egregiously and repeatedly extorted PARENT-1, M.C., C.C., and me both during and after the ostensible representation. PARENT-1 and I have stated that LLG DEFENDANTS were supposed to be providing case evaluation and related services for us. For those purposes, we instructed them to either assume—or review the evidence we had provided to them that showed that the DIABLO DEFENDANTS fraudulently brought the sham

**COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND**

restraining order proceedings and fraudulently alleged wrongdoing by PARENT-1, M.C., C.C., and me as means to retaliate against us for credibly complaining about misconduct by REID, to distract from their other previous wrongdoing, to further stall our attempts to petition the government to remedy the harm LLG DEFENDANTS had caused, to reduce the value of our causes of action against them, to stigmatize us, and to otherwise gain advantages in the civil dispute involving us. That is what required LLG DEFENDANTS to protect us from DIABLO's egregious and repeated extortion. Instead, they corruptly conspired with DIABLO to perpetrate it.

196. LLG DEFENDANTS asserted that neither PARENT-1 nor I disputed any fees before LLG DEFENDANTS withdrew (**LLG DEFENDANTS' 1/23/2019 MFA BRIEF**, pp. 28:7-29:10), but I had disputed all fees before then.

197. LLG DEFENDANTS bragged about their "over 20 years of collective litigation experience" (*Id.*, p. 33:8-9), but they failed to review the dox PARENT-1 and I uploaded to the Shared Folder on 8/21/2018 or to perform the case evaluation as they had agreed to do. LEIGH asked me almost no questions about those dox while she ostensibly represented me, so she gave me almost no opportunity to share what I knew about the events those dox described.

198. On 3/14/2019:

    a. Just after 8:00 AM, I submitted **MY 3/12/2019 REQUEST FOR A *MARDSEN* SUBSTITUTION OF APPOINTED DEFENSE COUNSEL (MY 3/12/2019 *MARDSEN* REQUEST)** and **PROPOSED ORDER** to a clerk for filing/lodging against DALY in the DIABLO, F3, CCCOE, PHPD, & CCCDAO DEFENDANTS' fraudulent misdemeanor prosecution against me, and therein asked the court for an *in camera* or otherwise closed *Marsden* hearing to exclude the CCCDAO in order to protect my privilege not to be called as a witness and not to testify (Evid. Code § 930), my privilege against self-incrimination (Evid. Code § 940), my lawyer-client privilege (Evid. Code § 954) and the lawyer work product privilege (see, e.g., Pen. Code § 1054.6). I had been extremely busy in the underlying fraudulent civil case working to prove that DIABLO, F3, & OTHER DEFENDANTS had perpetrated multiple crimes, including but not limited to perjury, subornation of perjury, destruction of evidence, witness intimidation,

COMPLAINT FOR INJUNCTIVE RELIEF, SETTING ASIDE ORDERS, DAMAGES, AND